# EXHIBIT 1

E-FILED
CIVIL DIVISION
10/27/2023 15:36:26

CL-2023-0015318

John T. Frey
CLERK, CIRCUIT COURT
FAIRFAX, VA

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

| | |
|---|---|
| **SURGE TRANSPORTATION, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. _____** |
| ) | |
| **DIRECT CONNECT LOGISTIX,** ) | |
| **INC.,** ) | |
| <u>Serve</u>: **Kelly Gee** ) | |
| **Secretary of the Commonwealth** ) | |
| **P.O. Box 1475** ) | |
| **Richmond, VA 23218** ) | |
| ) | |
| **and** ) | |
| ) | |
| **MATTHEW R. MAY** ) | |
| **5379 Glenview Drive** ) | |
| **Clarence, New York 14031** ) | |
| ) | |
| **Defendants.** ) | |

### COMPLAINT FOR PRELIMINARY
### AND PERMANENT INJUNCTIVE AND OTHER RELIEF

Plaintiff Surge Transportation, Inc. ("Surge Transportation" or "Plaintiff"), by and through

counsel, brings this complaint for preliminary and permanent injunctive and other relief against

Defendants Direct Connect Logistix, Inc. ("Direct Connect") and Matthew R. May ("May," and

together with Direct Connect, "Defendants") and in support thereof states as follows:

### INTRODUCTION

1.     This action arises from the willful and deliberate breaches by Defendants of their

non-solicitation, non-competition, non-disclosure obligations and non-disparagement obligations

to Surge Transportation. Despite these agreements, Defendants have successfully solicited and

1

services at least two Surge Transportation customers. Given Defendants' intentional wrongful conduct as described herein and their refusal to acknowledge the enforceability of their promises, Surge Transportation fears that Defendants may have solicited other of its customers and may also be disparaging Plaintiff to its customers and in the market place. Unless Defendants are immediately enjoined by this Court on an interim basis to preserve the status quo, Defendants will continue to plunder Surge Transportation's customers, misappropriate its confidential information and interfere with its customer relations. Absent immediate relief from this Court, Surge Transportation's efforts to reorganize its business affairs under the United States Bankruptcy Code, as well as its viability as a going concern, will continue to suffer and Plaintiff will be immediately and irreparably injured.

## PARTIES, JURISDICTION AND VENUE

2.      Plaintiff Surge Transportation is a Florida corporation with its principal place of business at 7077 Bonneval Road, Jacksonville, Florida. Surge also conducts business out of its office in Ashburn, Virginia.

3.      Surge Transportation provides over-land, freight-brokerage services to its customers nationwide.

4.      On July 24, 2023, Surge Transportation filed a petition for reorganization under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq*. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division, commencing Case No. 3:23-bk-1712-JAB. Surge Transportation continues to operate as a debtor-in-possession pursuant to section 1107 of the Bankruptcy Code and is diligently pursuing a reorganization of its business affairs.

5.     Defendant Direct Connect is an Indiana corporation that provides over-land, freight brokerage services and is a direct competitor of Surge Transportation.

6.     Defendant May is an adult citizen and resident of the State of New York at the above address in Clarence, New York. Until he voluntarily resigned on August 12, 2023, May was Surge Transportation's Vice President of Business Development.

7.     This Court has personal jurisdiction over Defendants because each has minimum contacts with Virginia and because, under Virginia's Long-Arm statute, Va. Code § 8.01-328.1, each caused tortious injury to Surge Transportation in Virginia arising out of an act or omission by Defendants. As an additional basis for jurisdiction, Defendant May has consented to exclusive jurisdiction within the state courts of Fairfax County, Virginia under section 14.8 of the May Employment Agreement (as that term is defined in paragraph 10 herein).

8.     Venue is properly laid in this Court pursuant to Va. Code § 8.01-262 because Defendant May has consented to venue within this Court and because the causes of action alleged in the Complaint arose in Fairfax County.

## FACTUAL ALLEGATIONS

A.     **Surge Transportation is formed by Omar Singh as a start-up company in 2016 to provide over-land fright transportation brokerage services to his legacy direct trucking customers.**

9.     Omar Singh is the founder and president of Surge Transportation. Before incorporating Surge Transportation in April of 2016,[1] Singh had owned a small company which itself owned trucks and which provided freight transportation services directly to its clients. In 2010, Singh liquidated his trucking company but maintained his customer relationships in the

---

[1] Surge Transportation was originally formed as a Virginia corporation, but was domesticated as a Florida corporation in 2019.

freight-transportation industry, first as a commissioned sales agent for other trucking companies, and later as a sole-proprietor providing brokerage services to his customers to locate carriers with capacity to transport freight. Declaration of Omar Singh ("Singh Decl."), ¶¶ 2-4, attached hereto as **Exhibit 1**.

10.     Initially, Surge Transportation relied on Singh's long-time customer relationships as the core of its revenue-producing business. Due, in part, to implementation of a proprietary marketing and pricing tool developed by Singh and which gave the company a significant competitive advantage (the "Proprietary Strategy and Pricing Tool"), the company had great success and grew rapidly. Singh Decl. ¶ 5.

**B.      Surge Transportation shares its Confidential Information with Defendant May.**

11.     On or shortly after July 25, 2018, Surge Transportation hired defendant May as Vice President of Business Development. Surge Transportation intended to and did involve May in meeting and working with nearly every existing customer and every potential new customer of the company. Further, it intended to and did share with him the company's customer lists, prospects, its Proprietary Strategy and Pricing Tool and its other proprietary and confidential information. Other than Singh and his wife, Tadina Ross, May is the only person at Surge who has had access to the company's Proprietary Strategy and Pricing Tool. Singh Decl. ¶ 6.

12.     Accordingly, to protect the company's interests, Surge Transportation and May entered into an employment agreement (the "May Employment Agreement"). Singh Decl. ¶ 7; *see* Exhibit A to Singh Decl.

13.     Pursuant to section 8(c) of the May Employment Agreement, May agreed that "for a period of two years from the date of Employee's termination of employment, for any reason, Employee agrees not to become employed by, solicit business from or with, service, or work for

4

another in the service of, any Business Account of Surge Transportation, with respect to providing Competitive Services. Competitive Services shall mean trucking/freight brokerage services." *See* Singh Decl., Ex. A, § 8(c).

14.     Under Section 8(d) of the May Employment Agreement, "Business Account" is defined to mean both existing customers and potential customers who had contacted Surge Transportation, had been referred to Surge Transportation, or had been solicited by Surge Transportation during the six-month period prior to the date of the Employee's termination. *See* Singh Decl., Ex. 1, § 8(d).

15.     Throughout his tenure as Vice President of Business Development at Surge Transportation, together with Singh, May was intimately involved in marketing and sales. He and Singh were present at every conference Surge Transportation sponsored or attended. May was often featured by Surge Transportation as the face of the company for sales events and was responsible for, among other things, "closing the deal" to sign on new customers, obtaining additional work from existing customers and handling the day-to-day relationship with customers. Singh Decl. ¶ 10.

16.     May was also introduced to Surge Transportation's legacy customers and relationships that were established by Singh between 2003 and 2018, and he was encouraged to develop relationships with these individuals. Singh Decl. ¶ 11.

17.     From the time he was hired by Surge Transportation in July 2018 until early in 2020, May participated in approximately 250 in-person customer sales visits throughout the country. After COVID-19 restrictions eliminated in-person business development meetings, May conducted sales calls via Zoom. Singh Decl. ¶ 12.

**C.** **Surge Transportation shares its Confidential Information with Non-Party John Mooney.**

18. On or about December 31, 2019, Surge Transportation hired non-party John Mooney ("Mooney") as Surge Transportation's Executive Vice President. As with May, Mooney was provided access to Surge Transportation's customer lists, prospects and other proprietary and confidential information. To protect this information and the company's interests, Surge Transportation and Mooney entered into an employment agreement (the "Mooney Employment Agreement"). Singh Decl. ¶ 13; *see* Exhibit B to the Singh Decl.

19. In his role as Executive Vice President, Mooney was responsible for new customer sales, executive talent recruitment, day-to-day operations and personnel management. Singh Decl. ¶ 16.

**D.** **Surge Transportation shares its Confidential Information with Defendant Direct Connect.**

20. Beginning in about May of 2021, Surge Transportation hired an investment banker for the purposes, among other things, of allowing Surge Transportation to evaluate the potential sale of the company. Singh Decl. ¶ 17.

21. Sometime toward the end of 2021, Mooney, knowing of Singh's interest in selling the company, introduced Singh to Richard Piontek, Chief Executive Officer of Defendant Direct Connect which was and is Surge Transportation's direct competitor . Mooney represented that he had a prior relationship with Piontek and that Direct Connect was interested in a possible acquisition of Surge Transportation. Singh Decl. ¶ 18.

22. In connection with Direct Connect's interest in acquiring Surge Transportation, Direct Connect and Surge Transportation entered into a Mutual Confidentiality Agreement dated

as of November 10, 2021 (the "Direct Connect MCA"). Singh Decl. ¶ 19; *see* Exhibit C to Singh Decl.

23.     Under this agreement, Surge Transportation intended to, and did, provide its confidential information (including information about the company's clients and employees) to Direct Connect in furtherance of discussions about a potential future sale of Surge Transportation to Direct Connect. Singh Decl. ¶ 19.

24.     Under Section 3 of the Direct Connect MCA, Direct Connect agreed to keep Surge Transportation's Confidential Information (as defined) confidential. Singh Decl., Ex. C § 3.

25.     Section 4 of the Direct Connect MCA prohibits Direct Connect from directly or indirectly contacting or soliciting Surge Transportation's customers, clients, suppliers, distributors, sales representatives, employees and other business relationships except as in the ordinary course of business. Singh Decl., Ex. C § 4.

26.     Direct Connect also agreed in Section 5 not to directly or indirectly engage, employ, solicit or contact with a view to the engagement or employment of, any of Surge Transportation's employees, directors, officers, managers, or consultants. Singh Decl., Ex. C § 5.

**E.     Due to changes in the freight transportation brokerage industry, Surge Transportation files for reorganization under the Bankruptcy Code.**

27.     Due to fundamental changes in the freight transportation brokerage industry, Singh realized earlier this year that Surge Transportation needed to make changes in its business plan and operations. Singh Decl. ¶ 23.

28.     As mentioned above, on July 24, 2023, Surge Transportation filed a petition for reorganization under chapter 11 of the Bankruptcy Code and continues to operate as a debtor-in-possession. Singh Decl. ¶ 23.

29.     At or shortly after the bankruptcy filing, Mooney told Singh he intended to retire. Singh Decl. ¶ 25.

30.     At about the same time, May told Singh that if Surge Transportation was unable to reorganize, he intended to leave the over-land freight brokerage industry altogether and try something new. Singh Decl. ¶ 26.

31.     Surge Transportation is a viable entity with substantial market value and is diligently pursuing efforts to reorganize its affairs and emerge from bankruptcy. Singh Decl. ¶ 24.

**F.     Direct Connect and May solicit Surge Transportation client USPS.**

32.     On August 12, 2023, May voluntarily resigned from Surge Transportation. Until recently, as described more fully below, Surge Transportation was not aware that May was working for Surge Transportation competitor, Direct Connect. Singh Decl. ¶ 27.

33.     On September 2, 2023, Mooney voluntarily resigned from Surge Transportation. Until recently, as described more fully below, Surge Transportation was not aware that Mooney was working for Surge Transportation competitor, Direct Connect. Singh Decl. ¶ 28.

34.     On September 14, 2023, Surge Transportation learned that it had received a copy of email correspondence between May (now as an employee of Surge Transportation competitor, Direct Connect), and Jamesetta Brown, of the United States Postal Service (USPS Transportation Strategy, Contractor). Singh Decl. ¶ 29; *see* Exhibit D to Singh Decl. This email confirms that May has successfully solicited the United States Postal Service ("USPS") as a new customer of Direct Connect. *Id.*

35.     USPS is one of Surge Transportation's existing customers that was recruited by May in his capacity as Surge Transportation's Vice President of Business Development. Singh Decl. ¶ 30.

8

36.     This email also shows that it was sent to Direct Connect president Greg Humrichouser and former Surge Transportation, and current Direct Connect, employee Mooney (addressed to Mooney, presumably by mistake, at Mooney's old Surge Transportation email address). Singh Decl. ¶ 31; *see* Singh Decl., Ex. D.

37.     Counsel for Surge Transportation subsequently sent cease and desist letters to Direct Connect, May, and Mooney. Singh Decl. ¶ 32; *see* Exhibits E, F, and G to Singh Decl.

38.     By letter dated October 2, 2023, counsel for Defendants acknowledged that Defendants had solicited and serviced Surge Transportation customers USPS and Dollar General but denied that May and Mooney were bound by their employment agreements with Surge Transportation. Although counsel purported to represent Direct Connect, he did not acknowledge the cease and desist letter, Singh Decl. ¶ 33.

39.     In a follow up letter dated October 13, 2023, counsel for Defendants alleged that Direct Connect had not previously seen the cease and desist letter to it, but summarily denied that it was bound by the covenants of the Direct Connect MCA, Singh Decl. ¶ 34.

40.     Despite demand, Direct Connect has refused to acknowledge to Surge Transportation that it will discontinue its contract with USPS or Dollar General in violation of the Direct Connect MCA. Nor has Direct Connect acknowledged that it has or will terminate the employment of May or Mooney nor has it acknowledged that it will refrain from further violations of the Direct Connect MCA or from interference with the Employment Agreements between Surge Transportation and each of Mooney and May. Singh Decl. ¶ 34.

41.     Despite demand, May has refused to acknowledged that he is bound by the promises of his Employment Agreement and refused to refrain from further violations of the Employment Agreement or interference with the Direct Connect MCA. Singh Decl. ¶ 34.

42.     As a result of the misappropriation of Surge Transportation customers by Direct Connect through the efforts of and with the knowledge and cooperation of May and Direct Connect president Greg Humrichouser, Surge Transportation is in immediate danger of irreparable injury. Singh Decl. ¶ 35.

43.     As a former employee and executives of Surge Transportation, May has critically important information about Surge Transportation which each has promised to keep confidential. May has agreed not work for Surge Transportation's competitors to service Surge Transportation's customers. May has intentionally violated each of these promises. Singh Decl. ¶ 36.

44.     Under the Direct Connect MCA, Direct Connect promised to keep Surge Transportation's Confidential Information confidential, refrain from soliciting or servicing Surge Transportation's clients and refrain from hiring Surge Transportation's employees. Direct Connect has intentionally violated each of these promises. Singh Decl. ¶ 37.

45.     The promises made by May and Direct Connect to Surge Transportation were and still are crucial to preserving the value of Surge Transportation's assets. Singh Decl. ¶ 38.

46.     The potential loss of and interference with Surge Transportation's customer relationship s is substantial and, because of the intimate knowledge that May, Mooney and Direct Connect have of Surge Transportation's operations, customer lists and pricing, Surge Transportation anticipates that such conduct, if not enjoined by this Court, will strip Surge Transportation of its most valuable assets and prevent it from successfully reorganizing its operations under the United States Bankruptcy Code. Singh Decl. ¶ 39.

47.     If Defendants are not enjoined from further violations of their non-solicitation, non-competition, non-disparagement and non-disclosure obligations to Surge Transportation,

Defendants' conduct, as described herein, will continue to cause Plaintiff immediate and irreparable injury. Singh Decl. ¶ 39.

### COUNT I: BREACH OF CONTRACT
### (against Defendant Direct Connect)

48.     Surge Transportation repeats and re-alleges paragraphs 1 through 47 as if fully set forth herein.

49.     The Direct Connect MCA is a valid contract under which Direct Connect and Surge Transportation have agreed to certain rights and obligations.

50.     Surge Transportation has performed each of the duties and obligations required of Surge Transportation under the Direct Connect MCA.

51.     Despite demand, Direct Connect has continued to employ May and Mooney.

52.     On information and belief, despite demand, Direct Connect has failed to terminate its relationship with USPS or Dollar General both of which relationships it obtained through the prohibited hiring of May and Mooney.

53.     Direct Connect's continued employment of May and Mooney constitutes a material breach of the Direct Connect MCA.

54.     Direct Connect's solicitation of Surge Transportation's customers and its failure to terminate its relationships with USPS and Dollar General constitute material breaches of the Direct Connect MCA.

55.     As a direct and proximate cause of Direct Connect's material breaches, Surge Transportation has sustained and will sustain irreparable injury to Surge Transportation's reputation, goodwill, and business for which Surge Transportation has no adequate remedy at law.

11

## COUNT II: BREACH OF CONTRACT
### (against Defendant May)

56.     Surge Transportation repeats and re-alleges paragraphs 1 through 55 as if fully set forth herein.

57.     The May Employment Agreement is a valid contract under which May and Surge Transportation have agreed to certain rights and obligations.

58.     As consideration for the May Employment Agreement, Surge Transportation provided May with, among other things, employment, continued employment, training and support, and compensation.

59.     Surge Transportation has performed each of the duties and obligations required of Surge Transportation under the May Employment Agreement

60.     May's solicitation of Surge Transportation's customers on behalf of Direct Connect, including USPS and Dollar General, constitutes a material breach of the May Employment Agreement.

61.     As a direct and proximate cause of May's material breaches, Surge Transportation has and will sustain irreparable injury to Surge Transportation's reputation, goodwill, and business for which Surge Transportation has no adequate remedy at law, which May affirmatively agreed in the May Employment Agreement.

## COUNT IV: TORTIOUS INTERFERENCE
## WITH CONTRACTS
### (against Defendant Direct Connect)

62.     Surge Transportation repeats and re-alleges paragraphs 1 through 61 as if fully set forth herein.

63.     Surge Transportation had valid contractual relationships with May and Mooney under the May Employment Agreement and the Mooney Employment Agreement, respectively.

12

64.     As a result of the information it received under the Direct Connect MCA, Direct Connect knew that May and Mooney had Employment Agreements with Surge Transportation.

65.     Through the misappropriation and misuse of Surge Transportation's information, Direct Connect intentionally interfered with Surge Transportation's relationships with May and Mooney, causing each of May and Mooney to breach and/or terminate the May Employment Agreement and the Mooney Employment Agreement, respectively. Among other things, Direct Connect induced or caused May to solicit Surge Transportation customers, specifically including but not limited to, USPS and Dollar General, in violation of May's obligations under the May Employment Agreement and induced or caused May and Mooney to use or disclose Surge Transportation's confidential information to Direct Connect.

66.     As a direct and proximate cause of Direct Connect's actions, Surge Transportation has and will sustain irreparable harm and loss and has sustained damages, including but not limited to, the loss of valuable business relationships, loss of the opportunity to obtain and/or retain valuable business relationships, loss of profits and future profits, loss of reputation, and loss of goodwill.

67.     Unless enjoined and restrained by Order of this Court, Direct Connect's wrongful conduct will continue to cause severe and irreparable injury to Surge Transportation's reputation, goodwill, and business for which Surge Transportation has no adequate remedy at law.

### COUNT V: TORTIOUS INTERFERENCE
### WITH CONTRACTS
### (against Defendant May)

68.     Surge Transportation repeats and re-alleges paragraphs 1 through 67 as if fully set forth herein.

13

69.     Surge Transportation had valid contractual relationships with Direct Connect and Mooney under the Direct Connect MCA and the Mooney Employment Agreement, respectively.

70.     As a result of his employment with Surge Transportation, May had knowledge of Surge Transportation's contractual relationships with Direct Connect and Mooney.

71.     Through the misappropriation and misuse of Surge Transportation's information, May intentionally interfered with Surge Transportation's contractual relationship with Direct Connect, causing Direct Connect to breach the Direct Connect MCA by, among other things, inducing or causing Direct Connect to solicit or service Surge Transportation's clients and hire Surge Transportation's employees.

72.     May has also intentionally interfered with Surge Transportation's relationship with Mooney, causing Mooney to breach and terminate the Mooney Employment Agreement.

73.     As a direct and proximate cause of May's actions, Surge Transportation has and will sustain irreparable harm and loss and has sustained damages, including but not limited to, the loss of valuable business relationships, loss of the opportunity to obtain and/or retain valuable business relationships, loss of profits and future profits, loss of reputation, and loss of goodwill. Unless enjoined and restrained by Order of this Court, May's wrongful conduct will continue to cause severe and irreparable injury to Surge Transportation's reputation, goodwill, and business for which Surge Transportation has no adequate remedy at law.

### COUNT V: CRIMINAL BUSINESS CONSPIRACY
### (against Defendants Direct Connect and May)

74.     Surge Transportation repeats and re-alleges paragraphs 1 through73 as if fully set forth herein.

75.     In violation of Va. Code § 18.2-499, *et seq.*, Direct Connect and May, prior to his employment with Direct Connect, combined, associated, agreed, mutually undertook or concerted

14

together for the purposes of willfully and maliciously injuring Surge Transportation in its trade, business or profession. Among other things, they agreed and combined to injure Surge Transportation's business by: (1) breaching Direct Connect's contractual duties not to hire employees of Surge Transportation, (2) breaching May's contractual duties not to use or disclose Surge Transportation's confidential information; and (3) tortiously interfering with Surge Transportation's contractual relationship with Mooney. In doing so, Direct Connect and May acted intentionally, purposefully and without lawful justification.

76.     As a direct and proximate cause of Direct Connect and May's unlawful conspiracy, Surge Transportation has and will sustain irreparable harm and loss and has sustained damages, including but not limited to, the loss of valuable business relationships, loss of the opportunity to obtain and/or retain valuable business relationships, loss of profits and future profits, loss of reputation, and loss of goodwill.

77.     Unless enjoined and restrained by Order of this Court, Defendants' wrongful conduct will continue to cause severe and irreparable injury to Surge Transportation's reputation, goodwill, and business for which Surge Transportation has no adequate remedy at law.

### PRAYER FOR RELIEF

**WHEREFORE,** Surge Transportation, Inc. respectfully requests that this Court:

1.     Enter temporary and preliminary injunctive relief:

   a.     Prohibiting Direct Connect from continuing to employ May and Mooney;

   b.     Prohibiting Direct Connect and May from doing business with USPS or with any other of Surge Transportation's clients in violation of the Direct Connect MCA and the May Employment Agreement;

15

  c.  Prohibiting Direct Connect from employing any other employee of Surge Transportation and from contacting or soliciting any other Surge Transportation customer;

  d.  Prohibiting May from soliciting any other Surge Transportation client on behalf of Direct Connect;

  e.  Prohibiting Direct Connect and May from interfering with Surge Transportation's efforts to reorganize under the United States Bankruptcy Code;

  f.  Prohibiting Direct Connect and May from disparaging Surge Transportation; and

  g.  Prohibiting May from using or disclosing Surge Transportation Confidential Information;

2.  Enter a final judgment in favor of Surge Transportation and against Defendants, jointly and severally, for compensatory damages including lost profits, in the amount of $50 million;

3.  Enter a final judgement in favor of Surge Transportation and against Defendants, jointly and severally, trebling damages as provided in Va. Code § 18.2-500 B. and awarding the costs of suit, including a reasonable fee to plaintiff's counsel; and

4.  Enter a final judgment in favor of Surge Transportation and against Defendants, jointly and severally, for other and further relief as this Court deems just and proper.

Date: October 27, 2023

**SURGE TRANSPORTATION, INC.**

By:___*/s/ Wayne G. Travell*_____
Wayne G. Travell, Esq. (VSB No. 22400)
Allison P. Klena, Esq. (VSB No. 96400)
HIRSCHLER FLEISCHER, P.C.
1676 International Drive, Suite 1350
Tysons, Virginia 22102-4940
Tel: (703) 584.8900
Fax: (703) 584.8901
Email: wtravell@hirschlerlaw.com
aklena@hirschlerlaw.com

*Counsel for Surge Transportation, Inc.*

16602175.1  048588.00001

# EXHIBIT 1

**VIRGINIA:**

**IN THE CIRCUIT COURT FOR FAIRFAX COUNTY**

|  |  |  |
|---|---|---|
| **SURGE TRANSPORTATION, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. _____** |
| | ) | |
| **DIRECT CONNECT LOGISTIX, INC.,** | ) | |
| | ) | |
| *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

### DECLARATION OF OMAR SINGH

I, Omar Singh, being first duly sworn, do hereby depose and state as follows:

1.     I am an adult resident and citizen of the Commonwealth of Virginia and am competent to testify to the facts set forth herein based on my personal knowledge.

2.     I am the founder and President of Plaintiff Surge Transportation, Inc. ("Surge Transportation") which is a Florida corporation with its principal place of business at 7077 Bonneval Road, Jacksonville, Florida.

3.     Surge Transportation provides over-land, freight-brokerage services to its customers nationwide.

4.     Before incorporating Surge Transportation in April of 2016,[1] I had owned a small company which itself owned trucks and which provided freight transportation services directly to its clients. Although I discontinued my trucking company in 2010, I maintained my customer

---

[1] I originally formed Surge Transportation as a Virginia corporation, but domesticated the company as a Florida corporation in 2019.

relationships in the freight-transportation industry thereafter, first as a commissioned sales agent for other trucking companies, and later as a sole-proprietor providing brokerage services to my customers to locate carriers with capacity to transport freight.

5.       Initially, Surge Transportation relied on my long-time customer relationships as the core of its revenue-producing business. Due, in part, to implementation of a proprietary marketing and pricing tool I developed and which gave the company a significant competitive advantage (the "Proprietary Strategy and Pricing Tool"), the company had great success and grew rapidly.

6.       On or shortly after July 25, 2018, Surge Transportation hired defendant Matthew May as Vice President of Business Development. I intended to involve Mr. May in meeting and working with nearly every existing and potential new customer of the company and I intended to and did share with him the company's customer lists, prospects, Proprietary Strategy and Pricing Tool and other proprietary and confidential information. Other than my wife Tadina Ross and me, May is the only person who has had access to the company's Proprietary Strategy and Pricing Tool.

7.       As a result, I believed it was crucial that Mr. May enter into an employment agreement with Surge Transportation to protect the company's interests. Attached as Exhibit A is Mr. May's Employment Agreement, a signed copy of which he transmitted to Surge Transportation on July 25, 2018. This Agreement was amended on October 25, 2021, and the amendment is also attached as part of Exhibit A (the "May Employment Agreement").

8.       Pursuant to Section 8(c) of the May Employment Agreement, Mr. May agreed that "for a period of two years from the date of Employee's termination of employment, for any reason, Employee agrees not to become employed by, solicit business from or with, service, or work for

another in the service of, any Business Account of Surge Transportation, with respect to providing Competitive Services. Competitive Services shall mean trucking/freight brokerage services."

9.      Under Section 8(d) of the May Employment Agreement, "Business Account" is defined to mean both existing customers and potential customers who had contacted Surge Transportation, had been referred to Surge Transportation, or had been solicited by Surge Transportation during the six-month period prior to the date of the Employee's termination.

10.      In his role as VP of Business Development, Mr. May was intimately involved in marketing and sales throughout his tenure.  He attended every conference the company sponsored or attended and was often featured by Surge Transportation as the face of the company for sales events. While I was engaged in public speaking, writing, podcasting and other promotional activities to generate sales leads, Mr. May was responsible for, among other things, "closing the deal" to sign on new customers and obtaining additional work from existing customers, and handling the day-to-day relationships with customers.

11.      I also introduced Mr. May to Surge Transportation's legacy customers and relationships I had established between 2003 and 2018 and allowed him to develop relationships with these individuals.

12.      From the time he was hired by Surge Transportation in July 2018 until early in 2020, Mr. May and I together conducted about 250 in-person customer sales visits throughout the country. After COVID-19 restrictions eliminated in-person business development meetings, Mr. May and I conducted our sales calls together on Zoom meetings.

13.      On or about December 31, 2019, Surge Transportation hired John Mooney as Surge Transportation's Executive Vice President. As with Mr. May, I intended to and did provide Mr. Mooney with access to the company's customer lists, prospects and other proprietary and

3

confidential information. To protect such information, I believed it was crucial that Mr. Mooney

be required to enter into an employment agreement to protect the company's interests. Attached

as Exhibit B is Mr. Mooney's Employment Agreement (the "Mooney Employment Agreement").

14.     Pursuant to Section 7(c) [subsections a and b] of the Mooney Employment

Agreement, Mr. Mooney agreed that, for a period of up to 18 months from the date of his

resignation, he would not become employed by, solicit business from or with, service, or work for

another in the service of, any Business Account of Surge Transportation, with respect to providing

Competitive Services. Competitive Services is defined as trucking/freight brokerage services.

15.     Under Section 7(d) of the Mooney Employment Agreement, "Business Account"

is defined to mean both existing customers and potential customers who had contacted Surge

Transportation, had been referred to Surge Transportation, or had been solicited by Surge

Transportation, during the six-month period prior to the date of the Employee's termination.

16.     In his role as Executive Vice President, Mooney was responsible for new customer

sales, executive talent recruitment, day-to-day operations and personnel management.

17.     Beginning in about May of 2021, Surge Transportation entered into a Mutual

Confidentiality and Nondisclosure Agreement with non-party, investment banker Logisyn

Advisors, Inc. ("Logisyn") for the purposes of, among other things, allowing Surge Transportation

and Logisyn to evaluate the potential for a sale of the company.

18.     Sometime toward the end of 2021, Mr. Mooney, knowing that I was interested in

selling the Company, introduced to me to Richard Piontek, Chief Executive Officer of Surge

Transportation's competitor and now defendant, Direct Connect Logistix, Inc. ("Direct

4

Connect").[2] Mr. Mooney told me that he had a prior relationship with Mr. Piontek and that Direct Connect was interested in a possible acquisition of Surge Transportation.

19.     Attached as Exhibit C is a Mutual Confidentiality Agreement between Surge Transportation and Direct Connect dated as of November 10, 2021 (the "Direct Connect MCA"). Under this agreement, Surge Transportation intended to, and did, provide its confidential information (including information about the company's clients and employees) to Direct Connect in furtherance of discussions about a potential future sale of Surge Transportation to Direct Connect.

20.     Under Section 3 of the Direct Connect MCA, Direct Connect agreed to keep Surge Transportation's Confidential Information (as defined) confidential.

21.     Section 4 prohibits Direct Connect from directly or indirectly contacting or soliciting Surge Transportation's customers, clients, suppliers, distributors, sales representatives, employees and other business relationships except as in the ordinary course of business.

22.     Direct Connect also agreed in Section 5 not to directly or indirectly engage, employ, solicit or contact with a view to the engagement or employment of, any of Surge Transportation's employees, directors, officers, managers, or consultants.

23.     On July 24, 2023, Surge Transportation filed a petition for reorganization under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida. I authorized this filing because of fundamental changes in the freight transportation brokerage industry which required Surge Transportation to make changes to its business plan and

---

[2] To my knowledge, Mr. Money's introduction of Direct Connect was unrelated to Surge Transportation's engagement with Logisyn.

because I intend to reorganize Surge Transportation's business affairs to allow the company to continue doing business.

24.     To accomplish this goal, it is critical that I take the steps necessary to conserve and protect Surge Transportation's assets including its valuable customer lists. Surge Transportation is a viable entity with substantial market value and is diligently pursuing efforts to reorganize its affairs and to emerge from bankruptcy.

25.     At or shortly after the bankruptcy filing, Mr. Mooney told me that he intended to retire.

26.     At about the same time, Mr. May told me that if Surge Transportation was unable to reorganize, he intended to leave the over-land freight brokerage industry altogether and try something new.

27.     On August 12, 2023, Mr. May voluntarily resigned from Surge Transportation. Until recently, as described more fully below, I was not aware that Mr. May was working for Surge Transportation competitor, Direct Connect.

28.     On September 2, 2013, Mr. Mooney voluntarily resigned from Surge Transportation. Until recently, as described more fully below, I was not aware that Mr. Mooney was working for Surge Transportation competitor, Direct Connect.

29.     On September 14, 2023, I learned that Surge Transportation had received a copy of the email attached as Exhibit D. This email is correspondence between Mr. May (now as an employee of Surge Transportation competitor, Direct Connect), and Jamesetta Brown, of the United States Postal Service (USPS Transportation Strategy, Contractor). This email confirms Mr. May's successful solicitation of USPS on behalf of Direct Connect.

30.     USPS is one of Surge Transportation's existing customers that was recruited by Mr. May in his capacity as Surge Transportation's Vice President of Business Development.

31.     This email also shows that it was sent to Direct Connect president Greg Humrichouser and former Surge Transportation, and current Direct Connect, employee John Mooney (addressed to Mr. Mooney, presumably by mistake, at Mr. Mooney's old Surge Transportation email address).

32.     Once I learned of this email, I immediately contacted Surge Transportation's lawyers and instructed them to take the steps necessary to protect Surge Transportation. As a result, I authorized my lawyers to send cease and desist letters to Direct Connect Mr. May, Mr. Mooney and Direct Connect. These letters are attached hereto as Exhibits E, F and G, respectively.

33.     By letter dated October 2, 2023, counsel for Defendants acknowledged that Defendants had solicited and serviced Surge Transportation customers USPS and Dollar General but denied that May and Mooney were bound by their employment agreements with Surge Transportation. Although counsel purported to represent Direct Connect, he did not acknowledge the cease and desist letter (Exhibit G).To my knowledge, Direct Connect has refused to discontinue its contract with USPS in violation of the Direct Connect MCA. Nor has Direct Connect terminated the employment of Mr. May or Mr. Mooney or acknowledged that it will refrain from further violations of the Direct Connect MCA or from interference with the Employment Agreements between Surge Transportation and each of Mr. Mooney and Mr. May or from interference with Surge Transportation's business and bankruptcy reorganization.

34.     In a follow up letter dated October 13, 2023, counsel for Defendants alleged that Direct Connect had not previously seen the cease and desist letter to it, but summarily denied that it was bound by the covenants of the Direct Connect MCA.

35.     As a result of the misappropriation of Surge Transportation customers by Direct Connect through the efforts of and with the knowledge and cooperation of Mr. May and Direct Connect president Greg Humrichouser, Surge Transportation is in immediate danger of irreparable injury.

36.     As former employees and executives of Surge Transportation, Mr. May and Mr. Mooney both have  critically important information about Surge Transportation which each has promised to keep confidential. May has agreed not to solicit or service Surge Transportation's customers. He has intentionally violated this promises.

37.     Under the Direct Connect MCA, Direct Connect promised to keep Surge Transportation's Confidential Information confidential, refrain from soliciting or servicing Surge Transportation's clients and refrain from hiring Surge Transportation's employees. Direct Connect has intentionally violated each of these promises.

38.     The promises that Surge Transportation got from Mr. May and Direct Connect were and still are crucial to preserving the value of Surge Transportation's assets.

39.     Although the potential loss of and interference with the customer relationships with USPS and Dollar General are substantial, I fear it only the tip of the iceberg.

40.     Because of the intimate knowledge that Mr. May and Direct Connect have of Surge Transportation's operations, customer lists and pricing, I am very concerned that such conduct, if not enjoined by this Court, will strip Surge Transportation of its most valuable assets and will prevent it from successfully reorganizing its operations. If Mr. May and Direct Connect are not enjoined from further violations of their non-solicitation, non-competition, non-disparagement and non-disclosure obligations to Surge Transportation, their conduct will continue to cause Surge Transportation immediate and irreparable injury.

FURTHER AFFIANT SAYETH NOT.

Pursuant to Va. Code § 8.01-4.3, I hereby affirm under penalty of perjury that the facts stated in this Declaration are true and correct to the best of my personal information and belief.

Omar Singh, President
Surge Transportation, Inc.

16599674.1  048588.00001

# EXHIBIT A



---------- Forwarded message ---------
From: **Matthew May** <<u>maymatthew311@gmail.com</u>>
Date: Thu, Jul 26, 2018 at 3:36 PM
Subject: Re: Welcome to the Surge Transportation Team!
To: Surge HR <<u>hr@surgetransportation.com</u>>

Hi Tadina,

Sorry on the slight delay. Please see attached. Let me know if you need anything else. Thanks

Matt

On Wed, Jul 25, 2018 at 1:54 PM, Surge HR <<u>hr@surgetransportation.com</u>> wrote:
Hi Matt

We are so excited that you will be joining the Surge Team! Attached is our new hire paperwork and your contract. Please send the completed paperwork back to me at this email address at your earliest convenience.

<u>In the meantime, could you please send me the last six digits of your social security number. I will use it to set up your company usernames and passwords.</u>

Please let me know if you have any questions. We are looking forward to working with you.

Thanks!

Tadina

-----
Tadina Ross
Surge Transportation, Inc.
Cell: <u>202-329-4670</u>
Office: <u>571-222-4100</u>
Fax: <u>904-212-2172</u>

1



## EMPLOYMENT AGREEMENT

This Employment Agreement ("Employment Agreement") is entered into as of the _____ day of July, 2018, by and between Surge Transportation, Inc., a Virginia Corporation, ("Surge Transportation" or "Company"), and Matthew May ("Employee").

In consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Surge Transportation and Employee hereby agree as follows:

1.  <u>Employment</u>. Surge Transportation will employ the Employee as an at-will employee, meaning that Employee or Company can terminate employment relationship at any time or for any reasons.

2.  <u>Title</u>: Employee shall have the title ᵢVP of Sales & Business Development  Employee will report to Omar Singh, Surge Transportation's President. The terms and conditions of the Employee's employment shall, to the extent not addressed or described in this Employment Agreement, be governed by Surge Transportation's personnel manual, policies, procedures and practices.

3.  <u>Compensation and Benefits</u>.

    3.1  <u>Base Salary</u>. Employee shall be paid as a W-2 Exempt employee an annual salary of $140,000.00 (One-Hundred-Forty Thousand and 00/100 Cents) ("Base Salary"), subject to applicable federal, state, and local withholding, and other payroll deductions required by law or authorized by the Employee. Employee's Base Salary shall be paid to Employee in the same manner and on the same payroll schedule in which all Surge Transportation's employees receive payment. As an Exempt employee, Employee shall not be eligible for overtime pay.

    3.3.  <u>Commission / Bonus Structure</u>. As long as Employee remains employed by Company and is providing services and fulfilling the terms/conditions of his employment, he will be entitled to commissions/bonus payments pursuant to the following structure:

    3.3.A.  Ten Percent (10%) of Net Profit of each load during Year One of Service for New Customers originated by Employee. 7.5% of Net Profit of each load during Year Two of Service for such New Customers originated by Employee. And, 5% of Net Profit of each load during Year Three of Service for such New Customers originated by Employee. After Year Three, no commissions will be paid. Year One commences on the date the first shipment is moved for each New Customer (and such date becomes the anniversary date for Year Two and Year Three periods).

    3.3.B.  Company shall be required to track New Customer financial information and provide reports to Employee on quarterly basis. Commission payments shall be due to

employee within thirty (30) days after the end of each quarter. Quarters shall be measured on calendar basis (1st: JFM; 2nd: AMJ; 3rd: JAS; and 4th: OND).

3.3.C.   During Employee's first six (6) months of employment, Employee will also be entitled to $2,000.00 (Two-Thousand and 00/100 Cents) bonus payment for each Fortune 1000 New Customer Employee generates who moves at least ten (10) shipments with Surge Transportation during such time period.  Such bonus payments, as applicable, shall be paid on monthly basis.

3.3.D.   Commission and bonus payments shall be made on W-2 basis and will be subject to applicable federal, state, and local withholding, and other payroll deductions required by law or authorized by the Employee.

3.3.E.   New Customer is defined as any account that neither Surge nor Omar Singh has conducted business with within the prior twenty-four (24) months.

3.3.F.   Net Profit is defined as the number of sales dollars remaining after paying hired motor carrier expenses.

3.3.G.   If any receivables become uncollectable bad debt, any Commissions advanced/paid to Employee shall be reversed and monies otherwise owed to Employee (including salary payments), may be offset.

3.3.H.   By mutual written agreement, Employee and Surge Transportation can modify Employee's base salary and/or commissions/bonus payments.

3.4     Employee Benefits.

3.4.A.   Employee shall be eligible to participate in all employee benefit plans, policies, programs, or perquisites in which other Surge Transportation executives, officers or employees participate, including but not limited to, medical insurance, retirement plans, insurance plans and leave benefits. The terms and conditions of Employee's participation in the Surge Transportation employee benefit plans, policies or programs shall be governed by the terms of each such plan, policy, or program.  Any and all benefits offered by Surge Transportation can be modified, including being eliminated, at any time at the sole discretion of Surge Transportation (subject to applicable law).

3.4.B.   Surge Transportation will pay one-hundred (100) percent of the employee/family medical, vision, dental and life insurance costs.

3.5     Paid Time Off.  For Employee's first year of full employment, Employee shall be entitled to ten (10) days of paid time off annually. Such PTO shall accrue at .833 days per month. As applicable, for employment years 2 through 5, Employee shall receive an additional two (2) days of PTO each year (with monthly accrued for all PTO days pursuant to standard payroll practices) (accordingly, assuming Employee remains employed, he will have following PTO: Year 2 - 12 days; Year 3 - 14 days; Year 4 – 16 days; and Year 5 and beyond – 18 days.  Upon request, Employee may receive an

"advance" of PTO if he does not have sufficient accrued.  Upon termination of employment, any negative PTO shall be deducted from Employee's final pay.

4.    **Duties and Performance**.  The Employee acknowledges and agrees that he is being offered a position of employment by Surge Transportation with the understanding that the Employee possesses a unique set of skills, abilities, and experiences which will benefit Surge Transportation, and he agrees that his continued employment with Surge Transportation, whether during the term of this Employment Agreement or thereafter, is contingent upon his good faith performance of his duties as Sales Executive.

    4.1    General Duties.

        a.    Employee shall faithfully and industriously render to the best of Employee's skill, care, diligence and attention all responsibilities and duties connected with his employment and shall undertake diligently all duties assigned to him.

        b.    Employee shall devote his full time, ability, attention and skill to the business of Surge Transportation on a regular and professional basis.

        c.    Employee shall not undertake, either as an owner, director, shareholder, employee or otherwise, the performance of services for compensation (actual or expected) for any other entity without the express written consent of Surge Transportation.  For the sake of clarity, Employee shall not ship any cargo through any property broker, shipping broker, freight forwarder, or transportation services company – any such shipping shall be through Surge Transportation.

        d.    Employee shall have no authority to enter into any contracts binding upon Surge Transportation, or to deliberately create any obligations on the part of the Surge Transportation, except as may be specifically authorized by Omar Singh.

5.    Omitted

6.    **Anti-Piracy Covenant**.  During Employee's employment and for two (2) years after the termination, for any reason, of that employment, Employee shall not directly or indirectly induce or influence, or attempt to induce or influence, any employee or contractor of Surge Transportation to terminate his or her employment or contractual relationship with Surge Transportation.

7. <u>Non-Disclosure Agreement</u>

    a. Surge Transportation has developed trade secrets and other confidential information regarding Surge Transportation's business methods, practices, customers, pricing, advertising, vendor/contractor relationships, and other non-public proprietary information ("Confidential Information") which may be communicated to, or acquired by, Employee in the course of his/her employment. In order to avoid substantial and irreparable damage to Surge Transportation, it is essential for Surge Transportation to protect and preserve its Confidential Information for its own, and only its own, use.

    b. All of Surge Transportation's Confidential Information furnished to Employee by Surge Transportation, or developed by Employee on behalf of Surge Transportation or at Surge Transportation's direction, or otherwise available to Employee by virtue of Employee's employment, are and shall remain the sole property of Surge Transportation. Employee shall maintain the confidentiality of such Confidential Information and shall use them only for the benefit of Surge Transportation and in the course of providing services by Employee to Surge Transportation and its customers.

    c. Employee shall not, during or after the term of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Confidential Information, including, but not limited to: (1) techniques and methods of operation; (2) any sales prospects, customer lists (including customer names, email addresses, phone numbers, or addresses), products, research or data of any kind; or (3) any information relating to strategic plans, sales costs, profits or the financial condition of Surge Transportation or any of its customers or prospective customers, which is not generally known to the public or recognized as standard practice in the industries in which Surge Transportation shall be engaged.

    d. If Surge Transportation requests the return of any materials describing or discussing such Confidential Information at any time during or after the termination of Employee's employment, Employee shall immediately deliver them to Surge Transportation and retain no hard or electronic copies.

    e. During the course of Employee's employment, Employee may be exposed to or have access to Confidential Information of Surge Transportation's clients and/or customers. Except as necessary to perform services for Surge Transportation's client and/or customer, Employee shall not use such information or disclose it by publication or otherwise to any other person during the term of Surge Transportation's relationship with such client and/or customer and for a period of two (2) years thereafter.

    f. Any and all procedures, techniques, or inventions ("Creations") which Employee may make, conceive, discover, or develop, either solely or jointly with any other person(s) during the term of his/her employment, whether during working hours or not, and whether at the request or suggestion of Surge Transportation or not, which relate to or are useful in any business carried on or contemplated by the Surge Transportation including expansions of its present fields of operation, shall, to the fullest extent permitted by law, be the sole and exclusive property of Surge Transportation.

g. Employee shall disclose to Surge Transportation all Creations, and aid and assist Surge Transportation so that Surge Transportation can prepare and present applications for, secure, review and extend copyright or patent letters for the Creation(s), and can obtain the record title so that Surge Transportation shall be the sole and absolute owner thereof in all countries in which it may desire to have copyright or patent protection.  Employee shall not be entitled to any additional compensation for any such Creation(s).  All such Creations that are the sole result of freelance work with prior written approval by the President or that are non-compensated activity unrelated, directly or indirectly to the Employee's performance under this agreement, shall remain the property of the Employee.  To the extent necessary to effect the intention of this Sub-Paragraph and the immediately-preceding Sub-Paragraph, the Creations shall be deemed "works for hire."

8.   Non-Competition Agreement

a. By virtue of employment by Surge Transportation, Employee will acquire or has acquired an intimate knowledge and expertise of considerable value to Surge Transportation.

b. Surge Transportation has substantial rights and interests in each Business Account serviced, handled, contacted, or obtained by it, including, but not limited to, those Business Accounts procured and/or serviced in any manner by Employee while in the employment of Surge Transportation.  Employee acknowledges and represents that Employee does not have, and will not develop, any right or interest in such Business Accounts of Surge Transportation.

c. Absent prior written consent of Surge Transportation, for a period of two (2) years from the date of Employee's termination of employment, for any reason, Employee agrees not to become employed by, solicit business from or with, service, or work for another in the service of, any Business Account of Surge Transportation, with respect to providing Competitive Services.  Competitive Services shall mean trucking/freight brokerage services.

d. The term "Business Account" shall mean (i) business or client serviced by Surge Transportation during the two (2) years immediately preceding the date of termination of the Employee, or (ii) any individual, business or potential customer which contacted, was referred to, or in any manner was solicited by any agent or employee of Surge Transportation during the six -month period immediately preceding the date of termination of the Employee, regardless of whether the business, account, or client was obtained by Surge Transportation prior to the date of termination of the Employee.

e. If any period of time or other restriction specified in this Agreement should be found unreasonable or otherwise unenforceable in any proceeding, then the period of time or other restriction shall be reduced so that such restrictions may be enforced to the greatest extent possible as is reasonable and enforceable.

f. If Employee violates any of the restrictions contained in this Article 8, the restrictive period shall not begin to run until such time as the violation shall be cured by Employee to the satisfaction of Surge Transportation, or as otherwise ordered by a Court of competent jurisdiction.

9.  <u>Non-Disparagement</u>.  Employee shall not make any false, disparaging, derogatory, critical, insulting, offensive, deprecating or belittling comments, in public or in private, about the Company, its parent, subsidiaries or affiliated entities or about the business affairs or financial condition of the Company, its parent, subsidiaries, or affiliated entities, or about any employee, director or officer of the Company, its parent, subsidiaries or affiliated entities. Except as required by law or court order, Employee shall not directly or indirectly provide any assistance to any person or entity, including any governmental body, asserting or intending to assert any litigation, investigation or proceeding against the Company or any of its affiliated entities.

10.  <u>Injury and Injunctive Relief</u>.  The parties agree that in the event of violation by Employee of the restrictions contained in Article 8 of this Agreement, the amount of actual damages suffered by Surge Transportation will be difficult to ascertain.  The parties therefore irrevocably agree that the violation, or threatened violation, of those restrictions shall cause Surge Transportation irreparable injury for purposes of obtaining injunctive relief.  In addition, the parties' best estimate of monetary damages caused is that each violation of the anti-piracy provisions of Article 6, the non-disclosure provisions of Article 7 or the Non-Disparagement provisions of Article 9 will cause Surge Transportation damages of $15,000. The parties agree that these are fair and reasonable estimates of Surge Transportation's actual damages, and agree to the imposition of such amounts as liquidated damages in lieu of actual damages, and not as a penalty.

11.  <u>Prior Agreements</u>.  Employee represents and warrants to Surge Transportation: (i) that there are no restrictions, agreements or understandings whatsoever to which Employee is a party which would prevent or make unlawful his/her execution of this Agreement or his/her employment with Surge Transportation; (ii) that his/her execution of this Agreement and his/her employment by Surge Transportation will not constitute a breach of any contract, agreement or understanding, oral or written, to which he/she is a party or by which he/she is bound; and (iii) that he/she is free and able to execute this Agreement and to enter into employment with Surge Transportation.  Employee agrees to indemnify and hold harmless Surge Transportation from any costs, expenses, damages, or injury, including court costs and attorney's fees, resulting from any violation of this Article 11.

12.  <u>Expenses/Reimbursement</u>

12.1    Surge Transportation shall pay or reimburse Employee for office and reasonable travel related expenses upon submission vouchers or receipts maintained and provided to Surge Transportation in compliance with such rules and policies relating thereto as Surge Transportation may from time to time adopt.

13.  <u>Omitted</u>

14.  General Provisions

14.1    <u>Notices</u>. All notices and other communications required or permitted by this Employment Agreement to be delivered by Surge Transportation or Employee to the other party shall be delivered in writing to the address shown below, either personally, or by certified or express mail, return receipt requested, postage prepaid,

to the address for such party specified below or to such other address as the party may from time to time advise the other party, and shall be deemed given and received as of actual personal delivery, or upon the date of actual receipt shown on any return receipt if registered, certified or express mail is used, as the case may be.

| | |
|---|---|
| Company: | Surge Transportation<br>20651 Holyoke Drive<br>Ashburn, VA 20147 |
| With a copy to: | Merritt Green<br>General Counsel, P.C.<br>6849 Old Dominion Drive, Suite 220<br>McLean, VA 22101 |
| Employee: | Matthew May<br>55 SW 9th Street, Unit 1404<br>Miami, FL 33130 |

14.2    <u>Amendments and Termination; Entire Agreement</u>.  This Employment Agreement may not be amended or terminated except by a writing executed by all of the parties hereto. This Employment Agreement constitutes the entire agreement of Surge Transportation and Employee relating to the subject matter hereof and supersedes all prior oral and written understandings and agreements relating to such subject matter.

14.3    <u>Successors and Assigns</u>.  The Employee may not assign his rights and obligations under this Employment Agreement to another person without the prior written consent of the Executive Committee.

14.4    <u>Severability; Provisions Subject to Applicable Law</u>.  All provisions of this Employment Agreement shall be applicable only to the extent that they do not violate any applicable law, and are intended to be limited to the extent necessary so that they will not render this Employment Agreement invalid, illegal or unenforceable under any applicable law. If any provision of this Employment Agreement or any application thereof shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of other provisions of this Employment Agreement or of any other application of such provision shall in no way be affected thereby.

14.5    <u>Waiver of Rights</u>.  No waiver by Surge Transportation or Employee of a right or remedy hereunder shall be deemed to be a waiver of any other right or remedy or of any subsequent right or remedy of the same kind.

14.6    <u>Definitions; Headings; and Number</u>.  A term defined in any part of this Employment Agreement shall have the defined meaning wherever such term is used herein. The headings contained in this Employment Agreement are for reference purposes only and shall not affect in any manner the meaning or interpretation of this Employment Agreement. Where appropriate to the context of this Employment Agreement, use of the singular shall be deemed also to refer to the plural, and use of the plural to the singular.

14.7   <u>Counterparts</u>.  This Employment Agreement may be executed in separate counterparts, each of which shall be deemed an original but both of which taken together shall constitute but one and the same instrument.

14.8   <u>Governing Laws and Forum</u>.  This Employment Agreement shall be governed by, construed, and enforced in accordance with the laws of the Commonwealth of Virginia and the Parties agree to the exclusive jurisdiction of the State Courts located in Fairfax, Virginia or, as applicable, the Federal Courts located in Alexandria, Virginia.

   **IN WITNESS WHEREOF,** Surge Transportation and Employee have executed and delivered this Agreement as of the date written below.

Surge Transportation

By: _____

_____       _____
Matthew May                         Date

Omar Singh                             Date
President



## FIRST AMENDMENT TO EMPLOYMENT AGREEMENT

This First Amendment to Employment Agreement ("First Amendment") is an amendment to the Employment Agreement between Surge Transportation (Company) and Matthew May (Employee) dated July 2018.  In recognition of the valuable contributions Employee has made to Company, the Employment Agreement is amended as provided herein.  All terms not specifically amended herein remain unchanged within the Employment Agreement.

1. <u>Base Salary</u>.  Section 3.1 is amended as follows:  Base salary will be increased to $200,000.00 (Two-Hundred Thousand and 00/100 Cents).
2. <u>Commission / Bonus Structure</u>.  Section 3.3.A. is amended as follows:
   a. For the period Q3 of 2021, commission will be paid at a rate of 5% of Net Profit for all accounts originated by Employee.
   b. For the period Q4 of 2021 and beyond, commission  will be paid at a rate of 3% of Net Profit for all accounts originated by Employee and will not contain a sunset provision which reduces then eliminates in Years Two, Three, and beyond.
3. <u>House Accounts</u>.  This is a new provision.  House Accounts will be defined as customers whose relationship with Company is largely the result of Company's various TMS relationships (including companies such as BluJay/E2 Open, Blue Yonder, Mercury Gate, Kuebix, Oracle, SAP) and Company's ability to provide API and RPA Real-Time Pricing capability.  Originating these accounts does not require the extensive sales effort customarily associated with customer origination.  These accounts require little involvement from the Employee once they are activated and their volume of business is driven primarily through automated API and RPA technology.  Efforts on these accounts shall be considered to be responsibilities associated with Employee's Base Salary and wil not be considered "originated" by Employee.  No commissions will be paid on House Accounts.  House Accounts shall be designated at the discretion of Surge's President, Omar Singh.
4. <u>Liquidity Event of Surge</u>.  This is a new provision.  In the event of a Sale of the Company (as defined herein) which occurs during Employee's continuous employment by the Company (or an affiliate thereof), Employee shall be eligible to receive from the Company Two-Percent (2%) of the Net Sales Proceeds (as defined herein). A "Sale the Company" shall mean the earliest to occur of (i) a "change in ownership of the company" as defined in Treasury Regulation Section 1.409A-3(i)(5)(v) or (ii) "a change in the ownership of a substantial portion of the company's assets" as defined in Treasury Regulation Section 1.409A-3(i)(5)(vii) (but substituting 50% for 40%). Notwithstanding

the foregoing, a "Sale of the Company" shall <u>not</u> include: (i) a financing or original issuance of securities the primary purpose of which is to raise additional capital for the Company; (ii) a transaction in which stock or assets of the Company are transferred to a related party including, without limitation, to an already existing owner, employee, affiliated company, or owner or employee of an affiliated company; (iii) a pledge of stock of the Company that creates a mere security interest; (iv) a transfer of stock to the lineal descendants or spouse of an owner of the Company, or to trusts for the benefit of such persons; or (v) a gift of stock of the Company. "Net Sales Proceeds" shall mean the consideration received by the Company (or its owners, as applicable) upon a Sale of the Company reduced by (i) any and all transaction costs including, but not limited to, commissions, attorneys' fees, banker fees, closing costs, taxes, and similar costs and expenses; (ii) payments to all of the creditors of the Company (whether secured or unsecured); and/or (iii) any monies received by employees and/or owners of the Company under any employment and/or restrictive covenant agreements.

Employee shall be disqualified for the Sale Bonus if Employee's employment is terminated for cause, as defined herein, or if Employee is in material breach of this Agreement (as determined by reasonable business judgment of the Company).  Cause is defined as:  (1) fraud, embezzlement, or theft; (2) willful misconduct damaging to the Company, its reputation, products, services or customers; (3) intentional violation of any law, regulation or the terms of this Agreement; (4) any unauthorized disclosure of any trade secret or confidential information; (5) malfeasance; (6) breach of duty of loyalty to the Company; or (7) charged with felony or a misdemeanor involving moral turpitude.

Payments under this Section 4 will be made in cash or in-kind in the same proportions as is received by the Company (or its owners, as applicable) and will be paid to Employee as soon as practicable following the Sale of the Company but no later than the date which is one and one-half (1½) months after the close of the taxable year in which such Sale of the Company occurs. Notwithstanding the foregoing, if the Company (or its owners) receive a promissory note or other consideration that is subject to deferral conditions including, without limitation, escrows, earn-out requirements, vesting schedules or, in the case of securities, lock-up or similar underwriting restrictions, the same deferred payment terms or deferral conditions imposed on the Company (or its owners) will be imposed on payment to Employee to the extent permitted by Treasury Regulation Section 1.409A-3(i)(5). Any amounts paid under this Section 4 shall be subject to deductions as required by law and/or authorized by the Employee.

IN WITNESS WHEREOF, Surge Transportation and Employee have executed and delivered this Agreement as of the date written below.

Surge Transportation

| | | |
|---|---|---|
| _Matthew May_ ____ _10-19-2021_ | By: | _Omar Singh_   10.25.2021 |
| Matthew May          Date | | Omar Singh          Date |
| | | President |

# EXHIBIT B

CONFIDENTIAL DEC. 30, 2019



## EMPLOYMENT AGREEMENT

This Employment Agreement ("Employment Agreement") is entered into as of the 30th day of December 2019, by and between Surge Transportation, Inc., ("Surge Transportation" or "Company"), and John Mooney ("Employee").

In consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Surge Transportation and Employee hereby agree as follows:

1.  Employment. Surge Transportation will employ the Employee as an at-will employee, meaning that Employee or Company can terminate employment relationship at any time or for any reasons. It is contemplated that Employee will commence employment on or about December 31st, 2019. Employee's first full day of work shall be defined as the Effective Date.

2.  Title: Employee shall have the title of Executive Vice President. Employee will report to Omar Singh, Surge Transportation's President. The terms and conditions of the Employee's employment shall, to the extent not addressed or described in this Employment Agreement, be governed by Surge Transportation's personnel manual, policies, procedures and practices.

3.  Compensation and Benefits.

    3.1   Base Salary. Employee shall be paid as a W-2 Exempt employee an initial annual salary of $230,000.00_ (Two Hundred and Thirty Thousand Dollars_ and 00/100 Cents) ("Base Salary"), subject to applicable federal, state, and local withholding, and other payroll deductions required by law or authorized by the Employee. Employee's Base Salary shall be paid to Employee in the same manner and on the same payroll schedule in which all Surge Transportation's employees receive payment. As an Exempt employee, Employee shall not be eligible for overtime pay.

    3.2   Omitted.

    3.3.  Commission / Bonus Structure. As long as Employee remains employed by Company and is providing services and fulfilling the terms/conditions of his employment, he will be entitled to commissions/bonus payments pursuant to the following structure:

          3.3.A.  TBD by John and Omar based on P&L of the Chicago office, new outside customer sales and inside sales. Target range shall be $50,000-$80,000 dollars and goals will be modified periodically to reflect Company growth and market conditions.

3.3.B.  Incentive compensation payments shall be made on W-2 basis and will be subject to applicable federal, state, and local withholding, and other payroll deductions required by law or authorized by the Employee.

3.3.C.  By mutual written agreement, Employee and Surge Transportation can modify Employee's base salary and/or commissions/bonus payments.

3.4    <u>Liquidity Event of Surge</u>.  In the event of a Sale of the Company (as defined herein) which occurs during Employee's continuous employment by the Company (or an affiliate thereof), Employee shall be eligible to receive from the Company up to two -percent (2%) of the Net Sales Proceeds (as defined herein) as provided herein (the "Sale Bonus"). A "Sale the Company" shall mean the earliest to occur of (i) a "change in ownership of the company" as defined in Treasury Regulation Section 1.409A-3(i)(5)(v) or (ii) "a change in the ownership of a substantial portion of the company's assets" as defined in Treasury Regulation Section 1.409A-3(i)(5)(vii) (but substituting 50% for 40%). Notwithstanding the foregoing, a "Sale of the Company" shall <u>not</u> include: (i) a financing or original issuance of securities the primary purpose of which is to raise additional capital for the Company; (ii) a transaction in which stock or assets of the Company are transferred to a related party including, without limitation, to an already existing owner, employee, affiliated company, or owner or employee of an affiliated company; (iii) a pledge of stock of the Company that creates a mere security interest; (iv) a transfer of stock to the lineal descendants or spouse of an owner of the Company, or to trusts for the benefit of such persons; or (v) a gift of stock of the Company. "Net Sales Proceeds" shall mean the consideration received by the Company (or its owners, as applicable) upon a Sale of the Company reduced by (i) any and all transaction costs including, but not limited to, commissions, attorneys' fees, banker fees, closing costs, taxes, and similar costs and expenses; (ii) payments to all of the creditors of the Company (whether secured or unsecured); and/or (iii) any monies received by employees and/or owners of the Company under any employment and/or restrictive covenant agreements.

Employee shall be eligible for the Sale Bonus as defined herein:

a.    As long as Employee has been continuously employed for at least one (1) full year from the Effective Date of this Agreement and remains a full time employee of the Company, and there is a Sale of the Company as defined above, Employee shall be eligible for the Sale Bonus.

b.    On the first anniversary of the Effective Date of this Agreement, Employee shall vest in .66 percent the Sale Bonus, regardless of Employees future employment status with Company.

c.    On the second anniversary of the Effective Date of this Agreement, Employee shall vest in an additional .67 percent the Sale Bonus, regardless of Employees future employment status with Company.

d.    On the third anniversary of the Effective Date of this Agreement, Employee shall vest in an additional .67 percent the Sale Bonus, regardless of Employees future employment status with Company (so, at this time, Employee would have vested in

2% of Net Sales Proceeds as Sale Bonus).

Once vested in Employee, the vested portion only of the Sale Bonus may be transferred upon Employee's death to his lawfully married spouse and she will have rights upon a Sale of the Company. Employee cannot transfer, assign or encumber vested portion of Sale Bonus to anyone except his spouse. The spouse's interest cannot be transferred, assigned, or encumbered in any manner.

For purposes of this Agreement, the Sale Bonus shall be 2% of the Net Sales Proceeds of the Sale of the Company. Notwithstanding the foregoing, so long as the Net Sales Proceeds are at least $30,000,000 (Thirty Million Dollars), a minimum Sale Bonus shall be $1,500,000.00 (One Million, Five Hundred Thousand Dollars). Finally, the Sale Bonus shall be capped at $3,000,000.00 (Three Million Dollars).

Payments under this Section 3.4 will be made in cash or in-kind in the same proportions as is received by the Company (or its owners, as applicable) and will be paid to Employee as soon as practicable following the Sale of the Company but no later than the date which is one and one-half (1½) months after the close of the taxable year in which such Sale of the Company occurs. Notwithstanding the foregoing, if the Company (or its owners) receive a promissory note or other consideration that is subject to deferral conditions including, without limitation, escrows, earn-out requirements, vesting schedules or, in the case of securities, lock-up or similar underwriting restrictions, the same deferred payment terms or deferral conditions imposed on the Company (or its owners) will be imposed on payment to Employee to the extent permitted by Treasury Regulation Section 1.409A-3(i)(5). Any amounts paid under this Section 3.4 shall be subject to deductions as required by law and/or authorized by the Employee.

3.5     Employee Benefits.

        3.5.A.   Employee shall be eligible to participate in all employee benefit plans, policies, programs, or perquisites in which other Surge Transportation executives, officers or employees participate, including but not limited to, medical insurance, retirement plans, insurance plans and leave benefits. The terms and conditions of Employee's participation in the Surge Transportation employee benefit plans, policies or programs shall be governed by the terms of each such plan, policy, or program. Any and all benefits offered by Surge Transportation can be modified, including being eliminated, at any time at the sole discretion of Surge Transportation (subject to applicable law).

        3.5.B.   Company shall cover one-hundred (100) percent of the employee/family medical insurance cost and one-hundred (100) percent of the employee/family vision, dental and life insurance costs while Employee is working full-time (at least 30 hours per week) for Company.

3.6     Paid Time Off.  Employee shall be entitled to Fifteen (15) days of paid time off annually. Such PTO shall accrue at 1.25 days per month. Upon request, Employee may receive an "advance" of PTO if he does not have enough accrued. As applicable, for employment years 2 through 5, Employee shall receive an additional one (1) days of PTO each year (with monthly accrued for all PTO days pursuant to standard payroll

practices).  Accordingly, assuming Employee remains employed, he will have the following PTO: Year 2 – 16 days, Year 3 – 17 days; Year 4 – 18 days; and Years 5 and beyond – 19 days.  Upon termination of employment, any negative PTO shall be deducted from Employee's final pay.  PTO days do not roll over and will reset each year on March 31st.  Unused PTO is forfeited.  Maximum of 10 consecutive PTO workdays may be taken at any one time.

3.7   <u>Technology Reimbursement</u>.  Company shall provide Employee with mobile phone, computer and any reasonable additional technology to assist in performing Employee's duties and Company will directly pay or reimburse Employee for reasonable business-related expenses.  Employee shall be liable for non-business-related expenses incurred on Company provided equipment and, as applicable, consents to deductions from his pay to reimburse Company for such costs.  Employee shall return, within forty-eight (48) hours of his employment termination, for any reason, any Company owned equipment (or other property).

4.   <u>Duties and Performance</u>.  The Employee acknowledges and agrees that he is being offered a position of employment by Surge Transportation with the understanding that the Employee possesses a unique set of skills, abilities, and experiences which will benefit Surge Transportation, and he agrees that his continued employment with Surge Transportation, whether during the term of this Employment Agreement or thereafter, is contingent upon his good faith performance of his duties as Executive Vice President.

4.1   <u>General Duties</u>.

a.   Employee shall faithfully and industriously render to the best of Employee's skill, care, diligence and attention all responsibilities and duties connected with his employment and shall undertake diligently all duties assigned to him.

b.   Employee shall devote his full time, ability, attention and skill to the business of Surge Transportation on a regular and professional basis.

c.   Employee shall not undertake, either as an owner, director, shareholder, employee or otherwise, the performance of services for compensation (actual or expected) for any other entity without the express written consent of Surge Transportation.  For the sake of clarity, Employee shall not ship any cargo through any property broker, shipping broker, freight forwarder, or transportation services company – any such shipping shall be through Surge Transportation.

d.   Employee shall have no authority to enter into any contracts binding upon Surge Transportation, or to deliberately create any obligations on the part of the Surge Transportation, except as may be specifically authorized by Omar Singh.

5. <u>Anti-Piracy Covenant</u>.  During Employee's employment and for two (2) years after the termination, for any reason, of that employment, Employee shall not directly or indirectly induce or influence, or attempt to induce or influence, any employee or contractor of Surge Transportation to terminate his or her employment or contractual relationship with Surge Transportation.

6. <u>Non-Disclosure Agreement</u>

   a. Surge Transportation has developed trade secrets and other confidential information regarding Surge Transportation's business methods, practices, customers, pricing, advertising, vendor/contractor relationships, and other non-public proprietary information ("Confidential Information") which may be communicated to, or acquired by, Employee in the course of his/her employment.  In order to avoid substantial and irreparable damage to Surge Transportation, it is essential for Surge Transportation to protect and preserve its Confidential Information for its own, and only its own, use.

   b. All of Surge Transportation's Confidential Information furnished to Employee by Surge Transportation or developed by Employee on behalf of Surge Transportation or at Surge Transportation's direction, or otherwise available to Employee by virtue of Employee's employment, are and shall remain the sole property of Surge Transportation.  Employee shall maintain the confidentiality of such Confidential Information and shall use them only for the benefit of Surge Transportation and in the course of providing services by Employee to Surge Transportation and its customers.

   c. Employee shall not, during or after the term of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Confidential Information, including, but not limited to:  (1) techniques and methods of operation; (2) any sales prospects, customer lists (including customer names, email addresses, phone numbers, or addresses), products, research or data of any kind; or (3) any information relating to strategic plans, sales costs, profits or the financial condition of Surge Transportation or any of its customers or prospective customers, which is not generally known to the public or recognized as standard practice in the industries in which Surge Transportation shall be engaged.

   d. If Surge Transportation requests the return of any materials describing or discussing such Confidential Information at any time during or after the termination of Employee's employment, Employee shall immediately deliver them to Surge Transportation and retain no hard or electronic copies.

   e. During the course of Employee's employment, Employee may be exposed to or have access to Confidential Information of Surge Transportation's clients and/or customers.  Except as necessary to perform services for Surge Transportation's client and/or customer, Employee shall not use such information or disclose it by publication or otherwise to any other person during the term of Surge Transportation's relationship with such client and/or customer and for a period of two (2) years thereafter.

f. Any and all procedures, techniques, or inventions ("Creations") which Employee may make, conceive, discover, or develop, either solely or jointly with any other person(s) during the term of his/her employment, whether during working hours or not, and whether at the request or suggestion of Surge Transportation or not, which relate to or are useful in any business carried on or contemplated by the Surge Transportation including expansions of its present fields of operation, shall, to the fullest extent permitted by law, be the sole and exclusive property of Surge Transportation.

g. Employee shall disclose to Surge Transportation all Creations, and aid and assist Surge Transportation so that Surge Transportation can prepare and present applications for, secure, review and extend copyright or patent letters for the Creation(s), and can obtain the record title so that Surge Transportation shall be the sole and absolute owner thereof in all countries in which it may desire to have copyright or patent protection. Employee shall not be entitled to any additional compensation for any such Creation(s). All such Creations that are the sole result of freelance work with prior written approval by the President or that are non-compensated activity unrelated, directly or indirectly to the Employee's performance under this agreement, shall remain the property of the Employee. To the extent necessary to effect the intention of this Sub-Paragraph and the immediately-preceding Sub-Paragraph, the Creations shall be deemed "works for hire."

7. <u>Non-Solicitation Agreement</u>

a. By virtue of employment by Surge Transportation, Employee will acquire or has acquired an intimate knowledge and expertise of considerable value to Surge Transportation.

b. Surge Transportation has substantial rights and interests in each Business Account serviced, handled, contacted, or obtained by it, including, but not limited to, those Business Accounts procured and/or serviced in any manner by Employee while in the employment of Surge Transportation. Employee acknowledges and represents that Employee does not have, and will not develop, any right or interest in such Business Accounts of Surge Transportation. Notwithstanding the foregoing, Schedule A to this Agreement provides a Schedule of Excluded Customers that are prior clients/customers of Employee and are explicitly excluded from the definition of Business Account, so long as such clients/customers sign contact and commence moving freight with Surge Transportation within six (6) months of the Effective Date.

c. Absent prior written consent of Surge Transportation, for the time periods as defined below, Employee agrees not to become employed by, solicit business from or with, service, or work for another in the service of, any Business Account of Surge Transportation, with respect to providing Competitive Services ("Non-Solicitation Restriction"). Competitive Services shall mean freight brokerage services.

a. For a period of six (6) months from the date of Employee's termination of employment, for any reason, Employee agrees to the Non-Solicitation Restriction.

b. For a period of up to eighteen (18) months from the date of Employee's termination if the Employee resigns or is terminated for cause, Employee agrees to the Non-Solicitation Restriction. For purposes of this provision only, "Cause" shall mean conduct involving one or more of the following: (i) Employee's material violation of any applicable material law or regulation respecting the business of the Company; (ii) Employee's conviction of, or plea of nolo contendere to, a felony or other crime involving moral turpitude; (iii) the substantial and continuing failure of the Employee, after notice thereof, to render services to the Company in accordance with the terms or requirements of his employment; (iv) disloyalty, gross negligence, willful misconduct, dishonesty, fraud or breach of fiduciary duty to the Company; (v) deliberate disregard of the rules or policies of the Company, or breach of an employment or other agreement with the Company; (vi) the unauthorized disclosure of any trade secret or confidential information of the Company; or (vii) the commission of an act which constitutes unfair competition with the Company or which induces any customer or supplier to breach a contract with the Company.

c. If Employee's employment is terminated without cause, at the sole discretion of Company, the Non-Solicitation Restriction will be extended up to eighteen (18) months upon continuous payment of 100% of Employee's Base Salary at the time of his termination paid pursuant to normal Company payroll practices. Payment shall be on a 1099 basis.

d. The term "Business Account" shall mean: (i) business or client serviced by Surge Transportation during the two (2) years immediately preceding the date of termination of the Employee: or (ii) any individual, business or potential customer which contacted, was referred to, or in any manner was solicited by any agent or employee of Surge Transportation during the six -month period immediately preceding the date of termination of the Employee, regardless of whether the business, account, or client was obtained by Surge Transportation prior to the date of termination of the Employee, but only if Employee was involved in the solicitation and/or obtained confidential information about such potential customer

e. If any period of time or other restriction specified in this Agreement should be found unreasonable or otherwise unenforceable in any proceeding, then the period of time or other restriction shall be reduced so that such restrictions may be enforced to the greatest extent possible as is reasonable and enforceable.

f. If Employee violates any of the restrictions contained in this Article 7, the restrictive period shall not begin to run until such time as the violation shall be cured by Employee to the satisfaction of Surge Transportation, or as otherwise ordered by a Court of competent jurisdiction.

8.    <u>Non-Disparagement</u>.  Employee shall not make any false, disparaging, derogatory, critical, insulting, offensive, deprecating or belittling comments, in public or in private, about the Company, its parent, subsidiaries or affiliated entities or about the business affairs or financial condition of the Company, its parent, subsidiaries, or affiliated entities, or about any employee, director or officer of the Company, its parent, subsidiaries or affiliated entities.  Except as required by law or court order, Employee shall not directly or indirectly provide any assistance to any person or entity, including any

CONFIDENTIAL DEC. 30, 2019

governmental body, asserting or intending to assert any litigation, investigation or proceeding against the Company or any of its affiliated entities.

9.    Injury and Injunctive Relief.  The parties agree that in the event of violation by Employee of the restrictions contained in Article 7 of this Agreement, the amount of actual damages suffered by Surge Transportation will be difficult to ascertain.  The parties therefore irrevocably agree that the violation, or threatened violation, of those restrictions shall cause Surge Transportation irreparable injury for purposes of obtaining injunctive relief.  In addition, the parties' best estimate of monetary damages caused is that each violation of the anti-piracy provisions of Article 5, the non-disclosure provisions of Article 6 or the Non-Disparagement provisions of Article 8 will cause Surge Transportation damages of $15,000. The parties agree that these are fair and reasonable estimates of Surge Transportation's actual damages, and agree to the imposition of such amounts as liquidated damages in lieu of actual damages, and not as a penalty.

10.    Prior Agreements.  Employee represents and warrants to Surge Transportation: (i) that there are no restrictions, agreements or understandings whatsoever to which Employee is a party which would prevent or make unlawful his/her execution of this Agreement or his/her employment with Surge Transportation; (ii) that his/her execution of this Agreement and his/her employment by Surge Transportation will not constitute a breach of any contract, agreement or understanding, oral or written, to which he/she is a party or by which he/she is bound; and (iii) that he/she is free and able to execute this Agreement and to enter into employment with Surge Transportation.  Employee agrees to indemnify and hold harmless Surge Transportation from any costs, expenses, damages, or injury, including court costs and attorney's fees, resulting from any violation of this Article 10.

11.    Expenses/Reimbursement

11.1    Surge Transportation shall pay or reimburse Employee for office and reasonable travel related expenses upon submission vouchers or receipts maintained and provided to Surge Transportation in compliance with such rules and policies relating thereto as Surge Transportation may from time to time adopt.

12.    General Provisions

12.1    Notices.  All notices and other communications required or permitted by this Employment Agreement to be delivered by Surge Transportation or Employee to the other party shall be delivered in writing to the address shown below, either personally, or by certified or express mail, return receipt requested, postage prepaid, to the address for such party specified below or to such other address as the party may from time to time advise the other party, and shall be deemed given and received as of actual personal delivery, or upon the date of actual receipt shown on any return receipt if registered, certified or express mail is used, as the case may be.

    Company:        Surge Transportation
                    705 Wells Road, Suite 300

Orange Park, FL 32073

With a copy to:        Merritt Green
                       General Counsel, P.C.
                       6849 Old Dominion Drive, Suite 220
                       McLean, VA 22101

Employee:              John Mooney
                       15344 Oxford Drive
                       Orland Park, IL 60462

12.2    <u>Amendments and Termination; Entire Agreement</u>.  This Employment Agreement may not be amended or terminated except by a writing executed by all of the parties hereto. This Employment Agreement constitutes the entire agreement of Surge Transportation and Employee relating to the subject matter hereof and supersedes all prior oral and written understandings and agreements relating to such subject matter.

12.3    <u>Successors and Assigns</u>.  This Agreement inures to the benefit of and is binding upon the Company, its respective successors in interest by way of merger, acquisition, or otherwise, and its permitted assigns.  The Employee may not assign his rights and obligations under this Employment Agreement.

12.4    <u>Severability; Provisions Subject to Applicable Law</u>.  All provisions of this Employment Agreement shall be applicable only to the extent that they do not violate any applicable law, and are intended to be limited to the extent necessary so that they will not render this Employment Agreement invalid, illegal or unenforceable under any applicable law. If any provision of this Employment Agreement or any application thereof shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of other provisions of this Employment Agreement or of any other application of such provision shall in no way be affected thereby.

12.5    <u>Waiver of Rights</u>.  No waiver by Surge Transportation or Employee of a right or remedy hereunder shall be deemed to be a waiver of any other right or remedy or of any subsequent right or remedy of the same kind.

12.6    <u>Definitions; Headings; and Number</u>.  A term defined in any part of this Employment Agreement shall have the defined meaning wherever such term is used herein. The headings contained in this Employment Agreement are for reference purposes only and shall not affect in any manner the meaning or interpretation of this Employment Agreement. Where appropriate to the context of this Employment Agreement, use of the singular shall be deemed also to refer to the plural, and use of the plural to the singular.

**CONFIDENTIAL DEC. 30, 2019**

12.7   <u>Counterparts</u>.  This Employment Agreement may be executed in separate counterparts, each of which shall be deemed an original but both of which taken together shall constitute but one and the same instrument.

12.8   <u>Governing Laws and Forum</u>.  This Employment Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Florida and the Parties agree to the exclusive jurisdiction of the State and Federal Courts located in Jacksonville, Florida, Clay and/or Duval Counties

IN WITNESS WHEREOF, Surge Transportation and Employee have executed and delivered this Agreement as of the date written below.

_____   12/31/19      Surge Transportation
John Mooney          Date

                                    By:  _Omar Singh_   12/31/19
                                         Omar Singh            Date
                                         President

CONFIDENTIAL DEC. 30, 2019

## Schedule A - Schedule of Excluded Customers

# EXHIBIT C

## MUTUAL CONFIDENTIALITY AGREEMENT

This MUTUAL CONFIDENTIALITY AGREEMENT ("Agreement"), actually signed on the dates set forth below by and between Direct Connect Logistix, Inc. along with its affiliates, (collectively, "Direct Connect") and Surge Transportation, Inc. ("Surge").

The party disclosing Confidential Information (as defined below) is referred to as the "Disclosing Party" and the party receiving Confidential Information is referred to as the "Recipient." While the Disclosing Party undertakes no obligation to provide any Confidential Information to the Recipient, to the extent it does provide such information to the Recipient, it is agreeable to doing so only in reliance upon and subject to the terms and conditions of this Agreement.

WHEREAS, Recipient and the Disclosing Party may wish to engage in a potential business relationship; and

WHEREAS, to facilitate a business relationship, the Disclosing Party may deliver to the Recipient descriptive, statistical and analytical information regarding the Disclosing Party's financial condition and business operations while maintaining the necessary and appropriate level of confidentiality with respect to any information acquired by Recipient in connection with such analysis.

NOW, THEREFORE, the Disclosing Party and Recipient agree as follows:

Confidential Information.  For the purposes of this Agreement, the term "Confidential Information" shall mean all information (whether or not designated as "confidential") furnished at any time, in writing or during the course of discussions by the Disclosing Party or its affiliates or by their Representatives to Recipient or its attorneys, affiliates and agents (hereinafter collectively referred to as "Representatives"), or to which Recipient or its Representatives are otherwise given access by the Disclosing Party or its affiliates or their Representatives.  Confidential Information shall also include (a) any information derived from Confidential Information, (b) the fact that discussions or negotiations relating to a possible transaction between the parties have taken or are taking place, and (c) any of the terms, conditions or other facts with respect to any such possible transaction, negotiations or discussions.

1.      Limited Purpose and Use of Confidential Information.  If and to the extent the Disclosing Party furnishes Recipient or its Representatives with, or gives any of them access to, Confidential Information, Recipient, on behalf of itself and its Representatives, agrees to limit access to the information to only those of its employees and its Representatives who have a need to know such information for the stated purpose.

2.      Original Documents; Copies.  Recipient shall return to the Disclosing Party promptly upon written request by the Disclosing Party, all Confidential Information and copies thereof obtained by Recipient or its Representatives in printed or written form or on magnetic or electronic media or otherwise reduced to a tangible format.  Further upon such written request, Recipient will destroy all analytical and other materials developed by Recipient or its Representatives and containing Confidential Information including all notes, work papers, or other written materials or memoranda (and all copies thereof) prepared by or for Recipient or its Representatives that contain any Confidential Information, and an officer of Recipient shall certify as to such destruction.

41517349.2

3.  <u>Confidentiality</u>.  Without the prior written consent of the Disclosing Party, Recipient and all of its Representatives shall keep all of the Confidential Information confidential.  If Recipient or its Representatives or the Disclosing Party or its Representatives should be required by legal process or by operation of applicable law to disclose any of the foregoing or, in the case of the Recipient or its Representatives, any Confidential Information, the party so obligated shall promptly provide notice of such requirement(s) to the other party to this Agreement and will cooperate with such party in preventing any third party from obtaining any Confidential Information or from learning of the discussions being conducted between Recipient and the Disclosing Party.  Upon any breach of this agreement of confidentiality by either party, the non-breaching party shall have the absolute right to cease immediately any discussions between the parties and to pursue any other remedies which may be available at law or in equity.

4.  <u>No Interference with Business Relations</u>.  Recipient and its Representatives shall not, directly or indirectly, contact or solicit the Disclosing Party's, or any of its affiliates', customers, clients, suppliers, distributors, sales representatives, employees and other business relations except as in the ordinary course of business.

5.  <u>Non-Solicitation</u>. Recipient shall not, and will cause its Representatives not to, directly or indirectly, engage, employ, solicit or contact with a view to the engagement or employment of, any employee, director, officer or manager of, or consultant to, the Disclosing Party or any person who has been an employee, director, officer or manager of, or consultant to, the Disclosing Party at any time during the twelve-month period ending on the date of such engagement, employment, solicitation or contact (provided that the foregoing shall not prohibit general solicitations for employment or engagement (including through search firms) that do not specifically target such employees, directors, officers, managers or consultants, it being understood that the restrictions on engaging or employing such persons shall still apply). If any of the foregoing provisions shall be deemed to be invalid or unenforceable in any jurisdiction, such provision shall be amended as is necessary to cause such provision to be valid and enforceable to the maximum extent permitted in such jurisdiction (and such amendment shall apply with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made).

6.  <u>No Representations or Warranties.</u>   Neither the Disclosing Party nor any of its Representatives make any representation or warranty, expressed or implied herein, as to the accuracy or completeness of the Confidential Information disclosed to Recipient hereunder. Neither the Disclosing Party nor any of its Representatives shall be liable hereunder to Recipient or any of its Representatives relating to or resulting from Recipient's use of any of the Confidential Information or any errors therein or omissions therefrom.

7.  <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

8.  <u>Parties in Interest</u>.  This Agreement shall be binding upon and inure solely to the benefit of each party hereto and nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement. Any purported assignment, encumbrance or other transfer of this Agreement or any of the rights or obligations arising therefrom, by any of the parties, without the prior written consent of the other party is prohibited, void and without force or effect.

41517349.2

9.    Entirety of Agreement; Amendment.  This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof. This Agreement may be amended only by a written instrument executed by the Disclosing Party and the Recipient.

10.    Specific Performance.   The parties hereto agree that if any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, irreparable damage would occur.  Without limiting any rights or remedies available to the parties, upon the violation of any provision hereof, each of the parties acknowledges that the other party is entitled to specific performance of this Agreement and each term and provision hereof.

11.    Descriptive Headings.  The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

12.    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but each or all of which shall constitute one and the same agreement.

13.    Term.  The covenants contained herein shall expire two (2) years from the date of this agreement unless otherwise specified.


IN WITNESS WHEREOF, each of the parties has caused this Agreement to be duly executed as of the day and year first below written.


Direct Connect Logistix, Inc.                            Surge Transportation, Inc.
 ("Direct Connect")                                      ("Surge")

By: _____                             By: _____
                                                            Omar Singh

Richard G. Piontek                                      Name: _____


Title: Chief Executive Officer                          Title: _____
                                                            President

Date: November 9, 2021                                  Date: _____
                                                            11/10/2021

# EXHIBIT D



---------- Forwarded message ---------
From: **Matthew May** <mmay@directconnectlogistix.com>
Date: Tue, Sep 12, 2023 at 12:34 PM
Subject: Re: **External Email** FW: Direct Connect Logistix USPS Freight Auction Documents
To: Brown, Jamesetta - Memphis, TN - Contractor <Jamesetta.Brown@usps.gov>
Cc: Greg Humrichouser <greg@directconnectlogistix.com>, John Mooney
<john.mooney@surgetransportation.com>


Hi Jamesetta,

Thank you for the follow up. We'll have everything back to you shortly.

Matt

Sent from my iPhone

 **Matthew May** | Senior Vice President - Strategic Solutions
**O** (317) 218-7777 x1164

1

**M** (305) 915-8937

130 S Meridian St. 3rd Floor, Indianapolis, IN 46225 | DCLogistix.com

This e-mail may contain confidential or privileged information. If you are not the intended recipient, please delete it and notify the sender of the error.

On Sep 12, 2023, at 12:29 PM, Brown, Jamesetta - Memphis, TN - Contractor <Jamesetta.Brown@usps.gov> wrote:

Hi Mathew,

Please return the attached forms as well as a copy of the Certificate of Insurance.

Also complete the supplier EDI survey at the link below:

USPS Network Supplier Survey

Best regards,

Jamesetta Brown

USPS Transportation Strategy, Contractor

Processing Network Transportation, Memphis TN

# EXHIBIT E



**Wayne G. Travell**
D: 703.584.8903
wtravell@hirschlerlaw.com

Hirschler Fleischer | hirschlerlaw.com
1676 International Drive, Suite 1350 | Tysons, VA  22102
P: 703.584.8900 | F: 703.584.8901

September 25, 2023

**Via Federal Express and email**

Matthew May
5379 Glenview Drive
Clarence, NY 14031
mmay@directconnectlogistix.com

Re:     **Demand to Cease and Desist from further violations of your July 2018 Employment Agreement with Surge Transportation, Inc. (the "Agreement"); Demand for Preservation of Documents**

Dear Mr. May:

This firm and the undersigned are litigation counsel for your former employer, Surge Transportation, Inc. ("Surge"), with respect to enforcement of its rights under the Agreement, a copy of which is attached for your reference as Exhibit A.

The purpose of this letter is to demand that you immediately cease and desist from further violations of the Agreement. This demand is made without prejudice to Surge's right to hold you, your current employer, and those acting in concert and participation with you in such conduct, accountable in damages for your violations of the Agreement to date.

a.   <u>Cease and Desist</u>

Under the Agreement's section 8, you agreed for a period of two years after the date of the termination of your employment with Surge, not to become employed by, solicit business from or with, service, or work for another in the service of, any Business Account of Surge, with respect to providing trucking/freight brokerage services. Under section 7, you agreed to refrain from using or disclosing Surge's Confidential Information, which is defined by the Agreement to include, among other things, Surge's customer information, sales prospects, pricing, or techniques and methods of operation. Finally, under section 6 of the Agreement, you agreed not to directly or indirectly induce or influence, or attempt to induce or influence, any Surge employee to terminate his or her employment with Surge.

I am informed that while you were employed by Surge, you were actively involved in providing services to Surge's customer, the United States Postal Service ("USPS"). I am also informed that you voluntarily terminated your employment with Surge on or about August 12, 2023.

Attached hereto as Exhibit B is a copy of email correspondence between you, as an employee of Surge competitor, Direct Connect Logistix, Inc. ("DCL"), and Jamesetta Brown, USPS Transportation Strategy, Contractor, confirming your successful solicitation of Surge customer USPS on behalf of DCL. Your email copies DCL president Greg Humrichouser and former Surge, and current DCL, employee John Mooney. Such conduct by you, DCL and Mr. Mooney constitutes intentional and direct violations of the Agreement and of separate agreements between Surge and each of DCL and Mr. Mooney.

Surge demands that you immediately cease and desist from further solicitation or service of Surge's customers. Further, Surge demands that you immediately terminate your employment with DCL and that you immediately cease providing Surge's Confidential Information to anyone, including DCL. Surge also demands that you provide a complete list of Surge customers that you have solicited or serviced in violation of the Agreement.

Unless you respond to these demands on or before Wednesday, September 27, 2023, Surge will take the steps legally necessary to protect its rights in this matter. If you fail to cease and desist from activities that interfere with Surge's customer or employee relationships, or that implicate Surge's Confidential Information, Surge may be compelled to institute immediate legal proceedings against you, DCL and/or Mr. Mooney to obtain injunctive and/or monetary relief for your breaches of the Agreement, for your participation with DCL and Mr. Mooney (and their participation with you) in violating Surge's legal rights and for other claims arising under applicable law (collectively, the "Claims").

     b.  Document Preservation

This letter will also serve to clarify your document preservation responsibilities with respect to the Claims and litigation that may ensue. By this preservation letter, you are hereby given notice not to destroy, conceal, or alter any paper or electronic files, other data generated by and/or stored on your computer systems and storage media (e.g., hard disks, floppy disks, backup tapes, cloud storage), or any other electronic data, such as voicemail. You have an affirmative duty to take reasonable steps to preserve all records that may be relevant to the Claims and the litigation that may be pursued by Surge. Records, documents, and electronically stored information ("ESI") that may be relevant to these Claims include, but are not limited to, the following:

(1)     E-mails and text messages;

(2)     Posts or messages on social media platforms, including, without limitation, LinkedIn, WhatsApp, Facebook, Facebook Messenger, X (formerly Twitter), and Instagram; and

(3)     Any other communications between you and any other individual, including, without limitation, current or prospective customers or suppliers of Surge.

Potentially relevant records, documents, and ESI encompass a broad range of information, including paper documents and information stored electronically. The term "document" also includes any and all copies of any document that contains any notation or otherwise differs from the original and other copies, and specifically includes drafts or edits of the above and handwritten notes or notations in whatever form together with any attachments to any such documents. The term "document" expressly includes all computer records and items incorporated in an electronic database of any kind, including but not limited to hard drives, compact disks, floppy disks, removable drives, cloud services, and magnetic tapes of any other media.

Relevant materials in the following locations could be subject to discovery and, therefore, must be preserved: (1) e-mail messages and attachments, wherever they are stored (including messages in "Deleted Items" and "Sent Items" folders, in "Archives" or PST files, in E-mail Server Stores, cloud services, and – to the extent those message are not stored anywhere else and/or in any e-mail account(s), including personal accounts – in any Android device, iPhone, iPad, Blackberry, or other personal digital assistant); (2) word processing documents, spreadsheets, and presentations, whether stored locally on a desktop or laptop computer, in a shared folder, on a network drive, or in any other locations on the network, or in cloud storage; (3) information copied to CDs, DVDs, or removable drives (such as "flash" drives or "thumb" drives); (4) photographs, video recordings (including surveillance footage), and audio recordings (including voicemail); (5) text messages; (6) phone call logs on electronic communication devices such as mobile phones or in phone bills; (7) social media communications such as X (formerly Twitter) posts, Facebook posts, and Facebook Messenger messages; (8) information stored on any former computer systems, cell phone(s), or other media devices no longer in use; and (9) information retained on any backup media.

This list of potentially relevant records and possible locations of ESI is not all-inclusive and only represents an initial assessment of the categories of information that might be relevant and where the documents might be located. You are required to interpret this list broadly and err on the side of preservation. If you possess other information/materials not included in this list that may be relevant to future litigation, such information/materials also should be preserved.

As you may know, the law recognizes a duty to preserve evidence in anticipation of litigation. As such, this litigation evidence preservation letter is not necessary to trigger your duty to preserve evidence, which exists independently. Rather, this letter is to provide you additional detail in fulfilling your preservation obligations. Your failure to preserve evidence in circumstances where preservation is required could lead a court or administrative body to sanction you.

You must also ensure that your ESI preservation methods do not remove or degrade the ability to search the ESI by electronic means or otherwise make it difficult or burdensome to address or use the information. ESI should be preserved in the format in which it is ordinarily maintained (*i.e.*, native form). Because hard copies do not preserve electronic searchability or metadata, they are not an

September 25, 2023
Page 4

adequate substitute for, or cumulative of, electronically stored versions. If information exists in both electronic and paper forms, you should preserve both forms.

Adequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence. Accordingly, features of information systems, devices, and standard operating procedures that, in routine operation, cause the loss of potentially relevant and/or discoverable evidence must be immediately identified, and modified or suspended. Examples include: (1) purging the content of email repositories by age, capacity, or other criteria; (2) using data or media wiping, disposal, erasure, or encryption utilities or devices; (3) overriding, erasing, destroying, or discarding backup media; (4) reassigning, reimaging, or disposing of systems, servers, devices, or media; (5) running anti-virus or other programs affecting wholesale metadata alteration; (6) releasing or purchasing online storage repositories; (7) using metadata tripper utilities; (8) disabling server, packet or local instant messaging logging; or (9) executing driver or file defragmentation or compression programs.

Finally, you should take affirmative steps to ensure that individuals with access to your systems, archives, files, computers, devices, social media accounts, cloud storage accounts, or e-mail accounts understand these preservation requirements and refrain from modifying, destroying, or hiding any potentially relevant ESI while this litigation hold is in effect.

Please forward a copy of this letter to all persons and entities with custodial responsibility for the items referred to in this letter. Please also confirm in writing by no later than Wednesday, September 27, 2023 that you have taken or will take the steps outlined in this letter to preserve records, documents and ESI potentially relevant to the Claims and/or future litigation pursued by Surge. *Failure to abide by this request could result in penalties assessed against you and could form the basis of legal claims for spoliation.*

This demand is made without prejudice to the rights or remedies available to Surge. Surge expressly reserves the right to pursue any and all remedies or take such actions as Surge may be entitled to under the Agreement or applicable law.

I look forward to your prompt response.

Sincerely,

*Wayne G. Travell*

Wayne G. Travell

Enclosures

September 25, 2023
Page 5

Enclosures
cc:  Greg Humrichouser, President, Direct Connect Logistix, Inc.
     Richard G. Piontek, CEO, Direct Connect Logistix, Inc.
     Omar Singh (by email only)
     Stephen E. Leach, Esq. (by email only)
     Kristen E. Burgers, Esq. (by email only)
     David I. Swan, Esq. (by email only)
     Allison P. Klena, Esq. (by email only)
     Brad Markey, Esq. (by email only)
     Richard Thames, Esq. (by email only)

16489211.2  048588.00001

# EXHIBIT A



---------- Forwarded message ---------
From: **Matthew May** <maymatthew311@gmail.com>
Date: Thu, Jul 26, 2018 at 3:36 PM
Subject: Re: Welcome to the Surge Transportation Team!
To: Surge HR <hr@surgetransportation.com>


Hi Tadina,

Sorry on the slight delay. Please see attached. Let me know if you need anything else. Thanks

Matt

On Wed, Jul 25, 2018 at 1:54 PM, Surge HR <hr@surgetransportation.com> wrote:

Hi Matt

We are so excited that you will be joining the Surge Team! Attached is our new hire paperwork and your contract. Please send the completed paperwork back to me at this email address at your earliest convenience.

In the meantime, could you please send me the last six digits of your social security number. I will use it to set up your company usernames and passwords.

Please let me know if you have any questions. We are looking forward to working with you.

Thanks!

Tadina

-----
Tadina Ross
Surge Transportation, Inc.
Cell: 202-329-4670
Office: 571-222-4100
Fax: 904-212-2172



## EMPLOYMENT AGREEMENT

This Employment Agreement ("Employment Agreement") is entered into as of the _____ day of July, 2018, by and between Surge Transportation, Inc., a Virginia Corporation, ("Surge Transportation" or "Company"), and Matthew May ("Employee").

In consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Surge Transportation and Employee hereby agree as follows:

1.  **Employment.** Surge Transportation will employ the Employee as an at-will employee, meaning that Employee or Company can terminate employment relationship at any time or for any reasons.

2.  **Title:** Employee shall have the title ˌVP of Sales & Business Development  Employee will report to Omar Singh, Surge Transportation's President. The terms and conditions of the Employee's employment shall, to the extent not addressed or described in this Employment Agreement, be governed by Surge Transportation's personnel manual, policies, procedures and practices.

3.  **Compensation and Benefits.**

    3.1  **Base Salary.** Employee shall be paid as a W-2 Exempt employee an annual salary of $140,000.00 (One-Hundred-Forty Thousand and 00/100 Cents) ("Base Salary"), subject to applicable federal, state, and local withholding, and other payroll deductions required by law or authorized by the Employee. Employee's Base Salary shall be paid to Employee in the same manner and on the same payroll schedule in which all Surge Transportation's employees receive payment. As an Exempt employee, Employee shall not be eligible for overtime pay.

    3.3.  **Commission / Bonus Structure.** As long as Employee remains employed by Company and is providing services and fulfilling the terms/conditions of his employment, he will be entitled to commissions/bonus payments pursuant to the following structure:

    3.3.A.  Ten Percent (10%) of Net Profit of each load during Year One of Service for New Customers originated by Employee. 7.5% of Net Profit of each load during Year Two of Service for such New Customers originated by Employee. And, 5% of Net Profit of each load during Year Three of Service for such New Customers originated by Employee. After Year Three, no commissions will be paid. Year One commences on the date the first shipment is moved for each New Customer (and such date becomes the anniversary date for Year Two and Year Three periods).

    3.3.B.  Company shall be required to track New Customer financial information and provide reports to Employee on quarterly basis. Commission payments shall be due to

employee within thirty (30) days after the end of each quarter.  Quarters shall be measured on calendar basis (1st: JFM; 2nd: AMJ; 3rd: JAS; and 4th: OND).

3.3.C.  During Employee's first six (6) months of employment, Employee will also be entitled to $2,000.00 (Two-Thousand and 00/100 Cents) bonus payment for each Fortune 1000 New Customer Employee generates who moves at least ten (10) shipments with Surge Transportation during such time period.  Such bonus payments, as applicable, shall be paid on monthly basis.

3.3.D.  Commission and bonus payments shall be made on W-2 basis and will be subject to applicable federal, state, and local withholding, and other payroll deductions required by law or authorized by the Employee.

3.3.E.  New Customer is defined as any account that neither Surge nor Omar Singh has conducted business with within the prior twenty-four (24) months.

3.3.F.  Net Profit is defined as the number of sales dollars remaining after paying hired motor carrier expenses.

3.3.G.  If any receivables become uncollectable bad debt, any Commissions advanced/paid to Employee shall be reversed and monies otherwise owed to Employee (including salary payments), may be offset.

3.3.H.  By mutual written agreement, Employee and Surge Transportation can modify Employee's base salary and/or commissions/bonus payments.

3.4    <u>Employee Benefits</u>.

3.4.A.  Employee shall be eligible to participate in all employee benefit plans, policies, programs, or perquisites in which other Surge Transportation executives, officers or employees participate, including but not limited to, medical insurance, retirement plans, insurance plans and leave benefits. The terms and conditions of Employee's participation in the Surge Transportation employee benefit plans, policies or programs shall be governed by the terms of each such plan, policy, or program.  Any and all benefits offered by Surge Transportation can be modified, including being eliminated, at any time at the sole discretion of Surge Transportation (subject to applicable law).

3.4.B.  Surge Transportation will pay one-hundred (100) percent of the employee/family medical, vision, dental and life insurance costs.

3.5    <u>Paid Time Off</u>.  For Employee's first year of full employment, Employee shall be entitled to ten (10) days of paid time off annually.  Such PTO shall accrue at .833 days per month.  As applicable, for employment years 2 through 5, Employee shall receive an additional two (2) days of PTO each year (with monthly accrued for all PTO days pursuant to standard payroll practices) (accordingly, assuming Employee remains employed, he will have following PTO:  Year 2 - 12 days; Year 3 - 14 days; Year 4 – 16 days; and Year 5 and beyond – 18 days.  Upon request, Employee may receive an

"advance" of PTO if he does not have sufficient accrued. Upon termination of employment, any negative PTO shall be deducted from Employee's final pay.

4.    <u>Duties and Performance</u>.  The Employee acknowledges and agrees that he is being offered a position of employment by Surge Transportation with the understanding that the Employee possesses a unique set of skills, abilities, and experiences which will benefit Surge Transportation, and he agrees that his continued employment with Surge Transportation, whether during the term of this Employment Agreement or thereafter, is contingent upon his good faith performance of his duties as Sales Executive.

    4.1    <u>General Duties</u>.

        a.    Employee shall faithfully and industriously render to the best of Employee's skill, care, diligence and attention all responsibilities and duties connected with his employment and shall undertake diligently all duties assigned to him.

        b.    Employee shall devote his full time, ability, attention and skill to the business of Surge Transportation on a regular and professional basis.

        c.    Employee shall not undertake, either as an owner, director, shareholder, employee or otherwise, the performance of services for compensation (actual or expected) for any other entity without the express written consent of Surge Transportation.  For the sake of clarity, Employee shall not ship any cargo through any property broker, shipping broker, freight forwarder, or transportation services company – any such shipping shall be through Surge Transportation.

        d.    Employee shall have no authority to enter into any contracts binding upon Surge Transportation, or to deliberately create any obligations on the part of the Surge Transportation, except as may be specifically authorized by Omar Singh.

5.    Omitted

6.    <u>Anti-Piracy Covenant</u>.  During Employee's employment and for two (2) years after the termination, for any reason, of that employment, Employee shall not directly or indirectly induce or influence, or attempt to induce or influence, any employee or contractor of Surge Transportation to terminate his or her employment or contractual relationship with Surge Transportation.

7.   <u>Non-Disclosure Agreement</u>

    a.  Surge Transportation has developed trade secrets and other confidential information regarding Surge Transportation's business methods, practices, customers, pricing, advertising, vendor/contractor relationships, and other non-public proprietary information ("Confidential Information") which may be communicated to, or acquired by, Employee in the course of his/her employment.  In order to avoid substantial and irreparable damage to Surge Transportation, it is essential for Surge Transportation to protect and preserve its Confidential Information for its own, and only its own, use.

    b.  All of Surge Transportation's Confidential Information furnished to Employee by Surge Transportation, or developed by Employee on behalf of Surge Transportation or at Surge Transportation's direction, or otherwise available to Employee by virtue of Employee's employment, are and shall remain the sole property of Surge Transportation.  Employee shall maintain the confidentiality of such Confidential Information and shall use them only for the benefit of Surge Transportation and in the course of providing services by Employee to Surge Transportation and its customers.

    c.  Employee shall not, during or after the term of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Confidential Information, including, but not limited to:  (1) techniques and methods of operation; (2) any sales prospects, customer lists (including customer names, email addresses, phone numbers, or addresses), products, research or data of any kind; or (3) any information relating to strategic plans, sales costs, profits or the financial condition of Surge Transportation or any of its customers or prospective customers, which is not generally known to the public or recognized as standard practice in the industries in which  Surge Transportation shall be engaged.

    d.  If Surge Transportation requests the return of any materials describing or discussing such Confidential Information at any time during or after the termination of Employee's employment, Employee shall immediately deliver them to Surge Transportation and retain no hard or electronic copies.

    e.  During the course of Employee's employment, Employee may be exposed to or have access to Confidential Information of Surge Transportation's clients and/or customers.  Except as necessary to perform services for Surge Transportation's client and/or customer, Employee shall not use such information or disclose it by publication or otherwise to any other person during the term of Surge Transportation's relationship with such client and/or customer and for a period of two (2) years thereafter.

    f.  Any and all procedures, techniques, or inventions ("Creations") which Employee may make, conceive, discover, or develop, either solely or jointly with any other person(s) during the term of his/her employment, whether during working hours or not, and whether at the request or suggestion of Surge Transportation or not, which relate to or are useful in any business carried on or contemplated by the Surge Transportation including expansions of its present fields of operation, shall, to the fullest extent permitted by law, be the sole and exclusive property of Surge Transportation.

g. Employee shall disclose to Surge Transportation all Creations, and aid and assist Surge Transportation so that Surge Transportation can prepare and present applications for, secure, review and extend copyright or patent letters for the Creation(s), and can obtain the record title so that Surge Transportation shall be the sole and absolute owner thereof in all countries in which it may desire to have copyright or patent protection.  Employee shall not be entitled to any additional compensation for any such Creation(s).  All such Creations that are the sole result of freelance work with prior written approval by the President or that are non-compensated activity unrelated, directly or indirectly to the Employee's performance under this agreement, shall remain the property of the Employee.  To the extent necessary to effect the intention of this Sub-Paragraph and the immediately-preceding Sub-Paragraph, the Creations shall be deemed "works for hire."

8.   Non-Competition Agreement

a. By virtue of employment by Surge Transportation, Employee will acquire or has acquired an intimate knowledge and expertise of considerable value to Surge Transportation.

b. Surge Transportation has substantial rights and interests in each Business Account serviced, handled, contacted, or obtained by it, including, but not limited to, those Business Accounts procured and/or serviced in any manner by Employee while in the employment of Surge Transportation.  Employee acknowledges and represents that Employee does not have, and will not develop, any right or interest in such Business Accounts of Surge Transportation.

c. Absent prior written consent of Surge Transportation, for a period of two (2) years from the date of Employee's termination of employment, for any reason, Employee agrees not to become employed by, solicit business from or with, service, or work for another in the service of, any Business Account of Surge Transportation, with respect to providing Competitive Services.  Competitive Services shall mean trucking/freight brokerage services.

d. The term "Business Account" shall mean (i) business or client serviced by Surge Transportation during the two (2) years immediately preceding the date of termination of the Employee, or (ii) any individual, business or potential customer which contacted, was referred to, or in any manner was solicited by any agent or employee of Surge Transportation during the six -month period immediately preceding the date of termination of the Employee, regardless of whether the business, account, or client was obtained by Surge Transportation prior to the date of termination of the Employee.

e. If any period of time or other restriction specified in this Agreement should be found unreasonable or otherwise unenforceable in any proceeding, then the period of time or other restriction shall be reduced so that such restrictions may be enforced to the greatest extent possible as is reasonable and enforceable.

f. If Employee violates any of the restrictions contained in this Article 8, the restrictive period shall not begin to run until such time as the violation shall be cured by Employee to the satisfaction of Surge Transportation, or as otherwise ordered by a Court of competent jurisdiction.

9.  <u>Non-Disparagement</u>.  Employee shall not make any false, disparaging, derogatory, critical, insulting, offensive, deprecating or belittling comments, in public or in private, about the Company, its parent, subsidiaries or affiliated entities or about the business affairs or financial condition of the Company, its parent, subsidiaries, or affiliated entities, or about any employee, director or officer of the Company, its parent, subsidiaries or affiliated entities. Except as required by law or court order, Employee shall not directly or indirectly provide any assistance to any person or entity, including any governmental body, asserting or intending to assert any litigation, investigation or proceeding against the Company or any of its affiliated entities.

10.  <u>Injury and Injunctive Relief</u>.  The parties agree that in the event of violation by Employee of the restrictions contained in Article 8 of this Agreement, the amount of actual damages suffered by Surge Transportation will be difficult to ascertain.  The parties therefore irrevocably agree that the violation, or threatened violation, of those restrictions shall cause Surge Transportation irreparable injury for purposes of obtaining injunctive relief.  In addition, the parties' best estimate of monetary damages caused is that each violation of the anti-piracy provisions of Article 6, the non-disclosure provisions of Article 7 or the Non-Disparagement provisions of Article 9 will cause Surge Transportation damages of $15,000. The parties agree that these are fair and reasonable estimates of Surge Transportation's actual damages, and agree to the imposition of such amounts as liquidated damages in lieu of actual damages, and not as a penalty.

11.  <u>Prior Agreements</u>.  Employee represents and warrants to Surge Transportation: (i) that there are no restrictions, agreements or understandings whatsoever to which Employee is a party which would prevent or make unlawful his/her execution of this Agreement or his/her employment with Surge Transportation; (ii) that his/her execution of this Agreement and his/her employment by Surge Transportation will not constitute a breach of any contract, agreement or understanding, oral or written, to which he/she is a party or by which he/she is bound; and (iii) that he/she is free and able to execute this Agreement and to enter into employment with Surge Transportation.  Employee agrees to indemnify and hold harmless Surge Transportation from any costs, expenses, damages, or injury, including court costs and attorney's fees, resulting from any violation of this Article 11.

12.  <u>Expenses/Reimbursement</u>

    12.1    Surge Transportation shall pay or reimburse Employee for office and reasonable travel related expenses upon submission vouchers or receipts maintained and provided to Surge Transportation in compliance with such rules and policies relating thereto as Surge Transportation may from time to time adopt.

13.  <u>Omitted</u>

14.  General Provisions

    14.1    <u>Notices</u>.  All notices and other communications required or permitted by this Employment Agreement to be delivered by Surge Transportation or Employee to the other party shall be delivered in writing to the address shown below, either personally, or by certified or express mail, return receipt requested, postage prepaid,

to the address for such party specified below or to such other address as the party may from time to time advise the other party, and shall be deemed given and received as of actual personal delivery, or upon the date of actual receipt shown on any return receipt if registered, certified or express mail is used, as the case may be.

Company:        Surge Transportation
                 20651 Holyoke Drive
                 Ashburn, VA 20147

With a copy to:  Merritt Green
                 General Counsel, P.C.
                 6849 Old Dominion Drive, Suite 220
                 McLean, VA 22101

Employee:       Matthew May
                 55 SW 9th Street, Unit 1404
                 Miami, FL 33130

14.2    <u>Amendments and Termination; Entire Agreement</u>.  This Employment Agreement may not be amended or terminated except by a writing executed by all of the parties hereto. This Employment Agreement constitutes the entire agreement of Surge Transportation and Employee relating to the subject matter hereof and supersedes all prior oral and written understandings and agreements relating to such subject matter.

14.3    <u>Successors and Assigns</u>.  The Employee may not assign his rights and obligations under this Employment Agreement to another person without the prior written consent of the Executive Committee.

14.4    <u>Severability; Provisions Subject to Applicable Law</u>.  All provisions of this Employment Agreement shall be applicable only to the extent that they do not violate any applicable law, and are intended to be limited to the extent necessary so that they will not render this Employment Agreement invalid, illegal or unenforceable under any applicable law. If any provision of this Employment Agreement or any application thereof shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of other provisions of this Employment Agreement or of any other application of such provision shall in no way be affected thereby.

14.5    <u>Waiver of Rights</u>.  No waiver by Surge Transportation or Employee of a right or remedy hereunder shall be deemed to be a waiver of any other right or remedy or of any subsequent right or remedy of the same kind.

14.6    <u>Definitions; Headings; and Number</u>.  A term defined in any part of this Employment Agreement shall have the defined meaning wherever such term is used herein. The headings contained in this Employment Agreement are for reference purposes only and shall not affect in any manner the meaning or interpretation of this Employment Agreement. Where appropriate to the context of this Employment Agreement, use of the singular shall be deemed also to refer to the plural, and use of the plural to the singular.

14.7   <u>Counterparts</u>.  This Employment Agreement may be executed in separate counterparts, each of which shall be deemed an original but both of which taken together shall constitute but one and the same instrument.

14.8   <u>Governing Laws and Forum</u>.  This Employment Agreement shall be governed by, construed, and enforced in accordance with the laws of the Commonwealth of Virginia and the Parties agree to the exclusive jurisdiction of the State Courts located in Fairfax, Virginia or, as applicable, the Federal Courts located in Alexandria, Virginia.

IN WITNESS WHEREOF, Surge Transportation and Employee have executed and delivered this Agreement as of the date written below.

Surge Transportation

By: _____

Matthew May _____ Date          Omar Singh                         Date
                                              President



## FIRST AMENDMENT TO EMPLOYMENT AGREEMENT

This First Amendment to Employment Agreement ("First Amendment") is an amendment to the Employment Agreement between Surge Transportation (Company) and Matthew May (Employee) dated July 2018.  In recognition of the valuable contributions Employee has made to Company, the Employment Agreement is amended as provided herein.  All terms not specifically amended herein remain unchanged within the Employment Agreement.

1. <u>Base Salary</u>.  Section 3.1 is amended as follows: Base salary will be increased to $200,000.00 (Two-Hundred Thousand and 00/100 Cents).
2. <u>Commission / Bonus Structure</u>.  Section 3.3.A. is amended as follows:
    a. For the period Q3 of 2021, commission will be paid at a rate of 5% of Net Profit for all accounts originated by Employee.
    b. For the period Q4 of 2021 and beyond, commission  will be paid at a rate of 3% of Net Profit for all accounts originated by Employee and will not contain a sunset provision which reduces then eliminates in Years Two, Three, and beyond.
3. <u>House Accounts</u>.  This is a new provision.  House Accounts will be defined as customers whose relationship with Company is largely the result of Company's various TMS relationships (including companies such as BluJay/E2 Open, Blue Yonder, Mercury Gate, Kuebix, Oracle, SAP) and Company's ability to provide API and RPA Real-Time Pricing capability.  Originating these accounts does not require the extensive sales effort customarily associated with customer origination.  These accounts require little involvement from the Employee once they are activated and their volume of business is driven primarily through automated API and RPA technology.  Efforts on these accounts shall be considered to be responsibilities associated with Employee's Base Salary and will not be considered "originated" by Employee.  No commissions will be paid on House Accounts.  House Accounts shall be designated at the discretion of Surge's President, Omar Singh.
4. <u>Liquidity Event of Surge</u>.  This is a new provision.  In the event of a Sale of the Company (as defined herein) which occurs during Employee's continuous employment by the Company (or an affiliate thereof), Employee shall be eligible to receive from the Company Two-Percent (2%) of the Net Sales Proceeds (as defined herein). A "Sale the Company" shall mean the earliest to occur of (i) a "change in ownership of the company" as defined in Treasury Regulation Section 1.409A-3(i)(5)(v) or (ii) "a change in the ownership of a substantial portion of the company's assets" as defined in Treasury Regulation Section 1.409A-3(i)(5)(vii) (but substituting 50% for 40%). Notwithstanding

the foregoing, a "Sale of the Company" shall <u>not</u> include: (i) a financing or original issuance of securities the primary purpose of which is to raise additional capital for the Company; (ii) a transaction in which stock or assets of the Company are transferred to a related party including, without limitation, to an already existing owner, employee, affiliated company, or owner or employee of an affiliated company; (iii) a pledge of stock of the Company that creates a mere security interest; (iv) a transfer of stock to the lineal descendants or spouse of an owner of the Company, or to trusts for the benefit of such persons; or (v) a gift of stock of the Company. "Net Sales Proceeds" shall mean the consideration received by the Company (or its owners, as applicable) upon a Sale of the Company reduced by (i) any and all transaction costs including, but not limited to, commissions, attorneys' fees, banker fees, closing costs, taxes, and similar costs and expenses; (ii) payments to all of the creditors of the Company (whether secured or unsecured); and/or (iii) any monies received by employees and/or owners of the Company under any employment and/or restrictive covenant agreements.

Employee shall be disqualified for the Sale Bonus if Employee's employment is terminated for cause, as defined herein, or if Employee is in material breach of this Agreement (as determined by reasonable business judgment of the Company).  Cause is defined as: (1) fraud, embezzlement, or theft; (2) willful misconduct damaging to the Company, its reputation, products, services or customers; (3) intentional violation of any law, regulation or the terms of this Agreement; (4) any unauthorized disclosure of any trade secret or confidential information; (5) malfeasance; (6) breach of duty of loyalty to the Company; or (7) charged with felony or a misdemeanor involving moral turpitude.

Payments under this Section 4 will be made in cash or in-kind in the same proportions as is received by the Company (or its owners, as applicable) and will be paid to Employee as soon as practicable following the Sale of the Company but no later than the date which is one and one-half (1½) months after the close of the taxable year in which such Sale of the Company occurs. Notwithstanding the foregoing, if the Company (or its owners) receive a promissory note or other consideration that is subject to deferral conditions including, without limitation, escrows, earn-out requirements, vesting schedules or, in the case of securities, lock-up or similar underwriting restrictions, the same deferred payment terms or deferral conditions imposed on the Company (or its owners) will be imposed on payment to Employee to the extent permitted by Treasury Regulation Section 1.409A-3(i)(5). Any amounts paid under this Section 4 shall be subject to deductions as required by law and/or authorized by the Employee.

IN WITNESS WHEREOF, Surge Transportation and Employee have executed and delivered this Agreement as of the date written below.

Surge Transportation

_Matthew May_     _10-19-2021_     By:     _Omar Singh_     10.25.2021

Matthew May     Date           Omar Singh     Date

                                                                    President

# EXHIBIT B



---------- Forwarded message ---------
From: **Matthew May** <mmay@directconnectlogistix.com>
Date: Tue, Sep 12, 2023 at 12:34 PM
Subject: Re: **External Email** FW: Direct Connect Logistix USPS Freight Auction Documents
To: Brown, Jamesetta - Memphis, TN - Contractor <Jamesetta.Brown@usps.gov>
Cc: Greg Humrichouser <greg@directconnectlogistix.com>, John Mooney
<john.mooney@surgetransportation.com>

Hi Jamesetta,

Thank you for the follow up. We'll have everything back to you shortly.

Matt

Sent from my iPhone

**Matthew May** | SENIOR VICE PRESIDENT - STRATEGIC SOLUTIONS
**O** (317) 218-7777 x1164

1

**M** (305) 915-8937

130 S Meridian St. 3rd Floor, Indianapolis, IN 46225 | DCLogistix.com



This e-mail may contain confidential or privileged information. If you are not the intended recipient, please delete it and notify the sender of the error.

On Sep 12, 2023, at 12:29 PM, Brown, Jamesetta - Memphis, TN - Contractor
<Jamesetta.Brown@usps.gov> wrote:

Hi Mathew,

Please return the attached forms as well as a copy of the Certificate of Insurance.

Also complete the supplier EDI survey at the link below:

USPS Network Supplier Survey

Best regards,

Jamesetta Brown

USPS Transportation Strategy, Contractor

Processing Network Transportation, Memphis TN

# EXHIBIT F



Wayne G. Travell
D: 703.584.8903
wtravell@hirschlerlaw.com

Hirschler Fleischer | hirschlerlaw.com
1676 International Drive, Suite 1350 | Tysons, VA  22102
P: 703.584.8900 | F: 703.584.8901

September 25, 2023

**Via Federal Express and email**

John Mooney
302 West Frontier Drive
Minooka, IL 60447
jmooney@directconnectlogistix.com

Re:    **Demand to Cease and Desist from further violations of your December 30, 2019 Employment Agreement with Surge Transportation, Inc. (the "Agreement"); Demand for Preservation of Documents**

Dear Mr. Mooney:

This firm and the undersigned are litigation counsel for your former employer, Surge Transportation, Inc. ("Surge"), with respect to enforcement of its rights under the Agreement, a copy of which is attached for your reference as Exhibit A.

The purpose of this letter is to demand that you immediately cease and desist from further violations of the Agreement. This demand is made without prejudice to Surge's right to hold you, your current employer, and those acting in concert and participation with you in such conduct, accountable in damages for your violations of the Agreement to date.

a.   Cease and Desist

Under the Agreement's section 7, you agreed for a period of eighteen months after the date of the termination of your employment with Surge, not to become employed by, solicit business from or with, service, or work for another in the service of, any Business Account of Surge, with respect to providing trucking/freight brokerage services. Under section 6, you agreed to refrain from using or disclosing Surge's Confidential Information, which is defined by the Agreement to include, among other things, Surge's customer information, sales prospects, pricing, or techniques and methods of operation. Finally, under section 5 of the Agreement, you agreed not to directly or indirectly induce or influence, or attempt to induce or influence, any Surge employee to terminate his or her employment with Surge.

September 25, 2023
Page 2

I am informed that while you were employed by Surge, you were actively involved in providing services to Surge's customer, the United States Postal Service ("USPS"). I am also informed that you voluntarily terminated your employment with Surge on or about September 2, 2023.

Attached hereto as Exhibit B is a copy of email correspondence between Matthew May, as an employee of Surge competitor, Direct Connect Logistix, Inc. ("DCL"), and Jamesetta Brown, USPS Transportation Strategy, Contractor. Mr. May's email copies you, as an employee of DCL, and confirms your and Mr. May's successful solicitation of Surge customer USPS on behalf of DCL. Mr. May's email also copies DCL president Greg Humrichouser. Such conduct by you, DCL and Mr. May constitutes intentional and direct violations of the Agreement and of separate agreements between Surge and each of DCL and Mr. May.

Surge demands that you immediately cease and desist from further solicitation or service of Surge's customers. Further, Surge demands that you immediately terminate your employment with DCL and that you immediately cease providing Surge's Confidential Information to anyone, including DCL. Surge also demands that you provide a complete list of Surge customers that you have solicited or serviced in violation of the Agreement.

Unless you respond to these demands on or before Wednesday, September 27, 2023, Surge will take the steps legally necessary to protect its rights in this matter. If you fail to cease and desist from activities that interfere with Surge's customer or employee relationships, or that implicate Surge's Confidential Information, Surge may be compelled to institute immediate legal proceedings against you, DCL and/or Mr. May to obtain injunctive and/or monetary relief for your breaches of the Agreement, for your participation with DCL and Mr. May (and their participation with you) in violating Surge's legal rights and for other claims arising under applicable law (collectively, the "Claims").

      b.  Document Preservation

This letter will also serve to clarify your document preservation responsibilities with respect to the Claims and litigation that may ensue. By this preservation letter, you are hereby given notice not to destroy, conceal, or alter any paper or electronic files, other data generated by and/or stored on your computer systems and storage media (e.g., hard disks, floppy disks, backup tapes, cloud storage), or any other electronic data, such as voicemail. You have an affirmative duty to take reasonable steps to preserve all records that may be relevant to the Claims and the litigation that may be pursued by Surge. Records, documents, and electronically stored information ("ESI") that may be relevant to these Claims include, but are not limited to, the following:

(1)      E-mails and text messages;
(2)      Posts or messages on social media platforms, including, without limitation, LinkedIn, WhatsApp, Facebook, Facebook Messenger, X (formerly Twitter), and Instagram; and

(3)     Any other communications between you and any other individual, including, without limitation, current or prospective customers or suppliers of Surge.

Potentially relevant records, documents, and ESI encompass a broad range of information, including paper documents and information stored electronically. The term "document" also includes any and all copies of any document that contains any notation or otherwise differs from the original and other copies, and specifically includes drafts or edits of the above and handwritten notes or notations in whatever form together with any attachments to any such documents. The term "document" expressly includes all computer records and items incorporated in an electronic database of any kind, including but not limited to hard drives, compact disks, floppy disks, removable drives, cloud services, and magnetic tapes of any other media.

Relevant materials in the following locations could be subject to discovery and, therefore, must be preserved: (1) e-mail messages and attachments, wherever they are stored (including messages in "Deleted Items" and "Sent Items" folders, in "Archives" or PST files, in E-mail Server Stores, cloud services, and – to the extent those message are not stored anywhere else and/or in any e-mail account(s), including personal accounts – in any Android device, iPhone, iPad, Blackberry, or other personal digital assistant); (2) word processing documents, spreadsheets, and presentations, whether stored locally on a desktop or laptop computer, in a shared folder, on a network drive, or in any other locations on the network, or in cloud storage; (3) information copied to CDs, DVDs, or removable drives (such as "flash" drives or "thumb" drives); (4) photographs, video recordings (including surveillance footage), and audio recordings (including voicemail); (5) text messages; (6) phone call logs on electronic communication devices such as mobile phones or in phone bills; (7) social media communications such as X (formerly Twitter) posts, Facebook posts, and Facebook Messenger messages; (8) information stored on any former computer systems, cell phone(s), or other media devices no longer in use; and (9) information retained on any backup media.

This list of potentially relevant records and possible locations of ESI is not all-inclusive and only represents an initial assessment of the categories of information that might be relevant and where the documents might be located. You are required to interpret this list broadly and err on the side of preservation. If you possess other information/materials not included in this list that may be relevant to future litigation, such information/materials also should be preserved.

As you may know, the law recognizes a duty to preserve evidence in anticipation of litigation. As such, this litigation evidence preservation letter is not necessary to trigger your duty to preserve evidence, which exists independently. Rather, this letter is to provide you additional detail in fulfilling your preservation obligations. Your failure to preserve evidence in circumstances where preservation is required could lead a court or administrative body to sanction you.

You must also ensure that your ESI preservation methods do not remove or degrade the ability to search the ESI by electronic means or otherwise make it difficult or burdensome to address or use the

information. ESI should be preserved in the format in which it is ordinarily maintained (*i.e.*, native form). Because hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions. If information exists in both electronic and paper forms, you should preserve both forms.

Adequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence. Accordingly, features of information systems, devices, and standard operating procedures that, in routine operation, cause the loss of potentially relevant and/or discoverable evidence must be immediately identified, and modified or suspended. Examples include: (1) purging the content of email repositories by age, capacity, or other criteria; (2) using data or media wiping, disposal, erasure, or encryption utilities or devices; (3) overriding, erasing, destroying, or discarding backup media; (4) reassigning, reimaging, or disposing of systems, servers, devices, or media; (5) running anti-virus or other programs affecting wholesale metadata alteration; (6) releasing or purchasing online storage repositories; (7) using metadata tripper utilities; (8) disabling server, packet or local instant messaging logging; or (9) executing driver or file defragmentation or compression programs.

Finally, you should take affirmative steps to ensure that individuals with access to your systems, archives, files, computers, devices, social media accounts, cloud storage accounts, or e-mail accounts understand these preservation requirements and refrain from modifying, destroying, or hiding any potentially relevant ESI while this litigation hold is in effect.

Please forward a copy of this letter to all persons and entities with custodial responsibility for the items referred to in this letter. Please also confirm in writing by no later than Wednesday, September 27, 2023 that you have taken or will take the steps outlined in this letter to preserve records, documents and ESI potentially relevant to the Claims and/or future litigation pursued by Surge. *Failure to abide by this request could result in penalties assessed against you and could form the basis of legal claims for spoliation.*

This demand is made without prejudice to the rights or remedies available to Surge. Surge expressly reserves the right to pursue any and all remedies or take such actions as Surge may be entitled to under the Agreement or applicable law.

I look forward to your prompt response.

Sincerely,

*Wayne G. Travell*

Wayne G. Travell

September 25, 2023
Page 5

Enclosures

cc:   Greg Humrichouser, President, Direct Connect Logistix, Inc.
      Richard G. Piontek, CEO, Direct Connect Logistix, Inc.
      Omar Singh (by email only)
      Stephen E. Leach, Esq. (by email only)
      Kristen E. Burgers, Esq. (by email only)
      David I. Swan, Esq. (by email only)
      Allison P. Klena, Esq. (by email only)
      Brad Markey, Esq. (by email only)
      Richard Thames, Esq. (by email only)


16487472.3  048588.00001

# EXHIBIT A

**CONFIDENTIAL DEC. 30, 2019**



## EMPLOYMENT AGREEMENT

This Employment Agreement ("Employment Agreement") is entered into as of the 30th day of December 2019, by and between Surge Transportation, Inc., ("Surge Transportation" or "Company"), and John Mooney ("Employee").

In consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Surge Transportation and Employee hereby agree as follows:

1.   Employment. Surge Transportation will employ the Employee as an at-will employee, meaning that Employee or Company can terminate employment relationship at any time or for any reasons. It is contemplated that Employee will commence employment on or about December 31st, 2019. Employee's first full day of work shall be defined as the Effective Date.

2.   Title: Employee shall have the title of Executive Vice President. Employee will report to Omar Singh, Surge Transportation's President. The terms and conditions of the Employee's employment shall, to the extent not addressed or described in this Employment Agreement, be governed by Surge Transportation's personnel manual, policies, procedures and practices.

3.   Compensation and Benefits.

   3.1   Base Salary. Employee shall be paid as a W-2 Exempt employee an initial annual salary of $230,000.00_ (Two Hundred and Thirty Thousand Dollars_ and 00/100 Cents) ("Base Salary"), subject to applicable federal, state, and local withholding, and other payroll deductions required by law or authorized by the Employee. Employee's Base Salary shall be paid to Employee in the same manner and on the same payroll schedule in which all Surge Transportation's employees receive payment. As an Exempt employee, Employee shall not be eligible for overtime pay.

   3.2   Omitted.

   3.3.   Commission / Bonus Structure. As long as Employee remains employed by Company and is providing services and fulfilling the terms/conditions of his employment, he will be entitled to commissions/bonus payments pursuant to the following structure:

      3.3.A. TBD by John and Omar based on P&L of the Chicago office, new outside customer sales and inside sales. Target range shall be $50,000-$80,000 dollars and goals will be modified periodically to reflect Company growth and market conditions.

3.3.B.  Incentive compensation payments shall be made on W-2 basis and will be subject to applicable federal, state, and local withholding, and other payroll deductions required by law or authorized by the Employee.

3.3.C.  By mutual written agreement, Employee and Surge Transportation can modify Employee's base salary and/or commissions/bonus payments.

3.4     <u>Liquidity Event of Surge</u>.  In the event of a Sale of the Company (as defined herein) which occurs during Employee's continuous employment by the Company (or an affiliate thereof), Employee shall be eligible to receive from the Company up to two -percent (2%) of the Net Sales Proceeds (as defined herein) as provided herein (the "Sale Bonus"). A "Sale the Company" shall mean the earliest to occur of (i) a "change in ownership of the company" as defined in Treasury Regulation Section 1.409A-3(i)(5)(v) or (ii) "a change in the ownership of a substantial portion of the company's assets" as defined in Treasury Regulation Section 1.409A-3(i)(5)(vii) (but substituting 50% for 40%). Notwithstanding the foregoing, a "Sale of the Company" shall <u>not</u> include: (i) a financing or original issuance of securities the primary purpose of which is to raise additional capital for the Company; (ii) a transaction in which stock or assets of the Company are transferred to a related party including, without limitation, to an already existing owner, employee, affiliated company, or owner or employee of an affiliated company; (iii) a pledge of stock of the Company that creates a mere security interest; (iv) a transfer of stock to the lineal descendants or spouse of an owner of the Company, or to trusts for the benefit of such persons; or (v) a gift of stock of the Company. "Net Sales Proceeds" shall mean the consideration received by the Company (or its owners, as applicable) upon a Sale of the Company reduced by (i) any and all transaction costs including, but not limited to, commissions, attorneys' fees, banker fees, closing costs, taxes, and similar costs and expenses; (ii) payments to all of the creditors of the Company (whether secured or unsecured); and/or (iii) any monies received by employees and/or owners of the Company under any employment and/or restrictive covenant agreements.

Employee shall be eligible for the Sale Bonus as defined herein:

a.      As long as Employee has been continuously employed for at least one (1) full year from the Effective Date of this Agreement and remains a full time employee of the Company, and there is a Sale of the Company as defined above, Employee shall be eligible for the Sale Bonus.

b.      On the first anniversary of the Effective Date of this Agreement, Employee shall vest in .66 percent the Sale Bonus, regardless of Employees future employment status with Company.

c.      On the second anniversary of the Effective Date of this Agreement, Employee shall vest in an additional .67 percent the Sale Bonus, regardless of Employees future employment status with Company.

d.      On the third anniversary of the Effective Date of this Agreement, Employee shall vest in an additional .67 percent the Sale Bonus, regardless of Employees future employment status with Company (so, at this time, Employee would have vested in

2% of Net Sales Proceeds as Sale Bonus).

Once vested in Employee, the vested portion only of the Sale Bonus may be transferred upon Employee's death to his lawfully married spouse and she will have rights upon a Sale of the Company. Employee cannot transfer, assign or encumber vested portion of Sale Bonus to anyone except his spouse. The spouse's interest cannot be transferred, assigned, or encumbered in any manner.

For purposes of this Agreement, the Sale Bonus shall be 2% of the Net Sales Proceeds of the Sale of the Company. Notwithstanding the foregoing, so long as the Net Sales Proceeds are at least $30,000,000 (Thirty Million Dollars), a minimum Sale Bonus shall be $1,500,000.00 (One Million, Five Hundred Thousand Dollars). Finally, the Sale Bonus shall be capped at $3,000,000.00 (Three Million Dollars).

Payments under this Section 3.4 will be made in cash or in-kind in the same proportions as is received by the Company (or its owners, as applicable) and will be paid to Employee as soon as practicable following the Sale of the Company but no later than the date which is one and one-half (1½) months after the close of the taxable year in which such Sale of the Company occurs. Notwithstanding the foregoing, if the Company (or its owners) receive a promissory note or other consideration that is subject to deferral conditions including, without limitation, escrows, earn-out requirements, vesting schedules or, in the case of securities, lock-up or similar underwriting restrictions, the same deferred payment terms or deferral conditions imposed on the Company (or its owners) will be imposed on payment to Employee to the extent permitted by Treasury Regulation Section 1.409A-3(i)(5). Any amounts paid under this Section 3.4 shall be subject to deductions as required by law and/or authorized by the Employee.

3.5    Employee Benefits.

3.5.A.   Employee shall be eligible to participate in all employee benefit plans, policies, programs, or perquisites in which other Surge Transportation executives, officers or employees participate, including but not limited to, medical insurance, retirement plans, insurance plans and leave benefits. The terms and conditions of Employee's participation in the Surge Transportation employee benefit plans, policies or programs shall be governed by the terms of each such plan, policy, or program. Any and all benefits offered by Surge Transportation can be modified, including being eliminated, at any time at the sole discretion of Surge Transportation (subject to applicable law).

3.5.B.   Company shall cover one-hundred (100) percent of the employee/family medical insurance cost and one-hundred (100) percent of the employee/family vision, dental and life insurance costs while Employee is working full-time (at least 30 hours per week) for Company.

3.6    Paid Time Off.  Employee shall be entitled to Fifteen (15) days of paid time off annually.  Such PTO shall accrue at 1.25 days per month.  Upon request, Employee may receive an "advance" of PTO if he does not have enough accrued.  As applicable, for employment years 2 through 5, Employee shall receive an additional one (1) days of PTO each year (with monthly accrued for all PTO days pursuant to standard payroll

practices). Accordingly, assuming Employee remains employed, he will have the following PTO: Year 2 – 16 days, Year 3 – 17 days; Year 4 – 18 days; and Years 5 and beyond – 19 days. Upon termination of employment, any negative PTO shall be deducted from Employee's final pay. PTO days do not roll over and will reset each year on March 31st. Unused PTO is forfeited. Maximum of 10 consecutive PTO workdays may be taken at any one time.

3.7     <u>Technology Reimbursement</u>. Company shall provide Employee with mobile phone, computer and any reasonable additional technology to assist in performing Employee's duties and Company will directly pay or reimburse Employee for reasonable business-related expenses. Employee shall be liable for non-business-related expenses incurred on Company provided equipment and, as applicable, consents to deductions from his pay to reimburse Company for such costs. Employee shall return, within forty-eight (48) hours of his employment termination, for any reason, any Company owned equipment (or other property).

4.      <u>Duties and Performance</u>. The Employee acknowledges and agrees that he is being offered a position of employment by Surge Transportation with the understanding that the Employee possesses a unique set of skills, abilities, and experiences which will benefit Surge Transportation, and he agrees that his continued employment with Surge Transportation, whether during the term of this Employment Agreement or thereafter, is contingent upon his good faith performance of his duties as Executive Vice President.

4.1     <u>General Duties</u>.

a.      Employee shall faithfully and industriously render to the best of Employee's skill, care, diligence and attention all responsibilities and duties connected with his employment and shall undertake diligently all duties assigned to him.

b.      Employee shall devote his full time, ability, attention and skill to the business of Surge Transportation on a regular and professional basis.

c.      Employee shall not undertake, either as an owner, director, shareholder, employee or otherwise, the performance of services for compensation (actual or expected) for any other entity without the express written consent of Surge Transportation. For the sake of clarity, Employee shall not ship any cargo through any property broker, shipping broker, freight forwarder, or transportation services company – any such shipping shall be through Surge Transportation.

d.      Employee shall have no authority to enter into any contracts binding upon Surge Transportation, or to deliberately create any obligations on the part of the Surge Transportation, except as may be specifically authorized by Omar Singh.

5.   Anti-Piracy Covenant.  During Employee's employment and for two (2) years after the termination, for any reason, of that employment, Employee shall not directly or indirectly induce or influence, or attempt to induce or influence, any employee or contractor of Surge Transportation to terminate his or her employment or contractual relationship with Surge Transportation.

6.   Non-Disclosure Agreement

a.  Surge Transportation has developed trade secrets and other confidential information regarding Surge Transportation's business methods, practices, customers, pricing, advertising, vendor/contractor relationships, and other non-public proprietary information ("Confidential Information") which may be communicated to, or acquired by, Employee in the course of his/her employment.  In order to avoid substantial and irreparable damage to Surge Transportation, it is essential for Surge Transportation to protect and preserve its Confidential Information for its own, and only its own, use.

b.  All of Surge Transportation's Confidential Information furnished to Employee by Surge Transportation or developed by Employee on behalf of Surge Transportation or at Surge Transportation's direction, or otherwise available to Employee by virtue of Employee's employment, are and shall remain the sole property of Surge Transportation.  Employee shall maintain the confidentiality of such Confidential Information and shall use them only for the benefit of Surge Transportation and in the course of providing services by Employee to Surge Transportation and its customers.

c.  Employee shall not, during or after the term of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Confidential Information, including, but not limited to: (1) techniques and methods of operation; (2) any sales prospects, customer lists (including customer names, email addresses, phone numbers, or addresses), products, research or data of any kind; or (3) any information relating to strategic plans, sales costs, profits or the financial condition of Surge Transportation or any of its customers or prospective customers, which is not generally known to the public or recognized as standard practice in the industries in which Surge Transportation shall be engaged.

d.  If Surge Transportation requests the return of any materials describing or discussing such Confidential Information at any time during or after the termination of Employee's employment, Employee shall immediately deliver them to Surge Transportation and retain no hard or electronic copies.

e.  During the course of Employee's employment, Employee may be exposed to or have access to Confidential Information of Surge Transportation's clients and/or customers.  Except as necessary to perform services for Surge Transportation's client and/or customer, Employee shall not use such information or disclose it by publication or otherwise to any other person during the term of Surge Transportation's relationship with such client and/or customer and for a period of two (2) years thereafter.

**CONFIDENTIAL DEC. 30, 2019**

    f.   Any and all procedures, techniques, or inventions ("Creations") which Employee may make, conceive, discover, or develop, either solely or jointly with any other person(s) during the term of his/her employment, whether during working hours or not, and whether at the request or suggestion of Surge Transportation or not, which relate to or are useful in any business carried on or contemplated by the Surge Transportation including expansions of its present fields of operation, shall, to the fullest extent permitted by law, be the sole and exclusive property of Surge Transportation.

    g.   Employee shall disclose to Surge Transportation all Creations, and aid and assist Surge Transportation so that Surge Transportation can prepare and present applications for, secure, review and extend copyright or patent letters for the Creation(s), and can obtain the record title so that Surge Transportation shall be the sole and absolute owner thereof in all countries in which it may desire to have copyright or patent protection.  Employee shall not be entitled to any additional compensation for any such Creation(s).  All such Creations that are the sole result of freelance work with prior written approval by the President or that are non-compensated activity unrelated, directly or indirectly to the Employee's performance under this agreement, shall remain the property of the Employee.  To the extent necessary to effect the intention of this Sub-Paragraph and the immediately-preceding Sub-Paragraph, the Creations shall be deemed "works for hire."

**7.**    <u>Non-Solicitation Agreement</u>

    a.   By virtue of employment by Surge Transportation, Employee will acquire or has acquired an intimate knowledge and expertise of considerable value to Surge Transportation.

    b.   Surge Transportation has substantial rights and interests in each Business Account serviced, handled, contacted, or obtained by it, including, but not limited to, those Business Accounts procured and/or serviced in any manner by Employee while in the employment of Surge Transportation.  Employee acknowledges and represents that Employee does not have, and will not develop, any right or interest in such Business Accounts of Surge Transportation.  Notwithstanding the foregoing, Schedule A to this Agreement provides a Schedule of Excluded Customers that are prior clients/customers of Employee and are explicitly excluded from the definition of Business Account, so long as such clients/customers sign contact and commence moving freight with Surge Transportation within six (6) months of the Effective Date.

    c.   Absent prior written consent of Surge Transportation, for the time periods as defined below, Employee agrees not to become employed by, solicit business from or with, service, or work for another in the service of, any Business Account of Surge Transportation, with respect to providing Competitive Services ("Non-Solicitation Restriction").  Competitive Services shall mean freight brokerage services.

        a.   For a period of six (6) months from the date of Employee's termination of employment, for any reason, Employee agrees to the Non-Solicitation Restriction.

b. For a period of up to eighteen (18) months from the date of Employee's termination if the Employee resigns or is terminated for cause, Employee agrees to the Non-Solicitation Restriction. For purposes of this provision only, "Cause" shall mean conduct involving one or more of the following: (i) Employee's material violation of any applicable material law or regulation respecting the business of the Company; (ii) Employee's conviction of, or plea of nolo contendere to, a felony or other crime involving moral turpitude; (iii) the substantial and continuing failure of the Employee, after notice thereof, to render services to the Company in accordance with the terms or requirements of his employment; (iv) disloyalty, gross negligence, willful misconduct, dishonesty, fraud or breach of fiduciary duty to the Company; (v) deliberate disregard of the rules or policies of the Company, or breach of an employment or other agreement with the Company; (vi) the unauthorized disclosure of any trade secret or confidential information of the Company; or (vii) the commission of an act which constitutes unfair competition with the Company or which induces any customer or supplier to breach a contract with the Company.

c. If Employee's employment is terminated without cause, at the sole discretion of Company, the Non-Solicitation Restriction will be extended up to eighteen (18) months upon continuous payment of 100% of Employee's Base Salary at the time of his termination paid pursuant to normal Company payroll practices. Payment shall be on a 1099 basis.

d. The term "Business Account" shall mean: (i) business or client serviced by Surge Transportation during the two (2) years immediately preceding the date of termination of the Employee; or (ii) any individual, business or potential customer which contacted, was referred to, or in any manner was solicited by any agent or employee of Surge Transportation during the six-month period immediately preceding the date of termination of the Employee, regardless of whether the business, account, or client was obtained by Surge Transportation prior to the date of termination of the Employee, but only if Employee was involved in the solicitation and/or obtained confidential information about such potential customer

e. If any period of time or other restriction specified in this Agreement should be found unreasonable or otherwise unenforceable in any proceeding, then the period of time or other restriction shall be reduced so that such restrictions may be enforced to the greatest extent possible as is reasonable and enforceable.

f. If Employee violates any of the restrictions contained in this Article 7, the restrictive period shall not begin to run until such time as the violation shall be cured by Employee to the satisfaction of Surge Transportation, or as otherwise ordered by a Court of competent jurisdiction.

8. <u>Non-Disparagement</u>. Employee shall not make any false, disparaging, derogatory, critical, insulting, offensive, deprecating or belittling comments, in public or in private, about the Company, its parent, subsidiaries or affiliated entities or about the business affairs or financial condition of the Company, its parent, subsidiaries, or affiliated entities, or about any employee, director or officer of the Company, its parent, subsidiaries or affiliated entities. Except as required by law or court order, Employee shall not directly or indirectly provide any assistance to any person or entity, including any

governmental body, asserting or intending to assert any litigation, investigation or proceeding against the Company or any of its affiliated entities.

9. <u>Injury and Injunctive Relief</u>.  The parties agree that in the event of violation by Employee of the restrictions contained in Article 7 of this Agreement, the amount of actual damages suffered by Surge Transportation will be difficult to ascertain.  The parties therefore irrevocably agree that the violation, or threatened violation, of those restrictions shall cause Surge Transportation irreparable injury for purposes of obtaining injunctive relief.  In addition, the parties' best estimate of monetary damages caused is that each violation of the anti-piracy provisions of Article 5, the non-disclosure provisions of Article 6 or the Non-Disparagement provisions of Article 8 will cause Surge Transportation damages of $15,000.  The parties agree that these are fair and reasonable estimates of Surge Transportation's actual damages, and agree to the imposition of such amounts as liquidated damages in lieu of actual damages, and not as a penalty.

10. <u>Prior Agreements</u>.  Employee represents and warrants to Surge Transportation: (i) that there are no restrictions, agreements or understandings whatsoever to which Employee is a party which would prevent or make unlawful his/her execution of this Agreement or his/her employment with Surge Transportation; (ii) that his/her execution of this Agreement and his/her employment by Surge Transportation will not constitute a breach of any contract, agreement or understanding, oral or written, to which he/she is a party or by which he/she is bound; and (iii) that he/she is free and able to execute this Agreement and to enter into employment with Surge Transportation.  Employee agrees to indemnify and hold harmless Surge Transportation from any costs, expenses, damages, or injury, including court costs and attorney's fees, resulting from any violation of this Article 10.

11. <u>Expenses/Reimbursement</u>

   11.1   Surge Transportation shall pay or reimburse Employee for office and reasonable travel related expenses upon submission vouchers or receipts maintained and provided to Surge Transportation in compliance with such rules and policies relating thereto as Surge Transportation may from time to time adopt.

12. General Provisions

   12.1   <u>Notices</u>.  All notices and other communications required or permitted by this Employment Agreement to be delivered by Surge Transportation or Employee to the other party shall be delivered in writing to the address shown below, either personally, or by certified or express mail, return receipt requested, postage prepaid, to the address for such party specified below or to such other address as the party may from time to time advise the other party, and shall be deemed given and received as of actual personal delivery, or upon the date of actual receipt shown on any return receipt if registered, certified or express mail is used, as the case may be.

   Company:         Surge Transportation
                    705 Wells Road, Suite 300

**CONFIDENTIAL DEC. 30, 2019**

Orange Park, FL 32073

With a copy to:       Merritt Green
                      General Counsel, P.C.
                      6849 Old Dominion Drive, Suite 220
                      McLean, VA 22101

Employee:             John Mooney
                      15344 Oxford Drive
                      Orland Park, IL 60462

12.2    <u>Amendments and Termination; Entire Agreement</u>. This Employment Agreement may not be amended or terminated except by a writing executed by all of the parties hereto. This Employment Agreement constitutes the entire agreement of Surge Transportation and Employee relating to the subject matter hereof and supersedes all prior oral and written understandings and agreements relating to such subject matter.

12.3    <u>Successors and Assigns</u>. This Agreement inures to the benefit of and is binding upon the Company, its respective successors in interest by way of merger, acquisition, or otherwise, and its permitted assigns. The Employee may not assign his rights and obligations under this Employment Agreement.

12.4    <u>Severability; Provisions Subject to Applicable Law</u>. All provisions of this Employment Agreement shall be applicable only to the extent that they do not violate any applicable law, and are intended to be limited to the extent necessary so that they will not render this Employment Agreement invalid, illegal or unenforceable under any applicable law. If any provision of this Employment Agreement or any application thereof shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of other provisions of this Employment Agreement or of any other application of such provision shall in no way be affected thereby.

12.5    <u>Waiver of Rights</u>. No waiver by Surge Transportation or Employee of a right or remedy hereunder shall be deemed to be a waiver of any other right or remedy or of any subsequent right or remedy of the same kind.

12.6    <u>Definitions; Headings; and Number</u>. A term defined in any part of this Employment Agreement shall have the defined meaning wherever such term is used herein. The headings contained in this Employment Agreement are for reference purposes only and shall not affect in any manner the meaning or interpretation of this Employment Agreement. Where appropriate to the context of this Employment Agreement, use of the singular shall be deemed also to refer to the plural, and use of the plural to the singular.

**CONFIDENTIAL DEC. 30, 2019**

12.7 <u>Counterparts</u>. This Employment Agreement may be executed in separate counterparts, each of which shall be deemed an original but both of which taken together shall constitute but one and the same instrument.

12.8 <u>Governing Laws and Forum</u>. This Employment Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Florida and the Parties agree to the exclusive jurisdiction of the State and Federal Courts located in Jacksonville, Florida, Clay and/or Duval Counties

IN WITNESS WHEREOF, Surge Transportation and Employee have executed and delivered this Agreement as of the date written below.

_____   12/31/19        Surge Transportation

John Mooney            Date          By: _Omar Singh_    12/31/19
                                          **Omar Singh**      Date
                                          President

**CONFIDENTIAL DEC. 30, 2019**

## Schedule A – Schedule of Excluded Customers

# EXHIBIT B



---------- Forwarded message ---------
From: **Matthew May** <mmay@directconnectlogistix.com>
Date: Tue, Sep 12, 2023 at 12:34 PM
Subject: Re: **External Email** FW: Direct Connect Logistix USPS Freight Auction Documents
To: Brown, Jamesetta - Memphis, TN - Contractor <Jamesetta.Brown@usps.gov>
Cc: Greg Humrichouser <greg@directconnectlogistix.com>, John Mooney
<john.mooney@surgetransportation.com>


Hi Jamesetta,

Thank you for the follow up. We'll have everything back to you shortly.

Matt

Sent from my iPhone

 **Matthew May** | Senior Vice President - Strategic Solutions
**O** (317) 218-7777 x1164

**M** (305) 915-8937

130 S Meridian St. 3rd Floor,Indianapolis,IN46225 | DCLogistix.com



This e-mail may contain confidential or privileged information. If you are not the intended recipient, please delete it and notify the sender of the error.

On Sep 12, 2023, at 12:29 PM, Brown, Jamesetta - Memphis, TN - Contractor
<Jamesetta.Brown@usps.gov> wrote:

Hi Mathew,

Please return the attached forms as well as a copy of the Certificate of Insurance.

Also complete the supplier EDI survey at the link below:

USPS Network Supplier Survey

Best regards,

Jamesetta Brown

USPS Transportation Strategy, Contractor

**P**rocessing Network **T**ransportation, Memphis TN

# EXHIBIT G



Wayne G. Travell
D: 703.584.8903
wtravell@hirschlerlaw.com

Hirschler Fleischer | hirschlerlaw.com
1676 International Drive, Suite 1350 | Tysons, VA 22102
P: 703.584.8900 | F: 703.584.8901

September 25, 2023

**Via Federal Express and email**

Direct Connect Logistix, Inc.
Attn: Richard Piontek
130 S. Meridian Street
Indianapolis, IN 46225
rpiontek@directconnectlogistix.com

Re:   **Demand to Cease and Desist from further violations of the Mutual Confidentiality Agreement, dated November 10, 2021 (the "MCA"); Demand for Preservation of Documents**

Dear Mr. Piontek:

This firm and the undersigned are litigation counsel for Surge Transportation, Inc. ("Surge") with respect to enforcement of its rights against Direct Connect Logistix, Inc. ("DCL" or "you") for DCL's violations of the MCA, a copy of which is attached for your reference as Exhibit A.

a.   Cease and Desist

I understand from my client that DCL currently employs John Mooney and Matthew May, both of whom were recently Surge employees, and may be soliciting additional Surge employees. I further understand that DCL has, through Mr. May and Mr. Mooney, solicited and obtained a contract to provide trucking/freight brokerage services from the United States Postal Service ("USPS"), a Surge client. These activities violate DCL's obligations to refrain from poaching Surge employees and from contacting or soliciting Surge's customers, as set forth in sections 4 and 5 of the MCA.

As you may know, in addition to DCL's obligations under the MCA, Mr. Mooney and Mr. May each have separate Employment Agreements with Surge (respectively, the "Mooney Agreement," Exhibit B, and the "May Agreement," Exhibit C). Their acceptance of employment by DCL and their participation in DCL's solicitation of USPS constitute independent breaches by them and by DCL of those agreements.

September 25, 2023
Page 2

Attached hereto as Exhibit D is a copy of email correspondence between Mr. May as an employee of DCL and Jamesetta Brown, USPS Transportation Strategy, Contractor, confirming DCL's successful solicitation of Surge customer USPS. This email copies both DCL president Greg Humrichouser and former Surge, and current DCL, employee John Mooney. Such conduct by Mr. Humrichouser, Mr. May and Mr. Mooney constitutes intentional and direct violations by DCA of the MCA and by each of you and these individuals with respect to the agreements between Surge and each of Mr. May and Mr. Mooney. Surge also demands that you provide a complete list of Surge customers that you have solicited or serviced in violation of the MCA.

Unless DCL responds to these demands on or before Wednesday, September 27, 2023, Surge will take the steps legally necessary to protect its rights in this matter. If DCL fails to cease and desist from activities that interfere with Surge's relationships with its customers or employees, or that implicate Surge's Confidential Information, Surge may be compelled to institute immediate legal proceedings against DCL, Mr. May and Mr. Mooney to obtain injunctive and/or monetary relief for the various breaches of the MCA, the Mooney Agreement, and the May Agreement, and for DCL's participation with Mr. May and Mr. Mooney (and their participation with you) in violating Surge's legal rights and for other claims arising under applicable law (collectively, the "Claims")

b. Document Preservation

This letter will also serve to clarify your document preservation responsibilities with respect to the Claims and litigation that may ensue. By this preservation letter, you are hereby given notice not to destroy, conceal, or alter any paper or electronic files, other data generated by and/or stored on your computer systems and storage media (e.g., hard disks, floppy disks, backup tapes, cloud storage), or any other electronic data, such as voicemail. You have an affirmative duty to take reasonable steps to preserve all records that may be relevant to the Claims and the litigation that may be pursued by Surge. Records, documents, and electronically stored information ("ESI") that may be relevant to these Claims include, but are not limited to, the following:

(1)     E-mails and text messages;
(2)     Posts or messages on social media platforms, including, without limitation, LinkedIn, WhatsApp, Facebook, Facebook Messenger, X (formerly Twitter), and Instagram; and
(3)     Any other communications between you and any other individual, including, without limitation, current or prospective employees, customers, or suppliers of Surge.

Potentially relevant records, documents, and ESI encompass a broad range of information, including paper documents and information stored electronically. The term "document" also includes any and all copies of any document that contains any notation or otherwise differs from the original and other copies, and specifically includes drafts or edits of the above and handwritten notes or notations in whatever form together with any attachments to any such documents. The term "document" expressly includes all computer records and items incorporated in an electronic database of any kind, including

but not limited to hard drives, compact disks, floppy disks, removable drives, cloud services, and magnetic tapes of any other media.

Relevant materials in the following locations could be subject to discovery and, therefore, must be preserved: (1) e-mail messages and attachments, wherever they are stored (including messages in "Deleted Items" and "Sent Items" folders, in "Archives" or PST files, in E-mail Server Stores, cloud services, and – to the extent those message are not stored anywhere else and/or in any e-mail account(s), including personal accounts – in any Android device, iPhone, iPad, Blackberry, or other personal digital assistant); (2) word processing documents, spreadsheets, and presentations, whether stored locally on a desktop or laptop computer, in a shared folder, on a network drive, or in any other locations on the network, or in cloud storage; (3) information copied to CDs, DVDs, or removable drives (such as "flash" drives or "thumb" drives); (4) photographs, video recordings (including surveillance footage), and audio recordings (including voicemail); (5) text messages; (6) phone call logs on electronic communication devices such as mobile phones or in phone bills; (7) social media communications such as X (formerly Twitter) posts, Facebook posts, and Facebook Messenger messages; (8) information stored on any former computer systems, cell phone(s), or other media devices no longer in use; and (9) information retained on any backup media.

This list of potentially relevant records and possible locations of ESI is not all-inclusive and only represents an initial assessment of the categories of information that might be relevant and where the documents might be located. You are required to interpret this list broadly and err on the side of preservation. If you possess other information/materials not included in this list that may be relevant to future litigation, such information/materials also should be preserved.

As you may know, the law recognizes a duty to preserve evidence in anticipation of litigation. As such, this litigation evidence preservation letter is not necessary to trigger your duty to preserve evidence, which exists independently. Rather, this letter is to provide you additional detail in fulfilling your preservation obligations. Your failure to preserve evidence in circumstances where preservation is required could lead a court or administrative body to sanction you.

You must also ensure that your ESI preservation methods do not remove or degrade the ability to search the ESI by electronic means or otherwise make it difficult or burdensome to address or use the information. ESI should be preserved in the format in which it is ordinarily maintained (*i.e.*, native form). Because hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions. If information exists in both electronic and paper forms, you should preserve both forms.

Adequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence. Accordingly, features of information systems, devices, and standard operating procedures that, in routine operation, cause the loss of potentially relevant and/or discoverable evidence must be immediately identified, and modified or suspended. Examples include: (1) purging the content

September 25, 2023
Page 4

of email repositories by age, capacity, or other criteria; (2) using data or media wiping, disposal, erasure, or encryption utilities or devices; (3) overriding, erasing, destroying, or discarding backup media; (4) reassigning, reimaging, or disposing of systems, servers, devices, or media; (5) running anti-virus or other programs affecting wholesale metadata alteration; (6) releasing or purchasing online storage repositories; (7) using metadata tripper utilities; (8) disabling server, packet or local instant messaging logging; or (9) executing driver or file defragmentation or compression programs.

Finally, you should take affirmative steps to ensure that individuals with access to your systems, archives, files, computers, devices, social media accounts, cloud storage accounts, or e-mail accounts understand these preservation requirements and refrain from modifying, destroying, or hiding any potentially relevant ESI while this litigation hold is in effect.

Please forward a copy of this letter to all persons and entities with custodial responsibility for the items referred to in this letter. Please also confirm in writing by no later than Wednesday, September 27, 2023 that you have taken or will take the steps outlined in this letter to preserve records, documents and ESI potentially relevant to the Claims and/or future litigation pursued by Surge. *Failure to abide by this request could result in penalties assessed against you and could form the basis of legal claims for spoliation.*

This demand is made without prejudice to the rights or remedies available to Surge. Surge expressly reserves the right to pursue any and all remedies or take such actions as Surge may be entitled to under the Mutual Confidentiality Agreement or applicable law.

I look forward to your prompt response

Sincerely,

*Wayne G. Travell*

Wayne G. Travell

Enclosures
cc:  Greg Humrichouser, President, Direct Connect Logistix, Inc.
     Omar Singh (by email only)
     Stephen E. Leach, Esq. (by email only)
     Kristen E. Burgers, Esq. (by email only)
     David I. Swan, Esq. (by email only)
     Allison P. Klena, Esq. (by email only)
     Brad Markey, Esq. (by email only)

September 25, 2023
Page 5

Richard Thames, Esq. (by email only)

16489584.2  048588.00001

# EXHIBIT A

## MUTUAL CONFIDENTIALITY AGREEMENT

This MUTUAL CONFIDENTIALITY AGREEMENT ("Agreement"), actually signed on the dates set forth below by and between Direct Connect Logistix, Inc. along with its affiliates, (collectively, "Direct Connect") and Surge Transportation, Inc. ("Surge").

The party disclosing Confidential Information (as defined below) is referred to as the "Disclosing Party" and the party receiving Confidential Information is referred to as the "Recipient." While the Disclosing Party undertakes no obligation to provide any Confidential Information to the Recipient, to the extent it does provide such information to the Recipient, it is agreeable to doing so only in reliance upon and subject to the terms and conditions of this Agreement.

WHEREAS, Recipient and the Disclosing Party may wish to engage in a potential business relationship; and

WHEREAS, to facilitate a business relationship, the Disclosing Party may deliver to the Recipient descriptive, statistical and analytical information regarding the Disclosing Party's financial condition and business operations while maintaining the necessary and appropriate level of confidentiality with respect to any information acquired by Recipient in connection with such analysis.

NOW, THEREFORE, the Disclosing Party and Recipient agree as follows:

Confidential Information. For the purposes of this Agreement, the term "Confidential Information" shall mean all information (whether or not designated as "confidential") furnished at any time, in writing or during the course of discussions by the Disclosing Party or its affiliates or by their Representatives to Recipient or its attorneys, affiliates and agents (hereinafter collectively referred to as "Representatives"), or to which Recipient or its Representatives are otherwise given access by the Disclosing Party or its affiliates or their Representatives. Confidential Information shall also include (a) any information derived from Confidential Information, (b) the fact that discussions or negotiations relating to a possible transaction between the parties have taken or are taking place, and (c) any of the terms, conditions or other facts with respect to any such possible transaction, negotiations or discussions.

1.    Limited Purpose and Use of Confidential Information.  If and to the extent the Disclosing Party furnishes Recipient or its Representatives with, or gives any of them access to, Confidential Information, Recipient, on behalf of itself and its Representatives, agrees to limit access to the information to only those of its employees and its Representatives who have a need to know such information for the stated purpose.

2.    Original Documents; Copies.  Recipient shall return to the Disclosing Party promptly upon written request by the Disclosing Party, all Confidential Information and copies thereof obtained by Recipient or its Representatives in printed or written form or on magnetic or electronic media or otherwise reduced to a tangible format.  Further upon such written request, Recipient will destroy all analytical and other materials developed by Recipient or its Representatives and containing Confidential Information including all notes, work papers, or other written materials or memoranda (and all copies thereof) prepared by or for Recipient or its Representatives that contain any Confidential Information, and an officer of Recipient shall certify as to such destruction.

41517349.2

3.    <u>Confidentiality</u>.  Without the prior written consent of the Disclosing Party, Recipient and all of its Representatives shall keep all of the Confidential Information confidential.  If Recipient or its Representatives or the Disclosing Party or its Representatives should be required by legal process or by operation of applicable law to disclose any of the foregoing or, in the case of the Recipient or its Representatives, any Confidential Information, the party so obligated shall promptly provide notice of such requirement(s) to the other party to this Agreement and will cooperate with such party in preventing any third party from obtaining any Confidential Information or from learning of the discussions being conducted between Recipient and the Disclosing Party.  Upon any breach of this agreement of confidentiality by either party, the non-breaching party shall have the absolute right to cease immediately any discussions between the parties and to pursue any other remedies which may be available at law or in equity.

4.    <u>No Interference with Business Relations</u>.  Recipient and its Representatives shall not, directly or indirectly, contact or solicit the Disclosing Party's, or any of its affiliates', customers, clients, suppliers, distributors, sales representatives, employees and other business relations except as in the ordinary course of business.

5.    <u>Non-Solicitation</u>. Recipient shall not, and will cause its Representatives not to, directly or indirectly, engage, employ, solicit or contact with a view to the engagement or employment of, any employee, director, officer or manager of, or consultant to, the Disclosing Party or any person who has been an employee, director, officer or manager of, or consultant to, the Disclosing Party at any time during the twelve-month period ending on the date of such engagement, employment, solicitation or contact (provided that the foregoing shall not prohibit general solicitations for employment or engagement (including through search firms) that do not specifically target such employees, directors, officers, managers or consultants, it being understood that the restrictions on engaging or employing such persons shall still apply). If any of the foregoing provisions shall be deemed to be invalid or unenforceable in any jurisdiction, such provision shall be amended as is necessary to cause such provision to be valid and enforceable to the maximum extent permitted in such jurisdiction (and such amendment shall apply with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made).

6.    <u>No Representations or Warranties.</u>    Neither the Disclosing Party nor any of its Representatives make any representation or warranty, expressed or implied herein, as to the accuracy or completeness of the Confidential Information disclosed to Recipient hereunder. Neither the Disclosing Party nor any of its Representatives shall be liable hereunder to Recipient or any of its Representatives relating to or resulting from Recipient's use of any of the Confidential Information or any errors therein or omissions therefrom.

7.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

8.    <u>Parties in Interest</u>.  This Agreement shall be binding upon and inure solely to the benefit of each party hereto and nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement. Any purported assignment, encumbrance or other transfer of this Agreement or any of the rights or obligations arising therefrom, by any of the parties, without the prior written consent of the other party is prohibited, void and without force or effect.

9.      <u>Entirety of Agreement; Amendment</u>.  This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof. This Agreement may be amended only by a written instrument executed by the Disclosing Party and the Recipient.

10.      <u>Specific Performance</u>.  The parties hereto agree that if any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, irreparable damage would occur.  Without limiting any rights or remedies available to the parties, upon the violation of any provision hereof, each of the parties acknowledges that the other party is entitled to specific performance of this Agreement and each term and provision hereof.

11.      <u>Descriptive Headings</u>.  The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

12.      <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but each or all of which shall constitute one and the same agreement.

13.      <u>Term</u>.  The covenants contained herein shall expire two (2) years from the date of this agreement unless otherwise specified.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be duly executed as of the day and year first below written.

Direct Connect Logistix, Inc.                    Surge Transportation, Inc.
("Direct Connect")                               ("Surge")

By:                                              By: _____

Richard G. Piontek                               Name: _____
                                                      Omar Singh

Title: Chief Executive Officer                   Title: _____
                                                         President

Date: November 9, 2021                           Date: _____
                                                        11/10/2021

41517349.2                                3

# EXHIBIT B

**CONFIDENTIAL DEC. 30, 2019**



## EMPLOYMENT AGREEMENT

This Employment Agreement ("Employment Agreement") is entered into as of the 30th day of December 2019, by and between Surge Transportation, Inc., ("Surge Transportation" or "Company"), and John Mooney ("Employee").

In consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Surge Transportation and Employee hereby agree as follows:

1.　　**Employment.** Surge Transportation will employ the Employee as an at-will employee, meaning that Employee or Company can terminate employment relationship at any time or for any reasons. It is contemplated that Employee will commence employment on or about December 31st, 2019. Employee's first full day of work shall be defined as the Effective Date.

2.　　**Title:** Employee shall have the title of Executive Vice President. Employee will report to Omar Singh, Surge Transportation's President. The terms and conditions of the Employee's employment shall, to the extent not addressed or described in this Employment Agreement, be governed by Surge Transportation's personnel manual, policies, procedures and practices.

3.　　Compensation and Benefits.

　　　　3.1　　**Base Salary.** Employee shall be paid as a W-2 Exempt employee an initial annual salary of $230,000.00_ (Two Hundred and Thirty Thousand Dollars_ and 00/100 Cents) ("Base Salary"), subject to applicable federal, state, and local withholding, and other payroll deductions required by law or authorized by the Employee. Employee's Base Salary shall be paid to Employee in the same manner and on the same payroll schedule in which all Surge Transportation's employees receive payment. As an Exempt employee, Employee shall not be eligible for overtime pay.

　　　　3.2　　**Omitted.**

　　　　3.3.　　**Commission / Bonus Structure.** As long as Employee remains employed by Company and is providing services and fulfilling the terms/conditions of his employment, he will be entitled to commissions/bonus payments pursuant to the following structure:

　　　　　　3.3.A.　TBD by John and Omar based on P&L of the Chicago office, new outside customer sales and inside sales. Target range shall be $50,000-$80,000 dollars and goals will be modified periodically to reflect Company growth and market conditions.

3.3.B.   Incentive compensation payments shall be made on W-2 basis and will be subject to applicable federal, state, and local withholding, and other payroll deductions required by law or authorized by the Employee.

3.3.C.   By mutual written agreement, Employee and Surge Transportation can modify Employee's base salary and/or commissions/bonus payments.

3.4     Liquidity Event of Surge.  In the event of a Sale of the Company (as defined herein) which occurs during Employee's continuous employment by the Company (or an affiliate thereof), Employee shall be eligible to receive from the Company up to two -percent (2%) of the Net Sales Proceeds (as defined herein) as provided herein (the "Sale Bonus"). A "Sale the Company" shall mean the earliest to occur of (i) a "change in ownership of the company" as defined in Treasury Regulation Section 1.409A-3(i)(5)(v) or (ii) "a change in the ownership of a substantial portion of the company's assets" as defined in Treasury Regulation Section 1.409A-3(i)(5)(vii) (but substituting 50% for 40%). Notwithstanding the foregoing, a "Sale of the Company" shall not include: (i) a financing or original issuance of securities the primary purpose of which is to raise additional capital for the Company; (ii) a transaction in which stock or assets of the Company are transferred to a related party including, without limitation, to an already existing owner, employee, affiliated company, or owner or employee of an affiliated company; (iii) a pledge of stock of the Company that creates a mere security interest; (iv) a transfer of stock to the lineal descendants or spouse of an owner of the Company, or to trusts for the benefit of such persons; or (v) a gift of stock of the Company. "Net Sales Proceeds" shall mean the consideration received by the Company (or its owners, as applicable) upon a Sale of the Company reduced by (i) any and all transaction costs including, but not limited to, commissions, attorneys' fees, banker fees, closing costs, taxes, and similar costs and expenses; (ii) payments to all of the creditors of the Company (whether secured or unsecured); and/or (iii) any monies received by employees and/or owners of the Company under any employment and/or restrictive covenant agreements.

Employee shall be eligible for the Sale Bonus as defined herein:

a.     As long as Employee has been continuously employed for at least one (1) full year from the Effective Date of this Agreement and remains a full time employee of the Company, and there is a Sale of the Company as defined above, Employee shall be eligible for the Sale Bonus.

b.     On the first anniversary of the Effective Date of this Agreement, Employee shall vest in .66 percent the Sale Bonus, regardless of Employees future employment status with Company.

c.     On the second anniversary of the Effective Date of this Agreement, Employee shall vest in an additional .67 percent the Sale Bonus, regardless of Employees future employment status with Company.

d.     On the third anniversary of the Effective Date of this Agreement, Employee shall vest in an additional .67 percent the Sale Bonus, regardless of Employees future employment status with Company (so, at this time, Employee would have vested in

2% of Net Sales Proceeds as Sale Bonus).

Once vested in Employee, the vested portion only of the Sale Bonus may be transferred upon Employee's death to his lawfully married spouse and she will have rights upon a Sale of the Company. Employee cannot transfer, assign or encumber vested portion of Sale Bonus to anyone except his spouse. The spouse's interest cannot be transferred, assigned, or encumbered in any manner.

For purposes of this Agreement, the Sale Bonus shall be 2% of the Net Sales Proceeds of the Sale of the Company. Notwithstanding the foregoing, so long as the Net Sales Proceeds are at least $30,000,000 (Thirty Million Dollars), a minimum Sale Bonus shall be $1,500,000.00 (One Million, Five Hundred Thousand Dollars). Finally, the Sale Bonus shall be capped at $3,000,000.00 (Three Million Dollars).

Payments under this Section 3.4 will be made in cash or in-kind in the same proportions as is received by the Company (or its owners, as applicable) and will be paid to Employee as soon as practicable following the Sale of the Company but no later than the date which is one and one-half (1½) months after the close of the taxable year in which such Sale of the Company occurs. Notwithstanding the foregoing, if the Company (or its owners) receive a promissory note or other consideration that is subject to deferral conditions including, without limitation, escrows, earn-out requirements, vesting schedules or, in the case of securities, lock-up or similar underwriting restrictions, the same deferred payment terms or deferral conditions imposed on the Company (or its owners) will be imposed on payment to Employee to the extent permitted by Treasury Regulation Section 1.409A-3(i)(5). Any amounts paid under this Section 3.4 shall be subject to deductions as required by law and/or authorized by the Employee.

3.5    Employee Benefits.

    3.5.A.  Employee shall be eligible to participate in all employee benefit plans, policies, programs, or perquisites in which other Surge Transportation executives, officers or employees participate, including but not limited to, medical insurance, retirement plans, insurance plans and leave benefits. The terms and conditions of Employee's participation in the Surge Transportation employee benefit plans, policies or programs shall be governed by the terms of each such plan, policy, or program. Any and all benefits offered by Surge Transportation can be modified, including being eliminated, at any time at the sole discretion of Surge Transportation (subject to applicable law).

    3.5.B.  Company shall cover one-hundred (100) percent of the employee/family medical insurance cost and one-hundred (100) percent of the employee/family vision, dental and life insurance costs while Employee is working full-time (at least 30 hours per week) for Company.

3.6    Paid Time Off.  Employee shall be entitled to Fifteen (15) days of paid time off annually. Such PTO shall accrue at 1.25 days per month. Upon request, Employee may receive an "advance" of PTO if he does not have enough accrued. As applicable, for employment years 2 through 5, Employee shall receive an additional one (1) days of PTO each year (with monthly accrued for all PTO days pursuant to standard payroll

**CONFIDENTIAL DEC. 30, 2019**

practices).  Accordingly, assuming Employee remains employed, he will have the following PTO: Year 2 – 16 days, Year 3 – 17 days; Year 4 – 18 days; and Years 5 and beyond – 19 days.  Upon termination of employment, any negative PTO shall be deducted from Employee's final pay.  PTO days do not roll over and will reset each year on March 31st.  Unused PTO is forfeited.  Maximum of 10 consecutive PTO workdays may be taken at any one time.

3.7   Technology Reimbursement.  Company shall provide Employee with mobile phone, computer and any reasonable additional technology to assist in performing Employee's duties and Company will directly pay or reimburse Employee for reasonable business-related expenses.  Employee shall be liable for non-business-related expenses incurred on Company provided equipment and, as applicable, consents to deductions from his pay to reimburse Company for such costs.  Employee shall return, within forty-eight (48) hours of his employment termination, for any reason, any Company owned equipment (or other property).

4.   Duties and Performance.  The Employee acknowledges and agrees that he is being offered a position of employment by Surge Transportation with the understanding that the Employee possesses a unique set of skills, abilities, and experiences which will benefit Surge Transportation, and he agrees that his continued employment with Surge Transportation, whether during the term of this Employment Agreement or thereafter, is contingent upon his good faith performance of his duties as Executive Vice President.

4.1   General Duties.

a.   Employee shall faithfully and industriously render to the best of Employee's skill, care, diligence and attention all responsibilities and duties connected with his employment and shall undertake diligently all duties assigned to him.

b.   Employee shall devote his full time, ability, attention and skill to the business of Surge Transportation on a regular and professional basis.

c.   Employee shall not undertake, either as an owner, director, shareholder, employee or otherwise, the performance of services for compensation (actual or expected) for any other entity without the express written consent of Surge Transportation.  For the sake of clarity, Employee shall not ship any cargo through any property broker, shipping broker, freight forwarder, or transportation services company – any such shipping shall be through Surge Transportation.

d.   Employee shall have no authority to enter into any contracts binding upon Surge Transportation, or to deliberately create any obligations on the part of the Surge Transportation, except as may be specifically authorized by Omar Singh.

**CONFIDENTIAL DEC. 30, 2019**

5. <u>Anti-Piracy Covenant</u>. During Employee's employment and for two (2) years after the termination, for any reason, of that employment, Employee shall not directly or indirectly induce or influence, or attempt to induce or influence, any employee or contractor of Surge Transportation to terminate his or her employment or contractual relationship with Surge Transportation.

6. <u>Non-Disclosure Agreement</u>

   a. Surge Transportation has developed trade secrets and other confidential information regarding Surge Transportation's business methods, practices, customers, pricing, advertising, vendor/contractor relationships, and other non-public proprietary information ("Confidential Information") which may be communicated to, or acquired by, Employee in the course of his/her employment. In order to avoid substantial and irreparable damage to Surge Transportation, it is essential for Surge Transportation to protect and preserve its Confidential Information for its own, and only its own, use.

   b. All of Surge Transportation's Confidential Information furnished to Employee by Surge Transportation or developed by Employee on behalf of Surge Transportation or at Surge Transportation's direction, or otherwise available to Employee by virtue of Employee's employment, are and shall remain the sole property of Surge Transportation. Employee shall maintain the confidentiality of such Confidential Information and shall use them only for the benefit of Surge Transportation and in the course of providing services by Employee to Surge Transportation and its customers.

   c. Employee shall not, during or after the term of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Confidential Information, including, but not limited to: (1) techniques and methods of operation; (2) any sales prospects, customer lists (including customer names, email addresses, phone numbers, or addresses), products, research or data of any kind; or (3) any information relating to strategic plans, sales costs, profits or the financial condition of Surge Transportation or any of its customers or prospective customers, which is not generally known to the public or recognized as standard practice in the industries in which Surge Transportation shall be engaged.

   d. If Surge Transportation requests the return of any materials describing or discussing such Confidential Information at any time during or after the termination of Employee's employment, Employee shall immediately deliver them to Surge Transportation and retain no hard or electronic copies.

   e. During the course of Employee's employment, Employee may be exposed to or have access to Confidential Information of Surge Transportation's clients and/or customers. Except as necessary to perform services for Surge Transportation's client and/or customer, Employee shall not use such information or disclose it by publication or otherwise to any other person during the term of Surge Transportation's relationship with such client and/or customer and for a period of two (2) years thereafter.

**CONFIDENTIAL DEC. 30, 2019**

f.   Any and all procedures, techniques, or inventions ("Creations") which Employee may make, conceive, discover, or develop, either solely or jointly with any other person(s) during the term of his/her employment, whether during working hours or not, and whether at the request or suggestion of Surge Transportation or not, which relate to or are useful in any business carried on or contemplated by the Surge Transportation including expansions of its present fields of operation, shall, to the fullest extent permitted by law, be the sole and exclusive property of Surge Transportation.

g.   Employee shall disclose to Surge Transportation all Creations, and aid and assist Surge Transportation so that Surge Transportation can prepare and present applications for, secure, review and extend copyright or patent letters for the Creation(s), and can obtain the record title so that Surge Transportation shall be the sole and absolute owner thereof in all countries in which it may desire to have copyright or patent protection.  Employee shall not be entitled to any additional compensation for any such Creation(s).  All such Creations that are the sole result of freelance work with prior written approval by the President or that are non-compensated activity unrelated, directly or indirectly to the Employee's performance under this agreement, shall remain the property of the Employee.  To the extent necessary to effect the intention of this Sub-Paragraph and the immediately-preceding Sub-Paragraph, the Creations shall be deemed "works for hire."

7.   <u>Non-Solicitation Agreement</u>

a.   By virtue of employment by Surge Transportation, Employee will acquire or has acquired an intimate knowledge and expertise of considerable value to Surge Transportation.

b.   Surge Transportation has substantial rights and interests in each Business Account serviced, handled, contacted, or obtained by it, including, but not limited to, those Business Accounts procured and/or serviced in any manner by Employee while in the employment of Surge Transportation.  Employee acknowledges and represents that Employee does not have, and will not develop, any right or interest in such Business Accounts of Surge Transportation.  Notwithstanding the foregoing, Schedule A to this Agreement provides a Schedule of Excluded Customers that are prior clients/customers of Employee and are explicitly excluded from the definition of Business Account, so long as such clients/customers sign contact and commence moving freight with Surge Transportation within six (6) months of the Effective Date.

c.   Absent prior written consent of Surge Transportation, for the time periods as defined below, Employee agrees not to become employed by, solicit business from or with, service, or work for another in the service of, any Business Account of Surge Transportation, with respect to providing Competitive Services ("Non-Solicitation Restriction").  Competitive Services shall mean freight brokerage services.

     a.   For a period of six (6) months from the date of Employee's termination of employment, for any reason, Employee agrees to the Non-Solicitation Restriction.

b. For a period of up to eighteen (18) months from the date of Employee's termination if the Employee resigns or is terminated for cause, Employee agrees to the Non-Solicitation Restriction. For purposes of this provision only, "Cause" shall mean conduct involving one or more of the following: (i) Employee's material violation of any applicable material law or regulation respecting the business of the Company; (ii) Employee's conviction of, or plea of nolo contendere to, a felony or other crime involving moral turpitude; (iii) the substantial and continuing failure of the Employee, after notice thereof, to render services to the Company in accordance with the terms or requirements of his employment; (iv) disloyalty, gross negligence, willful misconduct, dishonesty, fraud or breach of fiduciary duty to the Company; (v) deliberate disregard of the rules or policies of the Company, or breach of an employment or other agreement with the Company; (vi) the unauthorized disclosure of any trade secret or confidential information of the Company; or (vii) the commission of an act which constitutes unfair competition with the Company or which induces any customer or supplier to breach a contract with the Company.

c. If Employee's employment is terminated without cause, at the sole discretion of Company, the Non-Solicitation Restriction will be extended up to eighteen (18) months upon continuous payment of 100% of Employee's Base Salary at the time of his termination paid pursuant to normal Company payroll practices. Payment shall be on a 1099 basis.

d. The term "Business Account" shall mean: (i) business or client serviced by Surge Transportation during the two (2) years immediately preceding the date of termination of the Employee; or (ii) any individual, business or potential customer which contacted, was referred to, or in any manner was solicited by any agent or employee of Surge Transportation during the six -month period immediately preceding the date of termination of the Employee, regardless of whether the business, account, or client was obtained by Surge Transportation prior to the date of termination of the Employee, but only if Employee was involved in the solicitation and/or obtained confidential information about such potential customer

e. If any period of time or other restriction specified in this Agreement should be found unreasonable or otherwise unenforceable in any proceeding, then the period of time or other restriction shall be reduced so that such restrictions may be enforced to the greatest extent possible as is reasonable and enforceable.

f. If Employee violates any of the restrictions contained in this Article 7, the restrictive period shall not begin to run until such time as the violation shall be cured by Employee to the satisfaction of Surge Transportation, or as otherwise ordered by a Court of competent jurisdiction.

8. <u>Non-Disparagement</u>. Employee shall not make any false, disparaging, derogatory, critical, insulting, offensive, deprecating or belittling comments, in public or in private, about the Company, its parent, subsidiaries or affiliated entities or about the business affairs or financial condition of the Company, its parent, subsidiaries, or affiliated entities, or about any employee, director or officer of the Company, its parent, subsidiaries or affiliated entities. Except as required by law or court order, Employee shall not directly or indirectly provide any assistance to any person or entity, including any

**CONFIDENTIAL DEC. 30, 2019**

governmental body, asserting or intending to assert any litigation, investigation or proceeding against the Company or any of its affiliated entities.

9.     Injury and Injunctive Relief.  The parties agree that in the event of violation by Employee of the restrictions contained in Article 7 of this Agreement, the amount of actual damages suffered by Surge Transportation will be difficult to ascertain.  The parties therefore irrevocably agree that the violation, or threatened violation, of those restrictions shall cause Surge Transportation irreparable injury for purposes of obtaining injunctive relief.  In addition, the parties' best estimate of monetary damages caused is that each violation of the anti-piracy provisions of Article 5, the non-disclosure provisions of Article 6 or the Non-Disparagement provisions of Article 8 will cause Surge Transportation damages of $15,000. The parties agree that these are fair and reasonable estimates of Surge Transportation's actual damages, and agree to the imposition of such amounts as liquidated damages in lieu of actual damages, and not as a penalty.

10.    Prior Agreements.  Employee represents and warrants to Surge Transportation: (i) that there are no restrictions, agreements or understandings whatsoever to which Employee is a party which would prevent or make unlawful his/her execution of this Agreement or his/her employment with Surge Transportation; (ii) that his/her execution of this Agreement and his/her employment by Surge Transportation will not constitute a breach of any contract, agreement or understanding, oral or written, to which he/she is a party or by which he/she is bound; and (iii) that he/she is free and able to execute this Agreement and to enter into employment with Surge Transportation.  Employee agrees to indemnify and hold harmless Surge Transportation from any costs, expenses, damages, or injury, including court costs and attorney's fees, resulting from any violation of this Article 10.

11.    Expenses/Reimbursement

       11.1   Surge Transportation shall pay or reimburse Employee for office and reasonable travel related expenses upon submission vouchers or receipts maintained and provided to Surge Transportation in compliance with such rules and policies relating thereto as Surge Transportation may from time to time adopt.

12.    General Provisions

       12.1   Notices.  All notices and other communications required or permitted by this Employment Agreement to be delivered by Surge Transportation or Employee to the other party shall be delivered in writing to the address shown below, either personally, or by certified or express mail, return receipt requested, postage prepaid, to the address for such party specified below or to such other address as the party may from time to time advise the other party, and shall be deemed given and received as of actual personal delivery, or upon the date of actual receipt shown on any return receipt if registered, certified or express mail is used, as the case may be.

              Company:          Surge Transportation
                                705 Wells Road, Suite 300

CONFIDENTIAL DEC. 30, 2019

Orange Park, FL 32073

With a copy to:    Merritt Green
General Counsel, P.C.
6849 Old Dominion Drive, Suite 220
McLean, VA 22101

Employee:    John Mooney
15344 Oxford Drive
Orland Park, IL 60462

12.2 <u>Amendments and Termination; Entire Agreement</u>. This Employment Agreement may not be amended or terminated except by a writing executed by all of the parties hereto. This Employment Agreement constitutes the entire agreement of Surge Transportation and Employee relating to the subject matter hereof and supersedes all prior oral and written understandings and agreements relating to such subject matter.

12.3 <u>Successors and Assigns</u>. This Agreement inures to the benefit of and is binding upon the Company, its respective successors in interest by way of merger, acquisition, or otherwise, and its permitted assigns. The Employee may not assign his rights and obligations under this Employment Agreement.

12.4 <u>Severability; Provisions Subject to Applicable Law</u>. All provisions of this Employment Agreement shall be applicable only to the extent that they do not violate any applicable law, and are intended to be limited to the extent necessary so that they will not render this Employment Agreement invalid, illegal or unenforceable under any applicable law. If any provision of this Employment Agreement or any application thereof shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of other provisions of this Employment Agreement or of any other application of such provision shall in no way be affected thereby.

12.5 <u>Waiver of Rights</u>. No waiver by Surge Transportation or Employee of a right or remedy hereunder shall be deemed to be a waiver of any other right or remedy or of any subsequent right or remedy of the same kind.

12.6 <u>Definitions; Headings; and Number</u>. A term defined in any part of this Employment Agreement shall have the defined meaning wherever such term is used herein. The headings contained in this Employment Agreement are for reference purposes only and shall not affect in any manner the meaning or interpretation of this Employment Agreement. Where appropriate to the context of this Employment Agreement, use of the singular shall be deemed also to refer to the plural, and use of the plural to the singular.

**CONFIDENTIAL DEC. 30, 2019**

12.7   Counterparts. This Employment Agreement may be executed in separate counterparts, each of which shall be deemed an original but both of which taken together shall constitute but one and the same instrument.

12.8   Governing Laws and Forum. This Employment Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Florida and the Parties agree to the exclusive jurisdiction of the State and Federal Courts located in Jacksonville, Florida, Clay and/or Duval Counties

IN WITNESS WHEREOF, Surge Transportation and Employee have executed and delivered this Agreement as of the date written below.

_____   12/31/19

John Mooney               Date

Surge Transportation

By:   _Omar Singh_   12/31/19

Omar Singh              Date

President

**CONFIDENTIAL DEC. 30, 2019**

**Schedule A – Schedule of Excluded Customers**

# EXHIBIT C



---------- Forwarded message ----------
From: **Matthew May** <maymatthew311@gmail.com>
Date: Thu, Jul 26, 2018 at 3:36 PM
Subject: Re: Welcome to the Surge Transportation Team!
To: Surge HR <hr@surgetransportation.com>

Hi Tadina,

Sorry on the slight delay. Please see attached. Let me know if you need anything else. Thanks

Matt

On Wed, Jul 25, 2018 at 1:54 PM, Surge HR <hr@surgetransportation.com> wrote:

Hi Matt

We are so excited that you will be joining the Surge Team! Attached is our new hire paperwork and your contract. Please send the completed paperwork back to me at this email address at your earliest convenience.

In the meantime, could you please send me the last six digits of your social security number. I will use it to set up your company usernames and passwords.

Please let me know if you have any questions. We are looking forward to working with you.

Thanks!

Tadina

-----
Tadina Ross
Surge Transportation, Inc.
Cell: 202-329-4670
Office: 571-222-4100
Fax: 904-212-2172



**TRANSPORTATION**

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Employment Agreement") is entered into as of the \_\_\_\_ day of July, 2018, by and between Surge Transportation, Inc., a Virginia Corporation, ("Surge Transportation" or "Company"), and Matthew May ("Employee").

In consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Surge Transportation and Employee hereby agree as follows:

1.     <u>Employment</u>.  Surge Transportation will employ the Employee as an at-will employee, meaning that Employee or Company can terminate employment relationship at any time or for any reasons.

2.     <u>Title</u>:  Employee shall have the title  VP of Sales & Business Development  Employee will report to Omar Singh, Surge Transportation's President.  The terms and conditions of the Employee's employment shall, to the extent not addressed or described in this Employment Agreement, be governed by Surge Transportation's personnel manual, policies, procedures and practices.

3.     <u>Compensation and Benefits</u>.

    3.1.     <u>Base Salary</u>.  Employee shall be paid as a W-2 Exempt employee an annual salary of $140,000.00 (One-Hundred-Forty Thousand and 00/100 Cents) ("Base Salary"), subject to applicable federal, state, and local withholding, and other payroll deductions required by law or authorized by the Employee.  Employee's Base Salary shall be paid to Employee in the same manner and on the same payroll schedule in which all Surge Transportation's employees receive payment.  As an Exempt employee, Employee shall not be eligible for overtime pay.

    3.3.     <u>Commission / Bonus Structure</u>.  As long as Employee remains employed by Company and is providing services and fulfilling the terms/conditions of his employment, he will be entitled to commissions/bonus payments pursuant to the following structure:

    3.3.A.   Ten Percent (10%) of Net Profit of each load during Year One of Service for New Customers originated by Employee.  7.5% of Net Profit of each load during Year Two of Service for such New Customers originated by Employee.  And, 5% of Net Profit of each load during Year Three of Service for such New Customers originated by Employee.  After Year Three, no commissions will be paid.  Year One commences on the date the first shipment is moved for each New Customer (and such date becomes the anniversary date for Year Two and Year Three periods).

    3.3.B.   Company shall be required to track New Customer financial information and provide reports to Employee on quarterly basis.  Commission payments shall be due to

employee within thirty (30) days after the end of each quarter.  Quarters shall be measured on calendar basis (1st:  JFM; 2nd:  AMJ; 3rd:  JAS; and 4th:  OND).

3.3.C.   During Employee's first six (6) months of employment, Employee will also be entitled to $2,000.00 (Two-Thousand and 00/100 Cents) bonus payment for each Fortune 1000 New Customer Employee generates who moves at least ten (10) shipments with Surge Transportation during such time period.  Such bonus payments, as applicable, shall be paid on monthly basis.

3.3.D.   Commission and bonus payments shall be made on W-2 basis and will be subject to applicable federal, state, and local withholding, and other payroll deductions required by law or authorized by the Employee.

3.3.E.   New Customer is defined as any account that neither Surge nor Omar Singh has conducted business with within the prior twenty-four (24) months.

3.3.F.   Net Profit is defined as the number of sales dollars remaining after paying hired motor carrier expenses.

3.3.G.   If any receivables become uncollectable bad debt, any Commissions advanced/paid to Employee shall be reversed and monies otherwise owed to Employee (including salary payments), may be offset.

3.3.H.   By mutual written agreement, Employee and Surge Transportation can modify Employee's base salary and/or commissions/bonus payments.

3.4    Employee Benefits.

3.4.A.   Employee shall be eligible to participate in all employee benefit plans, policies, programs, or perquisites in which other Surge Transportation executives, officers or employees participate, including but not limited to, medical insurance, retirement plans, insurance plans and leave benefits. The terms and conditions of Employee's participation in the Surge Transportation employee benefit plans, policies or programs shall be governed by the terms of each such plan, policy, or program. Any and all benefits offered by Surge Transportation can be modified, including being eliminated, at any time at the sole discretion of Surge Transportation (subject to applicable law).

3.4.B.   Surge Transportation will pay one-hundred (100) percent of the employee/family medical, vision, dental and life insurance costs.

3.5    Paid Time Off.  For Employee's first year of full employment, Employee shall be entitled to ten (10) days of paid time off annually.  Such PTO shall accrue at .833 days per month.  As applicable, for employment years 2 through 5, Employee shall receive an additional two (2) days of PTO each year (with monthly accrued for all PTO days pursuant to standard payroll practices) (accordingly, assuming Employee remains employed, he will have following PTO: Year 2 - 12 days; Year 3 - 14 days; Year 4 – 16 days; and Year 5 and beyond – 18 days.  Upon request, Employee may receive an

"advance" of PTO if he does not have sufficient accrued. Upon termination of employment, any negative PTO shall be deducted from Employee's final pay.

4.    <u>Duties and Performance</u>.  The Employee acknowledges and agrees that he is being offered a position of employment by Surge Transportation with the understanding that the Employee possesses a unique set of skills, abilities, and experiences which will benefit Surge Transportation, and he agrees that his continued employment with Surge Transportation, whether during the term of this Employment Agreement or thereafter, is contingent upon his good faith performance of his duties as Sales Executive.

   4.1    <u>General Duties</u>.

       a.    Employee shall faithfully and industriously render to the best of Employee's skill, care, diligence and attention all responsibilities and duties connected with his employment and shall undertake diligently all duties assigned to him.

       b.    Employee shall devote his full time, ability, attention and skill to the business of Surge Transportation on a regular and professional basis.

       c.    Employee shall not undertake, either as an owner, director, shareholder, employee or otherwise, the performance of services for compensation (actual or expected) for any other entity without the express written consent of Surge Transportation.  For the sake of clarity, Employee shall not ship any cargo through any property broker, shipping broker, freight forwarder, or transportation services company – any such shipping shall be through Surge Transportation.

       d.    Employee shall have no authority to enter into any contracts binding upon Surge Transportation, or to deliberately create any obligations on the part of the Surge Transportation, except as may be specifically authorized by Omar Singh.

5.    Omitted

6.    <u>Anti-Piracy Covenant</u>.  During Employee's employment and for two (2) years after the termination, for any reason, of that employment, Employee shall not directly or indirectly induce or influence, or attempt to induce or influence, any employee or contractor of Surge Transportation to terminate his or her employment or contractual relationship with Surge Transportation.

7.   Non-Disclosure Agreement

a. Surge Transportation has developed trade secrets and other confidential information regarding Surge Transportation's business methods, practices, customers, pricing, advertising, vendor/contractor relationships, and other non-public proprietary information ("Confidential Information") which may be communicated to, or acquired by, Employee in the course of his/her employment. In order to avoid substantial and irreparable damage to Surge Transportation, it is essential for Surge Transportation to protect and preserve its Confidential Information for its own, and only its own, use.

b. All of Surge Transportation's Confidential Information furnished to Employee by Surge Transportation, or developed by Employee on behalf of Surge Transportation or at Surge Transportation's direction, or otherwise available to Employee by virtue of Employee's employment, are and shall remain the sole property of Surge Transportation. Employee shall maintain the confidentiality of such Confidential Information and shall use them only for the benefit of Surge Transportation and in the course of providing services by Employee to Surge Transportation and its customers.

c. Employee shall not, during or after the term of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Confidential Information, including, but not limited to:  (1) techniques and methods of operation; (2) any sales prospects, customer lists (including customer names, email addresses, phone numbers, or addresses), products, research or data of any kind; or (3) any information relating to strategic plans, sales costs, profits or the financial condition of Surge Transportation or any of its customers or prospective customers, which is not generally known to the public or recognized as standard practice in the industries in which Surge Transportation shall be engaged.

d. If Surge Transportation requests the return of any materials describing or discussing such Confidential Information at any time during or after the termination of Employee's employment, Employee shall immediately deliver them to Surge Transportation and retain no hard or electronic copies.

e. During the course of Employee's employment, Employee may be exposed to or have access to Confidential Information of Surge Transportation's clients and/or customers.  Except as necessary to perform services for Surge Transportation's client and/or customer, Employee shall not use such information or disclose it by publication or otherwise to any other person during the term of Surge Transportation's relationship with such client and/or customer and for a period of two (2) years thereafter.

f. Any and all procedures, techniques, or inventions ("Creations") which Employee may make, conceive, discover, or develop, either solely or jointly with any other person(s) during the term of his/her employment, whether during working hours or not, and whether at the request or suggestion of Surge Transportation or not, which relate to or are useful in any business carried on or contemplated by the Surge Transportation including expansions of its present fields of operation, shall, to the fullest extent permitted by law, be the sole and exclusive property of Surge Transportation.

g.   Employee shall disclose to Surge Transportation all Creations, and aid and assist Surge Transportation so that Surge Transportation can prepare and present applications for, secure, review and extend copyright or patent letters for the Creation(s), and can obtain the record title so that Surge Transportation shall be the sole and absolute owner thereof in all countries in which it may desire to have copyright or patent protection.  Employee shall not be entitled to any additional compensation for any such Creation(s).  All such Creations that are the sole result of freelance work with prior written approval by the President or that are non-compensated activity unrelated, directly or indirectly to the Employee's performance under this agreement, shall remain the property of the Employee.  To the extent necessary to effect the intention of this Sub-Paragraph and the immediately-preceding Sub-Paragraph, the Creations shall be deemed "works for hire."

8.   <u>Non-Competition Agreement</u>

a.   By virtue of employment by Surge Transportation, Employee will acquire or has acquired an intimate knowledge and expertise of considerable value to Surge Transportation.

b.   Surge Transportation has substantial rights and interests in each Business Account serviced, handled, contacted, or obtained by it, including, but not limited to, those Business Accounts procured and/or serviced in any manner by Employee while in the employment of Surge Transportation.  Employee acknowledges and represents that Employee does not have, and will not develop, any right or interest in such Business Accounts of Surge Transportation.

c.   Absent prior written consent of Surge Transportation, for a period of two (2) years from the date of Employee's termination of employment, for any reason, Employee agrees not to become employed by, solicit business from or with, service, or work for another in the service of, any Business Account of Surge Transportation, with respect to providing Competitive Services.  Competitive Services shall mean trucking/freight brokerage services.

d.   The term "Business Account" shall mean (i) business or client serviced by Surge Transportation during the two (2) years immediately preceding the date of termination of the Employee, or (ii) any individual, business or potential customer which contacted, was referred to, or in any manner was solicited by any agent or employee of Surge Transportation during the six -month period immediately preceding the date of termination of the Employee, regardless of whether the business, account, or client was obtained by Surge Transportation prior to the date of termination of the Employee.

e.   If any period of time or other restriction specified in this Agreement should be found unreasonable or otherwise unenforceable in any proceeding, then the period of time or other restriction shall be reduced so that such restrictions may be enforced to the greatest extent possible as is reasonable and enforceable.

f.   If Employee violates any of the restrictions contained in this Article 8, the restrictive period shall not begin to run until such time as the violation shall be cured by Employee to the satisfaction of Surge Transportation, or as otherwise ordered by a Court of competent jurisdiction.

9.   Non-Disparagement.  Employee shall not make any false, disparaging, derogatory, critical, insulting, offensive, deprecating or belittling comments, in public or in private, about the Company, its parent, subsidiaries or affiliated entities or about the business affairs or financial condition of the Company, its parent, subsidiaries, or affiliated entities, or about any employee, director or officer of the Company, its parent, subsidiaries or affiliated entities. Except as required by law or court order, Employee shall not directly or indirectly provide any assistance to any person or entity, including any governmental body, asserting or intending to assert any litigation, investigation or proceeding against the Company or any of its affiliated entities.

10.   Injury and Injunctive Relief.  The parties agree that in the event of violation by Employee of the restrictions contained in Article 8 of this Agreement, the amount of actual damages suffered by Surge Transportation will be difficult to ascertain.  The parties therefore irrevocably agree that the violation, or threatened violation, of those restrictions shall cause Surge Transportation irreparable injury for purposes of obtaining injunctive relief.  In addition, the parties' best estimate of monetary damages caused is that each violation of the anti-piracy provisions of Article 6, the non-disclosure provisions of Article 7 or the Non-Disparagement provisions of Article 9 will cause Surge Transportation damages of $15,000. The parties agree that these are fair and reasonable estimates of Surge Transportation's actual damages, and agree to the imposition of such amounts as liquidated damages in lieu of actual damages, and not as a penalty.

11.   Prior Agreements.  Employee represents and warrants to Surge Transportation: (i) that there are no restrictions, agreements or understandings whatsoever to which Employee is a party which would prevent or make unlawful his/her execution of this Agreement or his/her employment with Surge Transportation; (ii) that his/her execution of this Agreement and his/her employment by Surge Transportation will not constitute a breach of any contract, agreement or understanding, oral or written, to which he/she is a party or by which he/she is bound; and (iii) that he/she is free and able to execute this Agreement and to enter into employment with Surge Transportation.  Employee agrees to indemnify and hold harmless Surge Transportation from any costs, expenses, damages, or injury, including court costs and attorney's fees, resulting from any violation of this Article 11.

12.   Expenses/Reimbursement

   12.1   Surge Transportation shall pay or reimburse Employee for office and reasonable travel related expenses upon submission vouchers or receipts maintained and provided to Surge Transportation in compliance with such rules and policies relating thereto as Surge Transportation may from time to time adopt.

13.   Omitted

14.   General Provisions

   14.1   Notices.  All notices and other communications required or permitted by this Employment Agreement to be delivered by Surge Transportation or Employee to the other party shall be delivered in writing to the address shown below, either personally, or by certified or express mail, return receipt requested, postage prepaid,

to the address for such party specified below or to such other address as the party may from time to time advise the other party, and shall be deemed given and received as of actual personal delivery, or upon the date of actual receipt shown on any return receipt if registered, certified or express mail is used, as the case may be.

Company:         Surge Transportation
                 20651 Holyoke Drive
                 Ashburn, VA 20147

With a copy to:  Merritt Green
                 General Counsel, P.C.
                 6849 Old Dominion Drive, Suite 220
                 McLean, VA 22101

Employee:        Matthew May
                 55 SW 9th Street, Unit 1404
                 Miami, FL 33130

14.2    Amendments and Termination; Entire Agreement.  This Employment Agreement may not be amended or terminated except by a writing executed by all of the parties hereto. This Employment Agreement constitutes the entire agreement of Surge Transportation and Employee relating to the subject matter hereof and supersedes all prior oral and written understandings and agreements relating to such subject matter.

14.3    Successors and Assigns.  The Employee may not assign his rights and obligations under this Employment Agreement to another person without the prior written consent of the Executive Committee.

14.4    Severability; Provisions Subject to Applicable Law.  All provisions of this Employment Agreement shall be applicable only to the extent that they do not violate any applicable law, and are intended to be limited to the extent necessary so that they will not render this Employment Agreement invalid, illegal or unenforceable under any applicable law. If any provision of this Employment Agreement or any application thereof shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of other provisions of this Employment Agreement or of any other application of such provision shall in no way be affected thereby.

14.5    Waiver of Rights.  No waiver by Surge Transportation or Employee of a right or remedy hereunder shall be deemed to be a waiver of any other right or remedy or of any subsequent right or remedy of the same kind.

14.6    Definitions; Headings; and Number.  A term defined in any part of this Employment Agreement shall have the defined meaning wherever such term is used herein. The headings contained in this Employment Agreement are for reference purposes only and shall not affect in any manner the meaning or interpretation of this Employment Agreement. Where appropriate to the context of this Employment Agreement, use of the singular shall be deemed also to refer to the plural, and use of the plural to the singular.

14.7   <u>Counterparts</u>.  This Employment Agreement may be executed in separate counterparts, each of which shall be deemed an original but both of which taken together shall constitute but one and the same instrument.

14.8   <u>Governing Laws and Forum</u>.  This Employment Agreement shall be governed by, construed, and enforced in accordance with the laws of the Commonwealth of Virginia and the Parties agree to the exclusive jurisdiction of the State Courts located in Fairfax, Virginia or, as applicable, the Federal Courts located in Alexandria, Virginia.

**IN WITNESS WHEREOF, Surge Transportation and Employee have executed and delivered this Agreement as of the date written below.**

Surge Transportation

By: _____

| Matthew May | Date | Omar Singh | Date |
|---|---|---|---|
| | | President | |



## FIRST AMENDMENT TO EMPLOYMENT AGREEMENT

This First Amendment to Employment Agreement ("First Amendment") is an amendment to the Employment Agreement between Surge Transportation (Company) and Matthew May (Employee) dated July 2018.  In recognition of the valuable contributions Employee has made to Company, the Employment Agreement is amended as provided herein.  All terms not specifically amended herein remain unchanged within the Employment Agreement.

1. <u>Base Salary</u>.  Section 3.1 is amended as follows:  Base salary will be increased to $200,000.00 (Two-Hundred Thousand and 00/100 Cents).
2. <u>Commission / Bonus Structure</u>.  Section 3.3.A. is amended as follows:
    a. For the period Q3 of 2021, commission will be paid at a rate of 5% of Net Profit for all accounts originated by Employee.
    b. For the period Q4 of 2021 and beyond, commission  will be paid at a rate of 3% of Net Profit for all accounts originated by Employee and will not contain a sunset provision which reduces then eliminates in Years Two, Three, and beyond.
3. <u>House Accounts</u>.  This is a new provision.  House Accounts will be defined as customers whose relationship with Company is largely the result of Company's various TMS relationships (including companies such as BluJay/E2 Open, Blue Yonder, Mercury Gate, Bixebix, Oracle, SAP) and Company's ability to provide API and RPA Real-Time Pricing capability.  Originating these accounts does not require the extensive sales effort customarily associated with customer origination.  These accounts require little involvement from the Employee once they are activated and their volume of business is driven primarily through automated API and RPA technology.  Efforts on these accounts shall be considered to be responsibilities associated with Employee's Base Salary and will not be considered "originated" by Employee.  No commissions will be paid on House Accounts.  House Accounts shall be designated at the discretion of Surge's President, Omar Singh.
4. <u>Liquidity Event of Surge</u>.  This is a new provision.  In the event of a Sale of the Company (as defined herein) which occurs during Employee's continuous employment by the Company (or an affiliate thereof), Employee shall be eligible to receive from the Company Two-Percent (2%) of the Net Sales Proceeds (as defined herein). A "Sale the Company" shall mean the earliest to occur of (i) a "change in ownership of the company" as defined in Treasury Regulation Section 1.409A-3(i)(5)(v) or (ii) "a change in the ownership of a substantial portion of the company's assets" as defined in Treasury Regulation Section 1.409A-3(i)(5)(vii) (but substituting 50% for 40%). Notwithstanding

the foregoing, a "Sale of the Company" shall <u>not</u> include: (i) a financing or original issuance of securities the primary purpose of which is to raise additional capital for the Company; (ii) a transaction in which stock or assets of the Company are transferred to a related party including, without limitation, to an already existing owner, employee, affiliated company, or owner or employee of an affiliated company; (iii) a pledge of stock of the Company that creates a mere security interest; (iv) a transfer of stock to the lineal descendants or spouse of an owner of the Company, or to trusts for the benefit of such persons; or (v) a gift of stock of the Company. "Net Sales Proceeds" shall mean the consideration received by the Company (or its owners, as applicable) upon a Sale of the Company reduced by (i) any and all transaction costs including, but not limited to, commissions, attorneys' fees, banker fees, closing costs, taxes, and similar costs and expenses; (ii) payments to all of the creditors of the Company (whether secured or unsecured); and/or (iii) any monies received by employees and/or owners of the Company under any employment and/or restrictive covenant agreements.

Employee shall be disqualified for the Sale Bonus if Employee's employment is terminated for cause, as defined herein, or if Employee is in material breach of this Agreement (as determined by reasonable business judgment of the Company). Cause is defined as: (1) fraud, embezzlement, or theft; (2) willful misconduct damaging to the Company, its reputation, products, services or customers; (3) intentional violation of any law, regulation or the terms of this Agreement; (4) any unauthorized disclosure of any trade secret or confidential information; (5) malfeasance; (6) breach of duty of loyalty to the Company; or (7) charged with felony or a misdemeanor involving moral turpitude.

Payments under this Section 4 will be made in cash or in-kind in the same proportions as is received by the Company (or its owners, as applicable) and will be paid to Employee as soon as practicable following the Sale of the Company but no later than the date which is one and one-half (1½) months after the close of the taxable year in which such Sale of the Company occurs. Notwithstanding the foregoing, if the Company (or its owners) receive a promissory note or other consideration that is subject to deferral conditions including, without limitation, escrows, earn-out requirements, vesting schedules or, in the case of securities, lock-up or similar underwriting restrictions, the same deferred payment terms or deferral conditions imposed on the Company (or its owners) will be imposed on payment to Employee to the extent permitted by Treasury Regulation Section 1.409A-3(i)(5). Any amounts paid under this Section 4 shall be subject to deductions as required by law and/or authorized by the Employee.

IN WITNESS WHEREOF, Surge Transportation and Employee have executed and delivered this Agreement as of the date written below.

Surge Transportation

_____   _10-19-2021_        By:   _Omar Singh_        10.25.2021
Matthew May                        Date                             Omar Singh                    Date
                                                                              President

# EXHIBIT D



---------- Forwarded message ----------
From: **Matthew May** <mmay@directconnectlogistix.com>
Date: Tue, Sep 12, 2023 at 12:34 PM
Subject: Re: **External Email** FW: Direct Connect Logistix USPS Freight Auction Documents
To: Brown, Jamesetta - Memphis, TN - Contractor <Jamesetta.Brown@usps.gov>
Cc: Greg Humrichouser <greg@directconnectlogistix.com>, John Mooney
<john.mooney@surgetransportation.com>


Hi Jamesetta,

Thank you for the follow up. We'll have everything back to you shortly.

Matt

Sent from my iPhone

**Matthew May** | Senior Vice President - Strategic Solutions
**O** (317) 218-7777 x1164

M (305) 915-8937

130 S Meridian St. 3rd Floor, Indianapolis, IN46225 | DCLogistix.com

This e-mail may contain confidential or privileged information. If you are not the intended recipient, please delete it and notify the sender of the error.

On Sep 12, 2023, at 12:29 PM, Brown, Jamesetta - Memphis, TN - Contractor
<Jamesetta.Brown@usps.gov> wrote:

Hi Mathew,

Please return the attached forms as well as a copy of the Certificate of Insurance.

Also complete the supplier EDI survey at the link below:

USPS Network Supplier Survey

Best regards,

Jamesetta Brown

USPS Transportation Strategy, Contractor

Processing Network Transportation, Memphis TN